CARLA A. McCAULEY (State Bar No. 223910)
    carlamccauley@dwt.com
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Tel.:  (213) 633-6800  Fax:  (213) 633-6899

ROBERT D. BALIN (*pro hac vice* pending)
    robbalin@dwt.com
LACY H. KOONCE, III (*pro hac vice* pending)
    lancekoonce@dwt.com
SAMUEL BAYARD (*pro hac vice* pending)
    samuelbayard@dwt.com
GEORGE WUKOSON (*pro hac vice* pending)
    georgewukoson@dwt.com
DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York  10019
Tel.:  (212) 489-8230  Fax:  (212) 489-8340
ATTORNEYS FOR PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHINA CENTRAL TELEVISION, a China company; CHINA INTERNATIONAL COMMUNICATIONS CO., LTD., a China company; TVB HOLDINGS (USA), INC., a California corporation; and DISH NETWORK L.L.C., a Colorado limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>CREATE NEW TECHNOLOGY (HK) LIMITED, a Hong Kong company; HUA YANG INTERNATIONAL TECHNOLOGY LIMITED, a Hong Kong company; SHENZHEN GREATVISION NETWORK TECHNOLOGY CO. LTD., a China company; CLUB TVPAD, INC., a California corporation; BENNETT WONG, and individual; ASHA MEDIA GROUP INC. d/b/a TVpad.com, a Florida corporation; AMIT BHALLA, an individual; NEWTVPAD LTD. COMPANY b/b/a NEWTVPAD.COM a/k/a NEWTVPAD USA, a Texas corporation; LIANGZHONG ZHOU, an individual; HONGHUI CHEN d/b/a E-DIGITAL, an individual; JOHN DOE 1 d/b/a BETV; JOHN DOE 2 d/b/a YUE HAI; JOHN DOE 3 d/b/a 516; JOHN DOE 4 d/b/a HITV; JOHN DOE 5 d/b/a GANG YUE; JOHN DOE 6 d/b/a SPORT ONLINE; JOHN DOE 7 d/b/a GANG TAI WU XIA; and JOHN DOES 8-10,<br><br>Defendants. | Case No.<br>CV 15-1869 MMM (AJWx)<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Compendium of Evidence Volumes 1 through 7 and {Proposed} Order filed concurrently]<br><br>**Date:          June 8, 2015**<br>**Time:         10:00 a.m.**<br>**Crtrm.:       780**<br><br>Action Filed March 13, 2015 |

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST., SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on June 8, 2015 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 780 of the Honorable Margaret M. Morrow, located at 255 East Temple Street Los Angeles, California, Plaintiffs China Central Television, China International Communications Co., Ltd., TVB Holdings (USA), Inc., and DISH Network L.L.C. (collectively "Plaintiffs") will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 65 for an order preliminarily enjoining and restraining Defendants Create New Technology (HK) Limited, Club TVPad, Inc., and Asha Media Group Inc. (collectively, "Defendants") from engaging in contributory and/or vicarious copyright infringement in violation of 17 U.S.C. § 106.

As set forth in the accompanying declarations and memorandum of points and authorities, Defendants are liable for secondary copyright infringement, including by inducing and materially contributing to direct infringement by others and/or profiting from direct infringement while declining to exercise their rights to stop or limit such infringement. Defendants' conduct threatens both Plaintiffs and the public with irreparable injury. The injuries to both Plaintiffs and the public are not quantifiable through monetary damages, and, if allowed continued free rein, will cause ongoing injury to Plaintiffs and the public in ways that can never be recompensed through law or equity. As such, injunctive relief is necessary to preserve the status quo pending determination of the final merits of this action through trial.

Plaintiffs therefore respectfully request that this Court grant a preliminary injunction that enjoins Defendants and their officers, employees, agents, parents, subsidiaries, affiliates, and those in active concert or participation with them, from: (a) transmitting, retransmitting, streaming, or otherwise publicly performing, directly or indirectly, by means of any device or process, Plaintiffs' copyrighted programming; (b) authorizing, hosting, reproducing, downloading or otherwise distributing infringing software applications and associated services that are designed

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

for use on the television set-top devices sold under the name "TVpad"; (c)

advertising, displaying, marketing or otherwise promoting said infringing TVpad

software applications and associated services; (d) distributing, advertising, marketing

or promoting any set-top device that contains, connects to, or offers for download

said infringing TVpad software applications and associated services, or promotes

said infringing TVpad software applications and associated services through the

inclusion of icons for same; and (e) otherwise infringing Plaintiffs' rights in their

copyrighted programming, whether directly, contributorily, vicariously or in any

other manner. Plaintiffs also request that this Court order Defendants to identify all

domain names and IP addresses and the physical locations of all servers owned,

leased, or operated by Defendants that are used in connection with the activities

described in (a) and (b) above. Plaintiffs further request that this Court preliminarily

enjoin third parties who provide web, server, and file hosting services that are used

by Defendants in connection with the activities described in (a) and (b) above, and

who receive actual notice of the Court's preliminary injunction order, from providing

such hosting services to Defendants.

This Motion is based upon this Notice, the Memorandum of Points and

Authorities, the Declarations of Christopher Weil, Nicholas Braak, Shuk Kuen "Lily"

Lau, Samuel P. Tsang, Chunguang Lu, Christopher Kuelling, and George Wukoson,

and Exhibits 1 through 104, the [Proposed] Order Granting Preliminary Injunction,

///

///

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

1  and any additional evidence and arguments as may be presented at or before any

2  hearing on this matter.

3  DATED: March 16, 2015                DAVIS WRIGHT TREMAINE LLP
                                        CARLA A. McCAULEY
4                                       ROBERT D. BALIN (*pro hac vice* pending)
                                        LACY H. KOONCE, III (*pro hac vice* pending)
5                                       SAMUEL BAYARD (*pro hac vice* pending)
                                        GEORGE WUKOSON (*pro hac vice* pending)
6

7                                       By:_____/s Carla A. McCauley
8                                                      Carla A. McCauley

9                                       Attorneys for Plaintiffs
10                                      CHINA CENTRAL TELEVISION; CHINA
                                        INTERNATIONAL COMMUNICATIONS CO.,
                                        LTD.; TVB HOLDINGS (USA), INC.; AND
11                                      DISH NETWORK L.L.C.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ......................................... 1

I.   PRELIMINARY STATEMENT ..................................................... 1

II.  FACTUAL BACKGROUND........................................................ 3

    A.   Plaintiffs and Their Copyrighted Works ................................ 3

    B.   CNT's TVpad Device and the Infringing TVpad Apps ...................... 4

    C.   Infringement of Plaintiffs' Copyrighted Programs ..................... 4

    D.   CNT Actively Promotes Infringing Activity............................. 5

    E.   CNT Provides Customer Service and Technical Support that Foster Infringing Activity......................................... 6

    F.   CNT Collaborates With Purported Third-Party App Developers ........ 7

    G.   The U.S. Distributor Defendants Actively Promote Infringement ...... 8

    H.   Defendants Refuse to Cease-and-Desist.............................. 10

III. ARGUMENT.................................................................. 10

    A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SECONDARY COPYRIGHT INFRINGEMENT CLAIMS AGAINST CNT ................................................. 10

        1.   Third Parties Directly Infringe Plaintiffs' Copyrights............. 11

        2.   CNT Induces Third-Party Infringement.............................. 14

        3.   CNT Materially Contributes to Third-Party Infringement of Plaintiffs' Copyrights........................ 18

        4.   CNT Vicariously Infringes Plaintiffs' Copyrights.................. 19

    B.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CONTRIBUTORY INFRINGEMENT CLAIMS AGAINST THE U.S. DISTRIBUTOR DEFENDANTS ...................................... 20

    C.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION................................................. 21

    D.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR AN INJUNCTION.............................................. 24

IV.  CONCLUSION................................................................ 25

V.   APPENDIX ................................................................. 26

i

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*A&M Records, Inc. v. Napster,*
239 F.3d 1004 (9th Cir. 2000) ........................................................................*passim*

*ABC, Inc. v. Aereo, Inc.,*
134 S. Ct. 2498 (2014) ................................................................................ 12, 13

*Columbia Pictures Indus., Inc. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ........................................................ 14, 16, 17, 21

*Columbia Pictures Indus., Inc. v. Fung,*
No. CV 06-5578, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009), *aff'd*
*in relevant part*, 710 F.3d 1020 (9th Cir. 2013) ...........................................*passim*

*DISH Network L.L.C. v. TV Net Solutions, LLC,*
12-cv-1629, 2014 U.S. Dist. LEXIS 165120 (M.D. Fla. Nov. 25,
2014) ........................................................................................................... 12

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
76 F.3d 259 (9th Cir. 1996) ...................................................................... 19, 20

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC,*
915 F. Supp. 2d 1138 (C.D. Cal. 2012) ....................................................*passim*

*Fox Television Stations, Inc. v. Filmon X LLC,*
966 F. Supp. 2d 30 (D.D.C. 2013) .................................................................. 22

*Gershwin Publ'g v. Columbia Artists Mgmt.,*
443 F.2d 1159 (2d Cir. 1971) ......................................................................... 19

*i4i Ltd. P'ship v. Microsoft Corp.,*
598 F.3d 831 (Fed. Cir. 2010) ........................................................................ 22

*Los Angeles News Serv. v. Conus Commc'ns Co. P'ship,*
969 F. Supp. 579 (C.D. Cal. 1997) .................................................................. 13

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
454 F. Supp. 2d 966 (C.D. Cal. 2006) ....................................................... 15, 17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ........................................................................*passim*

*Munhwa Broadcasting Corp. v. Song,*
    2:14-cv-04213 (C.D. Cal. Aug. 25, 2014) ........................................... 13

*Perfect 10, Inc. v. Google Inc.,*
    508 F.3d 1146 (9th Cir. 2007) ................................................. 11, 18, 19

*Perfect 10 v. Visa Int'l Serv. Ass'n,*
    494 F.3d 788 (9th Cir. 2007) ............................................................. 11

*Robert Bosch LLC v. Pylon Mfg. Corp.,*
    659 F.3d 1142 (Fed. Cir. 2011) ......................................................... 22

*Triad Sys. Corp. v. Southeastern Express Co.,*
    64 F.3d 1330 (9th Cir. 1995) ............................................................ 25

*Twentieth Century Fox Film Corp. v. iCraveTV,*
    No. CIV.A. 00-120, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000).................... 13, 22

*Warner Bros. Entm't v. WTV Sys., Inc.,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ........................................*passim*

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................ 10

**Statutes**

17 U.S.C.A. § 106(4) ............................................................................ 12

17 U.S.C.
    § 101 .......................................................................................... 12
    § 106 .................................................................................... 11, 12
    § 410(c) ...................................................................................... 11
    § 501(b) ...................................................................................... 11
    § 512 (c)(2) ................................................................................ 17

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

This lawsuit involves a pirate television service that perpetrates and facilitates copyright infringement on a massive scale. Among the victims of this piracy are Plaintiffs, who hold exclusive rights to transmit and distribute in the United States Chinese-language television programming of Plaintiff China Central Television ("CCTV"), the largest television broadcaster in mainland China, and of Television Broadcasts Limited ("TVB"), the largest television broadcaster in Hong Kong.

Defendant Create New Technology (HK) Ltd. ("CNT") and its co-conspirators have set up a parallel pirate broadcasting network that, without permission, streams entire CCTV and TVB television channels over the Internet to U.S. users of the "TVpad" set-top box, 24 hours a day, seven days a week. CNT and its affiliates accomplish this piracy in part through a peer-to-peer network—like Napster, Grokster, and BitTorrent—through which TVpad users not only receive unauthorized foreign programming in the U.S., but retransmit it to large numbers of other TVpad users. Infringing software applications or "apps" that enable users to access this peer-to-peer network and view pirated programming are offered for free through CNT's "TVpad Store," which is a primary feature of its TVpad device.

CNT publicly claims that the TVpad is just a neutral device like a personal computer, and unauthorized third parties are giving it a bad name. Hogwash. Nothing gets on a TVpad device from that TVpad Store without CNT controlling it and knowing about it. The apps providing access to infringing television programming are in the TVpad Store because CNT wants them there. CNT hosts them on its TVpad Store servers and downloads them over the Internet when users request them. Like Napster and Grokster before it, the raison d'etre of the TVpad is to engage in unlawful activity—namely, unauthorized public performances in the United States of television programming from Asia. While Plaintiffs are confident that discovery will

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

demonstrate that CNT plays a central role in creating the infringing apps (and is thus a direct infringer), such evidence is not necessary to resolve this motion.

Even without discovery, it is apparent that CNT is liable for secondary copyright infringement because CNT intentionally induces, materially contributes to, and profits from (while failing to control) copyright infringement by others. CNT brazenly authorizes, promotes, encourages, and assists in the infringement of Plaintiffs' copyrighted programs by TVpad users and by the purported third parties who (in CNT's version of the facts) operate the infringing apps that stream CCTV and TVB programs. CNT provides the infringing apps for free to all TVpad purchasers; aggressively advertises the infringing apps and their capacity to deliver free CCTV and TVB programming; provides technical and customer support to help its users access (and by definition, illegally retransmit) CCTV and TVB programs; exercises control over servers that facilitate unauthorized streaming of Plaintiffs' programs; and directly profits from the infringement made possible by the TVpad.

CNT's U.S. distributors—including defendants Asha Media Group Inc. ("Asha Media") and Club TVpad, Inc. ("Club TVpad") (collectively, the "U.S. Distributor Defendants")—likewise advertise and aggressively promote the infringing apps and the infringing capabilities of the TVpad. They also assist customers in using the infringing apps to access CCTV and TVB programming, and even pre-install infringing apps and tell customers which apps stream CCTV and TVB channels.

Given the compelling evidentiary record, a preliminary injunction is warranted. Plaintiffs are likely to succeed on their contributory and vicarious copyright infringement claims against these defendants.[1] Plaintiffs suffer irreparable injury from the unauthorized and uncompensated streaming of their programming by entities of dubious legitimacy that have gone to great lengths to cover their tracks. The balance of equities and public interest likewise favor an injunction, given

---

[1] Plaintiffs have named other defendants in the Complaint, but proceed only against CNT, Asha Media, and Club TVpad (collectively, "Defendants") on this motion.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Defendants' blatant and willful wrongdoing and the enormous scope of infringement. Plaintiffs request that this Court preliminarily enjoin Defendants' unlawful conduct.

## II.  FACTUAL BACKGROUND

### A.  Plaintiffs and Their Copyrighted Works

CCTV and TVB are television broadcasters in mainland China and Hong Kong, respectively. Through affiliates, CCTV and TVB license copyrighted television programming for retransmission in the U.S. via authorized satellite, cable, and other television service providers (the "Authorized U.S. Providers"). Tsang Decl. ¶¶ 3-4, 11; Lu Decl. ¶¶ 3-5, 9. Plaintiff China International Communications Co., Ltd. ("CICC"), a CCTV affiliate, licenses Authorized U.S. Providers to broadcast CCTV's "Great Wall" package of channels to paying U.S. subscribers. Although CICC licenses certain rights, CCTV retains and owns the exclusive right to transmit CCTV programming in the U.S. over the Internet. Lu Decl. ¶¶ 5, 10-11. Plaintiff TVB Holdings (USA), Inc. ("TVB (USA)"), a wholly owned indirect subsidiary of TVB, distributes and licenses TVB programming in the U.S. Although it licenses certain rights, TVB (USA) retains and owns the exclusive right to transmit TVB programming in the U.S. via Internet Protocol Television (IPTV)[2] and via Over-the-Top (OTT)[3] in video-on-demand format. Tsang Decl. ¶¶ 3-4, 9, 11. Plaintiff DISH Network L.L.C. ("DISH") delivers television services to subscribers through both satellite and Internet platforms. Through licensing agreements, DISH owns the exclusive rights to transmit in the United States certain CCTV and TVB programming via satellite and certain TVB programming via OTT, except in video-on-demand format. Kuelling Decl. ¶¶ 5-6, 9; Lu Decl. ¶¶12-13; Tsang Decl. ¶ 12.

---

[2]  For purposes of this motion, "IPTV" refers to electronic delivery of video programming via Internet protocol over a service provider's own infrastructure (e.g., AT&T's U-verse).

[3]  For purposes of this motion, "Over-the-Top" or "OTT" refers to the delivery of video programming using an Internet connection that is not owned, managed, or operated by the party delivering the programming (e.g., Netflix).

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

### B.   CNT's TVpad Device and the Infringing TVpad Apps

Defendant CNT is a Hong Kong company that manufactures the TVpad device. Weil Decl. ¶ 9. CNT offers TVpads for sale to U.S. consumers (including in this District) through its website, www.itvpad.com, and through distributors in the United States. *Id.* ¶¶ 10-13, 64-71. CNT sells its latest model, the TVpad4, at retail for $299. *Id.* ¶ 13, Ex. 4. The TVpad is a set-top box that delivers streaming television programming from Asia to U.S. customers over the Internet without customers paying subscription fees to an authorized provider. *Id.* ¶ 16. TVpad users in the U.S. access pirated CCTV and TVB television programming through apps (the "Infringing TVpad Apps") they download for free from the "TVpad Store," a primary feature of each TVpad device. Weil Decl. ¶ 26; Braak Decl. ¶¶ 8, 14-16.

Plaintiffs' investigators have identified 15 Infringing TVpad Apps available through the TVpad Store. Braak Decl. ¶ 16. These Infringing TVpad Apps provide CCTV and TVB programming in four modes: "live" streaming, "time-shifted" streaming, and two forms of video-on-demand streaming. Braak Decl. ¶¶ 17, 52; Tsang Decl. ¶ 22. Before accessing the TVpad Store, users must accept CNT's mandatory terms of service, which reserve to CNT the right to "filter, modify, refuse or delete any or all software applications in the TVpad Store," and to "suspend, remove, or disable access to any Products, content, or other materials accessible through the TVpad Store." Braak Decl. ¶¶ 29-30, Ex. 47 (¶¶ 3.8 and 3.10). CNT solicits new apps for the TVpad Store, announces the release of new apps, sells different "editions" of its TVpad4 device with unique app collections, and touts that it "has strictly controlled and managed the way to upload apps on TVpad Store[.]" Weil Decl. ¶ 18, 25, 36,  Exs. 7, 9-12, 18; Wukoson Decl. ¶ 2, Ex. 104, p.4.

### C.   Infringement of Plaintiffs' Copyrighted Programs

Plaintiffs' investigator performed forensic analysis of the TVpad device and determined that Infringing TVpad Apps in "live" mode stream CCTV and TVB programming through a peer-to-peer network, in which each TVpad user streams

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

video content to large numbers of other users worldwide. Braak Decl. ¶¶ 10(a), 53-56, Ex. 45. That is, each TVpad user not only receives live CCTV and TVB broadcasts, but also simultaneously <u>retransmits</u> those broadcasts to many other TVpad users in the U.S. and abroad. CNT's website publicly touts the benefits of TVpad's peer-to-peer streaming. Weil Decl. ¶ 19, Ex. 9, p.1. Plaintiffs' investigator has also determined that Infringing TVpad Apps in "video-on-demand" modes stream CCTV and TVB programs to TVpad users directly from servers in the U.S., including servers in Los Angeles. Braak Decl. ¶¶ 10(b), (d), 60-62, Ex. 45. Data packets received from these servers indicate that recorded video files reside on the servers. *Id.* ¶ 62, Ex. 45. That is, individuals or entities who pirate CCTV and TVB programs from Asia illegally make copies of those programs and stream those copies from servers located in the U.S.[4]

In late 2014, Plaintiffs' investigator observed and recorded 30 CCTV episodes and 23 TVB episodes streamed through Infringing TVpad Apps on the TVpad device. *Id.* ¶ 74-75. Also, a TVB (USA) executive observed and recorded portions of an additional 406 TVB episodes streamed through Infringing TVpad Apps in video-on-demand mode. Tsang Decl. ¶ 27. All of these episodes (the "Registered Programs") are registered with the U.S. Copyright Office. Braak Decl. ¶ 75; Tsang Decl. ¶ 25, Ex. 92; Lu Decl. ¶25, Ex. 94. Plaintiffs have not granted CNT or any other party a license to stream or retransmit the Registered Programs or any other CCTV or TVB programs in the U.S. through the Infringing TVpad Apps. Tsang Decl. ¶ 23; Lu Decl. ¶ 23; Kuelling Decl. ¶ 14.

### D.   CNT Actively Promotes Infringing Activity

CNT aggressively promotes its pirate television service, the Infringing TVpad Apps, and the availability of CCTV and TVB programming on the TVpad device, in

---

[4] Forensic analysis has demonstrated that Infringing TVpad Apps in time-shift mode stream CCTV and TVB programming through both the peer-to-peer network and directly from servers in China. Braak Decl. ¶¶ 10(c), 63.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

some cases even falsely stating that such content is authorized. Weil Decl. ¶¶ 28-50, Exs. 13-29. Indeed, CNT even places in the user interface of the TVpad device prominent banner advertisements for Infringing TVpad Apps that stream CCTV and TVB programs. CNT also uses suggestive categories like "Live TV," "VOD," and "TV Dramas" in its TVpad Store to facilitate access to the Infringing TVpad Apps. Braak Decl. ¶¶ 31-36, 38-41, Exs. 46, 48.

CNT's website boasts that the TVpad delivers "massive contents from China, Taiwan and HK." Weil Decl. ¶ 29, Ex. 8. CNT's blog actively promotes Infringing TVpad Apps, for instance stating on January 8, 2014 that the infringing Gang Yue Wang Luo Dian Shi app provides live channels in high definition, "definitely the favorite of those who love to watch TVB," illustrating this point with a screenshot of a TVB program. *Id.* ¶ 36, Ex. 18. CNT solicits new distributors by claiming "[e]xclusive & authorized live content from mainland China/HK/Taiwan" alongside CCTV and TVB logos. *Id.* ¶ 33, Ex. 15.

Likewise, CNT's Facebook page regularly promotes the availability of CCTV and TVB television programs through the Infringing TVpad Apps. *Id.* ¶¶ 39-42, Exs. 20-21. One post by the TVpad administrator on the Facebook page encourages users to watch a CCTV documentary and places CNT's TVpad logo directly next to programming information for CCTV channels. *Id.* ¶ 40, Ex. 20, at 3-6. Other examples abound, including a promotional video on CNT's Facebook page that features icons of Infringing TVpad Apps and a CCTV broadcast. *Id.* ¶ 42, Ex. 21. *See also id.* ¶ 50, Ex. 29, pp. 1-19, 20-38, 39-53, 61-71 (promoting Infringing TVpad Apps on fan forum).

**E.      CNT Provides Customer Service and Technical Support that Foster Infringing Activity**

CNT also provides customer support and technical assistance to help TVpad users access and share infringing streams of CCTV and TVB programming. For example, a CNT blog post instructs users how to install the infringing BETV app

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

from the TVpad Store, providing step-by-step screenshots. *Id.* ¶ 37, Ex. 19. Administrators on CNT's Facebook page also instruct users to download and use Infringing TVpad Apps to access CCTV and TVB programming. *Id.* ¶¶ 43-45, Exs. 22-24. For instance, on June 12, 2014, when a user asked "Anyone knows which app or channel on tvpad is showing the World Cup???", a CNT administrator advised the user to try BETV and Sport Online, two Infringing TVpad Apps that stream CCTV channels. *Id.* ¶ 44, Ex. 23. Similarly, when a user asked "[w]hich tvpad is can see [sic] tvb day and night and 12 hour back and tvb drama," an administrator wrote "Could download three party applications from TVpad store for this case[.]" *Id.* ¶ 45, Ex. 24. Administrators provide similar assistance to users on CNT's official fan forum at tvpadfans.com. *Id.* ¶ 50, Ex. 29, pp. 81-87.

Administrators on CNT's Facebook page and fan forum also provide technical assistance and updates to customers regarding server problems impacting their ability to stream infringing television content, demonstrating that CNT exercises control over servers that facilitate the unauthorized streaming of Plaintiffs' programming. *See id.* ¶¶ 57, 59, Exs. 34, 36; Braak Decl. ¶ 59, Ex. 51. As recently as January 9, 2015, CNT fielded a barrage of user complaints about problems downloading the new Gang Yue Wang Luo Dian Shi app (an Infringing TVpad App), apologizing for the inconvenience, and asking those customers to send a private message to CNT so that CNT and the supposed "app provider" could address the problem. Weil Decl. ¶ 60, Ex. 37.

**F.     CNT Collaborates With Purported Third-Party App Developers**

Even assuming for purposes of this motion that third parties create the Infringing TVpad Apps, CNT's own statements show it actively collaborates with those parties to develop and improve infringing content. For example, on August 18, 2013, CNT published a post on its Facebook page asking for suggestions to help CNT "better serve [its] overseas customers and allow overseas TVpad users to enjoy better Chinese TV services." One user suggested adding a TVB football channel; the

administrator replied that the administrator would "communicate with third-party application developers" regarding the suggestion. When another user asked CNT to "improve all streaming sound bit rate and enable stereo," the administrator responded that "the application providers are working on this issue." *Id.* ¶ 54, Ex. 30; *see also id.* ¶ 55, Ex. 31 (CNT administrator stating that request for more Cantonese channels had been forwarded to the application provider). CNT also delivers messages in the other direction: in an October 2013 Facebook post, a CNT administrator notified TVpad users that maintenance carried out on the infringing 516 app might cause service disruptions. *Id.* ¶ 56, Ex. 32.

### G.    The U.S. Distributor Defendants Actively Promote Infringement

Defendants Club TVpad and Asha Media distribute the TVpad in the U.S.

***Club TVpad.*** Defendant Club TVpad is a corporation located in Hayward, California that operates an interactive website from which it offers TVpads for sale to consumers in California and this District. Lau Decl. ¶¶ 4-5, 9, Exs. 57-58, 62. On its website and Facebook page, Club TVpad aggressively markets the Infringing TVpad Apps, the infringing capabilities of the TVpad, and the availability of CCTV and TVB programming. *See id.* ¶¶ 10-11, Exs. 63-67. For example, a November 2012 post on Club TVpad's Facebook page stated: "Are you a Direct TV subscriber? Then you might be aware that they are removing TVB from their line up at the end of the month. . . .This is the best time to get a TVpad to replace Direct TV." *Id.* ¶ 10(d), Ex. 66. Club TVpad also operates a forum on which it regularly promotes Infringing TVpad Apps and assists customers in accessing infringing content. *See id.* ¶ 12-15, Exs. 68-71.

On October 26, 2014, Plaintiffs' investigator phoned Club TVpad and spoke with Bennett Wong[5] about purchasing a TVpad device. Mr. Wong stated that TVB's TVBS and Jade channels are available through the TVpad device and that the one-

---

[5] Corporate records identify Bennett Wong as Club TVpad's agent for service of process. Lau Decl. ¶ 4, Ex. 57.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

time purchase price of the TVpad is the only cost to access television programming. *Id.* ¶ 17. Plaintiffs' investigator purchased a TVpad device from Club TVpad's website. *Id.* ¶ 18. Club TVpad had pre-installed onto the device several Infringing TVpad Apps that stream CCTV and TVB programming. Braak Decl. ¶¶ 65-67.

    ***Asha Media.*** Asha Media operates an interactive website from which it offers TVpads for sale to consumers in California and this District. Lau Decl. ¶¶ 21, 23-24. Promotional blog posts on Asha Media's website advertise the availability of free CCTV and TVB programming through use of the Infringing TVpad Apps. *Id.* ¶ 28, Exs. 82-87. For example, a December 2014 blog post promoting the new TVpad4 model states: "Not wanting to pay for streaming television? TVpad4 still streams live news, sports, and television programming from stations like SoLive, <u>CCTV</u> and many, many more." *Id.* ¶ 28(a), Ex. 82 (emphasis added). In another example, a June 2014 blog post stated: "There are over 100 different Asian channels and apps to choose from, but lovers of television shows will certainly want to install the HITV app [an Infringing TVpad App that streams TVB programs]. Viewers can watch hundreds of live shows from Hong Kong, including all of their favorite dramas." *Id.* ¶ 28(d), Ex. 86.

    On May 30, 2014, Plaintiffs' investigator called Asha Media and spoke to an individual identifying himself as Amit.[6] Amit confirmed that CCTV channels were available on the TVpad device. *Id.* ¶ 30. In response to the investigator's inquiry about CCTV channels, another representative, acting at Amit's direction, sent the investigator a spreadsheet listing CCTV and TVB channels and the Infringing TVpad Apps that access those channels. *Id.* ¶ 32, Ex. 89. Plaintiffs' investigator purchased two TVpads from Asha Media's tvpad.com website. *Id.* ¶¶ 31, 35. Both devices came with USB flash drives containing several Infringing TVpad Apps. Braak Decl. ¶ 68-73.

---

[6] Corporate records identify Amit Bhalla as President of Asha Media. Lau Decl. ¶ 22, Ex. 74.

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

### H.    Defendants Refuse to Cease-and-Desist

Prior to filing this lawsuit, DISH sent cease-and-desist letters to CNT and the U.S. Distributor Defendants, demanding that each stop infringing and/or inducing infringement of Plaintiffs' copyrights. The letters identified the Infringing TVpad Apps on the TVpad3 and listed specific CCTV and TVB channels and programs streamed without authorization through the Infringing TVpad Apps. Kuelling Decl. ¶¶ 15-25, Exs. 95-103. Despite this notice, each Defendant continues to market, advertise, and promote the Infringing TVpad Apps and the availability of infringing television programming on the TVpad device. *Id.* ¶¶ 22, 25.

## III.   ARGUMENT

Plaintiffs seek to preliminarily enjoin Defendants' secondary infringement of Plaintiffs' copyrights. To obtain preliminary injunctive relief, a plaintiff must establish: "(1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that an injunction is in the public interest." *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1141 (C.D. Cal. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs satisfy each of these requirements.

### A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SECONDARY COPYRIGHT INFRINGEMENT CLAIMS AGAINST CNT

Although Plaintiffs believe the facts are otherwise and that discovery will so demonstrate, for purposes of this motion we assume that it is unknown third parties (the "App Infringers") rather than CNT who operate the Infringing TVpad Apps and are responsible for capturing and retransmitting Plaintiffs' copyrighted programming into and within the United States. Nonetheless, there is overwhelming evidence that CNT actively induces and materially contributes to rampant infringement of Plaintiffs' copyrighted works by third parties, and profits from infringing conduct it

**DAVIS WRIGHT TREMAINE** LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

has the right and ability to stop. Plaintiffs are thus likely to succeed on the merits of their contributory and vicarious copyright infringement claims against CNT.

To prevail on their contributory copyright infringement claim, Plaintiffs must prove that CNT (a) has knowledge of infringing activity; and (b) induces, causes, or materially contributes to direct infringement by others. *Perfect 10, Inc. v. Google Inc.*, 508 F.3d 1146, 1171 (9th Cir. 2007). In the Ninth Circuit, "inducement" and "material contribution" are distinct theories of contributory liability. *Perfect 10 v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). To succeed on a vicarious infringement claim, Plaintiffs must show CNT "profit[s] from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). For all theories of secondary liability, a plaintiff "must establish that there has been a direct infringement by third parties," *Google*, 508 F.3d at 1169, which requires a showing of: "(1) ownership of the infringed material, and (2) violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106 by the infringer." *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1013 (9th Cir. 2000).

## 1.      Third Parties Directly Infringe Plaintiffs' Copyrights

CCTV and TVB's subsidiary hold copyright registrations for the Registered Programs, giving rise to a presumption of ownership and validity. 17 U.S.C. § 410(c). As explained above, Plaintiffs CCTV, TVB (USA), and DISH own the exclusive rights to transmit the Registered Programs and other CCTV and TVB programming in the U.S. over the Internet in various formats, and therefore have standing to sue for infringement of those rights. 17 U.S.C. § 501(b). Plaintiffs' investigator and a TVB executive observed and recorded Plaintiffs' Registered Programs being streamed over the Internet into the U.S. through the Infringing TVpad Apps, and Plaintiffs have not granted anyone a license to do so. Braak Decl. ¶¶ 74-76; Tsang Decl. ¶¶ 23, 25-27; Lu Decl. ¶ 23, 25; Kuelling Decl. ¶ 14. The only question, then, is whether the unauthorized streaming of Plaintiffs' programs over the

11

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Internet infringes an "exclusive right granted to copyright holders under 17 U.S.C. § 106." *Napster*, 239 F.3d at 1013. It does.

The Copyright Act grants Plaintiffs the exclusive right to "perform the copyrighted work publicly." 17 U.S.C.A. § 106(4). A party publicly performs a copyrighted work when it "transmit[s] or otherwise communicate[s] a performance or display of the work … to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. In *ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014), the Supreme Court held that Aereo publicly performed the plaintiffs' television programs by streaming those programs over the Internet to "large numbers of paying subscribers who lack any prior relationship to the works." *Id.* at 2510. The Court reasoned that Aereo performed "publicly" because it streamed programs to "a large number of people who are unrelated and unknown to each other" who did not "receive performances in their capacities as owners or possessors of the underlying works." *Id.* at 2509-10.[7]

Here, two categories of direct infringers publicly perform Plaintiffs' television programming in the U.S. without authorization: (1) the App Infringers; and (2) TVpad users. Both the App Infringers and TVpad users transmit Plaintiffs' programs over the Internet to large numbers of unrelated TVpad users who have no prior relationship to, or right to access, CCTV and TVB programs.

First, certain Infringing TVpad Apps stream live and time-shifted CCTV and TVB channels through a peer-to-peer network. For that network to function, someone must capture CCTV and TVB broadcasts signals in Asia, convert them into digital data, and stream that data to TVpad users in the peer-to-peer network. Braak Decl. ¶¶

---

[7] *See also Warner Bros. Entm't v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1009-11 (C.D. Cal. 2011) (granting preliminary injunction against service that streamed motion pictures without authorization over the Internet to customers); *DISH Network L.L.C. v. TV Net Solutions, LLC*, 12-cv-1629, 2014 U.S. Dist. LEXIS 165120, at *13-14 (M.D. Fla. Nov. 25, 2014) (retransmission of Arabic television channels over the Internet into the United States infringed DISH's public-performance rights).

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

17, 56.[8] Other Infringing TVpad Apps directly stream CCTV and TVB programs from servers in the U.S. to large numbers of TVpad users who have no right to access that content. Braak Decl. ¶ 61-62, Ex. 45. Under *Aereo*, these acts by the App Infringers directly infringe Plaintiffs' public-performance rights in the Registered Programs and in their other copyrighted programs.

Second, as noted, U.S. TVpad users operate as peers in a peer-to-peer network through which each user retransmits live and time-shifted CCTV and TVB programs to large numbers of other TVpad users. Braak Decl. ¶¶ 53-55, 63. "[T]he concep[t] of public performance . . . cover[s] not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public." *Aereo*, 134 S. Ct. at 2506 (quoting H.R. Rep. No. 94-1976, at 63 (1976)). These retransmissions are "to the public" because TVpad users who receive them constitute "a large number of people who are unrelated and unknown to each other," and the TVpad users are not "owners or possessors of the underlying works." *Id.* at 2510. Thus, TVpad users directly infringe Plaintiffs' public-performance rights.

These facts distinguish the Court's decision in *Munhwa Broadcasting Corp. v. Song*, 2:14-cv-04213 (C.D. Cal. Aug. 25, 2014), where the Court was presented with no evidence of direct infringement by TVpad users. The Court was not informed that TVpad users retransmit copyrighted works to other users through a peer-to-peer network. Presented with no evidence that users publicly perform television programs to other unrelated users, the Court not surprisingly concluded that the plaintiffs there had shown only unlicensed "personal viewing" by users. The Court also did not consider the App Infringers' direct streaming of content to TVpad users. In this case,

---

[8] Although the unauthorized streams likely originate in Asia, the infringing acts take place in the U.S. where the streams are received, viewed, and retransmitted by U.S. TVpad users. *See Los Angeles News Serv. v. Conus Commc'ns Co. P'ship*, 969 F. Supp. 579, 582-84 (C.D. Cal. 1997); *Twentieth Century Fox Film Corp. v. iCraveTV*, No. CIV.A. 00-120, 2000 WL 255989, at *3 (W.D. Pa. Feb. 8, 2000).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST., SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

Plaintiffs have presented indisputable evidence that both the App Infringers and TVpad users engage in direct infringement.

### 2.     CNT Induces Third-Party Infringement

Contributory liability under an inducement theory is established where the defendant has undertaken purposeful acts aimed at assisting and encouraging others to infringe. *Grokster*, 545 U.S. at 936-37.[9] In *Grokster*, a group of record companies, movie studios, and music publishers sued defendants who distributed free software allowing users to share copyrighted content with others through peer-to-peer networks (which, as here, constituted direct infringement by users). *Id.* at 918. The Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 936-937. In the Ninth Circuit, inducement liability has four elements: (1) distribution of a device, product, or service; (2) acts of infringement; (3) an object of promoting use of the device, product, or service to infringe copyright; and (4) causation. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013). Each element is satisfied here.

### a.     CNT distributes both a device and a service.

In *Fung*, the Ninth Circuit held that the first element is satisfied by distribution of either a device or a service that is "used in accomplishing the infringement." 710 F.3d at 1033. Here, CNT distributes the TVpad device, which enables users to view and transmit infringing streams of Plaintiffs' programming, as well as the TVpad Store, a service through which users download the Infringing TVpad Apps.

---

[9] "[A] defendant may be liable for 'activity undertaken abroad that knowingly induces infringement within the United States.'" *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578, 2009 WL 6355911, at *8 (C.D. Cal. Dec. 21, 2009), *aff'd in relevant part*, 710 F.3d 1020 (9th Cir. 2013).

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**b.     Third parties directly infringe Plaintiffs' works.**

As explained in Part III.A.1, forensic analysis establishes that both the App Infringers and TVpad users directly infringe Plaintiffs' public-performance rights.

**c.     CNT distributes the TVpad device and TVpad Store with the object of promoting their use to infringe copyright.**

A defendant's intent to foster or promote infringement can be established by "clear expression" of such intent and "affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 936-37. In *Grokster*, the Supreme Court relied on several types of evidence to support its finding of inducement liability: First, defendants' advertising and promotional materials, because "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." *Id*. at 938. Both defendants had advertised and promoted themselves to potential customers as alternatives to Napster, a site known for illegal peer-to-peer file sharing. *Id*. at 937-938. Second, the Supreme Court relied on defendants' provision of customer support and technical assistance to customers engaged in infringing uses. *Id*. Third, the Court found that "neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software." *Id*. at 939. Finally, the Court noted that defendants relied on infringing activity for the success of their business models. *Id*. at 939-940. *See also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 987-988 (C.D. Cal. 2006) (on remand, also relying on defendant's interface having "Top 40" song category that "made it easier for users to share copyrighted content.").

In *Fung*, the plaintiff film studios sued the operator of websites that facilitated copyright infringement by users through the "BitTorrent" peer-to-peer protocol. *Id*. at 1023-1024, 1026-29. Fung's websites offered for download "torrent" files that did not themselves contain copyrighted content, but contained data used by a BitTorrent software client to help Fung's patrons download copyrighted content. *Id*. at 1027-28. Fung's websites collected and organized torrent files and permitted users to search

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

the collections. The websites also maintained lists such as "Box Office Movies" and "Top 20 TV Shows" where users could download or upload files for listed works. *Id.* at 1028, 1036. The Ninth Circuit affirmed summary judgment for plaintiffs on inducement liability, finding "most important" the fact that Fung encouraged users to "upload[] torrent files concerning copyrighted content" through the "Box Office Movies" list on his website. *Fung*, 710 F.3d at 1036. The court observed that Fung posted entries on his website's forum with links to torrent files for copyrighted films and urged users to download them. *Id.* He also "responded affirmatively to requests for help in locating and playing copyrighted materials." *Id.* Finally, the court noted that Fung "took no steps 'to develop filtering tools or other mechanisms to diminish the infringing activity'" and profited from "high-volume use [of his websites], which the record shows is infringing." *Id.* at 1036-1037 (quoting *Grokster*, 545 U.S. at 939).

Here, CNT engages in the same type of purposeful, culpable expression and conduct present in *Grokster* and *Fung*. First, the TVpad interface and TVpad Store provide Infringing TVpad Apps to users using banner ads and categories like "Live TV" and "TV Dramas" that make it easy for users to locate and download Infringing TVpad Apps. Braak Decl. ¶¶ 31-35, 38-40, 46-50. Second, CNT aggressively advertises and promotes the Infringing TVpad Apps and their capacity to deliver CCTV and TVB programming. Weil Decl. ¶¶ 28-42, Exs. 8, 13-21. Third, CNT provides customer support and technical assistance to users in locating, installing, and using Infringing TVpad Apps to access and share CCTV and TVB programming. Weil Decl. ¶¶ 37, 43-47, 50, 57-60, Exs. 19, 22-26, 29, 33-37; Braak Decl. ¶ 59, Ex. 51. Fourth, CNT actively collaborates with purported third-party App Infringers to develop and improve infringing content and conveys messages between TVpad customers and App Infringers. Weil Decl. ¶¶ 54-56, Exs. 30-32. Fifth, CNT has taken no meaningful steps to develop filtering tools or other mechanisms to stop the rampant infringement it induces. Indeed, despite its Internet-based streaming business model, CNT has not (a) posted a policy instructing users how to report

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

infringing activity, (b) appointed an agent to receive notifications of claimed infringement under the Digital Millennium Copyright Act, 17 U.S.C. § 512 (c)(2), or (c) adopted any notice-and-takedown procedures in the TVpad Store. *See* Braak Decl. ¶ 51. <u>Sixth</u>, CNT relies on copyright infringement for the success of its business model, which depends upon charging consumers an up-front, one-time fee for unlimited access to infringing programming for which those consumers would otherwise have to pay ongoing subscription fees. *See* Weil Decl. ¶¶ 4, 28, 35, 38, 62, Exs. 6, 13, 17, 38; Lau Decl. ¶¶ 26, 30, 34, Ex. 80; Tsang Decl. ¶ 14; Lu Decl. ¶ 15; Kuelling Decl. ¶¶ 7-8, 11.

This overwhelming evidence establishes CNT's unlawful intent to foster, promote, and profit from direct infringement of Plaintiffs' copyrighted works by both the App Infringers and TVpad users. The parallels to BitTorrent, Grokster, and other illegal networks are plain—CNT has built its entire business around helping customers get for free copyrighted works they would otherwise have to pay for.

### d.     The TVpad device and TVpad Store service cause infringement of Plaintiffs' copyrights.

In *Fung*, the Ninth Circuit held that, once intent to promote infringement is found, "the only causation requirement is that the product or service at issue was used to infringe the plaintiff's copyrights." *Fung*, 710 F.3d at 1037. The Ninth Circuit specifically rejected Fung's argument that "the acts of infringement must be caused by the manifestations of the distributor's improper object—that is, by the inducing messages themselves." *Fung*, 710 F.3d at 1037. *See also Grokster*, 454 F. Supp. 2d at 985-986 (rejecting argument that plaintiffs had to prove that the inducing statements "caused specific acts of infringement"). Here, there is overwhelming evidence the TVpad device and TVpad Store are being used to infringe Plaintiffs' copyrighted works, and that CNT is a but-for cause of that infringement because its hosting, distribution, and promotion of the Infringing TVpad Apps is the very mechanism which makes that infringement possible by a large number of users.

17

Braak Decl. ¶¶ 15-17, 52-63, 74-75; Tsang Decl. ¶¶ 21-27. Plaintiffs are therefore likely to succeed on their claim against CNT for contributory infringement based on inducement.

### 3. CNT Materially Contributes to Third-Party Infringement of Plaintiffs' Copyrights

As an alternative theory of contributory infringement, Plaintiffs are also likely to prevail in showing that CNT has knowledge of and materially contributes to direct infringements by the App Infringers and TVpad users. In the Ninth Circuit, "material contribution" can be established by proof that "a computer system operator has actual knowledge that specific infringing material is available using its system and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Google*, 508 F.3d at 1172.

Here, DISH sent CNT letters notifying CNT of specific Infringing TVpad Apps available through the TVpad Store, specific CCTV and TVB channels being infringed by those apps, and 145 CCTV and TVB programs streamed without authorization through the TVpad device. Kuelling Decl. ¶ 21. Those letters put CNT on notice of specific infringing material in the TVpad Store. *See Napster*, 239 F.3d at 1022 n.6 (defendant had actual notice of infringement because RIAA informed it of infringing files). Moreover, numerous posts and statements on CNT's website and Facebook page show that CNT is well aware that its device and service are being pervasively used by its customers to infringe CCTV and TVB channels and programs on a massive scale. Indeed, that is precisely what CNT encourages and enables.

CNT has failed to take any steps to protect Plaintiffs' copyrighted works. At a minimum, CNT could at any time (a) stop making the identified Infringing TVpad Apps available through the TVpad Store, and (b) take steps to block or filter such Apps from functioning on the device. CNT's terms of service expressly reserve the right to do so. Braak Decl. ¶ 30, Ex. 47. By failing to take these steps, CNT materially contributes to the App Infringers' infringing public performances. *See*

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

*Google*, 508 F.3d at 1172 ("assist[ing] a worldwide audience of users to access infringing materials" constitutes material contribution); *Gershwin Publ'g v. Columbia Artists Mgmt.*, 443 F.2d 1159, 1163 (2d Cir. 1971) (creating audience for infringing performance supports finding of contributory liability). CNT also materially contributes to infringement by TVpad users by providing software that causes them to act as infringing peers in TVpad's peer-to-peer network. *See Napster*, 239 F.3d at 1022 (peer-to-peer software provides "the site and facilities" for direct infringers and constitutes contributory infringement). Plaintiffs are thus likely to succeed on their claim that CNT materially contributes to third-party infringement.

### 4. CNT Vicariously Infringes Plaintiffs' Copyrights

Plaintiffs are also likely to succeed on their vicarious infringement claim, which requires a showing that CNT (1) has the right and ability to control the infringing conduct, and (2) derives a direct financial benefit from the infringing activity. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996).

A defendant "exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Google*, 508 F.3d at 1173. "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023. In *Fonovisa v. Cherry Auction*, for example, the Ninth Circuit held that a swap meet operator exercised control over vendors' sale of pirated goods because the operator had a contractual right to terminate vendors and could physically exclude vendors from the swap meet, putting an end to the infringing sales taking place there. 76 F.3d at 261-63.

As its terms of service attest, CNT has the power to exclude Infringing TVpad Apps from its TVpad Store and to block those Apps from operating on the TVpad device. Braak Decl. ¶ 30, Ex. 47. CNT's public statements also show it has practical, operational control over what apps are included in the Store and over the servers necessary for effective streaming of video content. Weil Decl. ¶ 18, 25, 36, 57-59

Exs. 7, 9-12, 18, 33-36; Wukoson Decl. ¶ 2, Ex. 104; Braak Decl. ¶¶ 24-26. Even assuming there are actual third-party app providers, CNT clearly has the right and ability to control infringing conduct occurring through its device and service.

"Financial benefit exists where the availability of infringing material "acts as a 'draw' for customers." *Napster*, 239 F.3d at 1023. In *Fonavisa*, the swap meet operator reaped "substantial financial benefits from admission fees, concession stand sales and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices." *Fonavisa*, 76 F.3d at 263. In *Napster*, Napster's revenue was dependent on "increases in [its] user-base" stimulated by "the quality and quantity of available [infringing] music." *Napster*, 239 F.3d at 1023. Here, ample evidence demonstrates that the Infringing TVpad Apps— and the free programming streamed through them—constitute a huge draw for potential customers of the TVpad. *See* Weil Decl. ¶¶ 61-63, Exs. 9, 38. CNT's own advertising and promotional materials confirm this conclusion. Weil Decl. ¶¶ 28-47, 50. Plaintiffs are therefore likely to succeed on their claim against CNT for vicarious infringement.

**B.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CONTRIBUTORY INFRINGEMENT CLAIMS AGAINST THE U.S. DISTRIBUTOR DEFENDANTS**

Plaintiffs are also likely to succeed on their claims for contributory infringement against the U.S. Distributor Defendants on an inducement theory. The first, second, and fourth elements of inducement liability are satisfied for the reasons explained above: (1) each U.S. Distributor Defendant distributes the TVpad device, Lau Decl. ¶¶ 9, 23-24; (2) the App Infringers and TVpad users directly infringe Plaintiffs' copyrights (Part III.A.1, *supra*); and (4) the TVpad (along with the TVpad Store service) is the vehicle by which App Infringers and TVpad users directly infringe Plaintiffs' copyrighted works (Part III.A.2(d), *supra*). The only question is whether each U.S. Distributor Defendant distributes the TVpad device with "an

object of promoting use of the device . . . to infringe copyright." *Fung*, 710 F.3d at 1032. The answer is yes.

The evidence is overwhelming that both Asha Media and Club TVpad intend to foster and promote copyright infringement through the TVpad device. Both aggressively advertise and promote the Infringing TVpad Apps and the availability of CCTV and TVB programming through use of those Apps. Lau Decl. ¶¶ 10-12, 15, 26-28, Exs. 63-68, 71, 81-87. Both provide customer support and technical assistance to help TVpad users access infringing CCTV and TVB programming. Lau Decl. ¶¶ 13-14,16, 20 30, 32-34, Exs. 60-70, 72. In direct interactions with Plaintiffs' investigator, both touted the availability of CCTV or TVB content on the TVpad device. Lau Decl. ¶¶ 17, 30. Further, both took affirmative steps to help facilitate user infringement: Club TVpad shipped a TVpad device with Infringing TVpad Apps pre-installed, and Asha Media shipped two TVpad devices along with USB flash drives that contained several Infringing TVpad Apps. Braak Decl. ¶¶ 65-73. Asha Media and Club TVpad also both know that TVpad users not only receive but also illegally retransmit television programming to other TVpad users. Indeed, Asha Media states on its website that "[t]he pictures are high in quality and stable due to the upgraded P2P service [the TVpad] uses." Lau Decl. ¶ 27, Ex. 81. Similarly, administrators and moderators on Club TVpad's forum have advised customers on issues associated with peer-to-peer streaming. *Id*. ¶ 14, Ex. 70.

In sum, both "clear expression" and "affirmative steps" demonstrate the U.S. Distributor Defendants' intent to foster, promote, and encourage infringement of CCTV and TVB programming by TVpad users and the App Infringers.

## C.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ABSENT AN INJUNCTION

Unauthorized and uncompensated Internet streaming that competes directly with the television programming of a copyright owner and its authorized licensees causes significant and multifaceted harms that are "neither easily calculable, nor

21

easily compensable." *BarryDriller*, 915 F. Supp. 2d at 1147 (granting preliminary injunction).[10] Here, the accompanying declarations establish that, unless restrained, Defendants' infringing conduct—operation of a service providing Infringing TVpad Apps for download and otherwise reproducing and distributing those Infringing TVpad Apps whose sole purpose is to violate exclusive public performance rights—will continue to irreparably harm Plaintiffs.

First, Defendants' conduct has materially reduced the number of individuals who subscribe to authorized U.S. platforms for CCTV and TVB programming in the United States and the price those individuals are willing to pay, reducing Plaintiffs' revenues in amounts that are difficult to quantify. *See* Tsang Decl. ¶¶ 29-32; Lu Decl. ¶ 27-28; Kuelling Decl. ¶¶ 26-32. Lost market share and price erosion are textbook irreparable harms. *See, e.g.*, *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010); *WTV*, 824 F. Supp. 2d at 1013 ("[T]he loss of revenue to Plaintiffs and their licensees, which is already significant, will continue to increase, and constitutes irreparable injury to Plaintiffs.").

Second, Defendants' ongoing infringement impairs the ability of CCTV, CICC and TVB (USA) to negotiate favorable license agreements with Authorized U.S. Providers and others. Tsang Decl. ¶ 39; Lu Decl. ¶ 29. "[I]f Defendants can transmit Plaintiffs' content without paying a fee, Plaintiffs' existing or prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives." *BarryDriller*, 915 F. Supp. 2d at 1147; *WTV*, 824 F. Supp. 2d at 1012-1013. Stated otherwise, "[t]he availability of Plaintiffs' content from sources other

---

[10] *See also WTV*, 824 F. Supp. 2d at 1012-13 (granting preliminary injunction); *Fox Television Stations, Inc. v. Filmon X LLC*, 966 F. Supp. 2d 30, 49-51 (D.D.C. 2013) (granting preliminary injunction); *iCraveTV*, 2000 WL 255989, at *8 (granting preliminary injunction).

than Plaintiffs also damages Plaintiffs' goodwill with their licensees." *BarryDriller*, 915 F. Supp. 2d at 1147. *See* Tsang Decl. ¶ 40; Lu Decl. ¶ 30; Kuelling Decl. ¶ 33.

Third, Defendants' infringing conduct undermines Plaintiffs' strategic choices about where, when, and how to distribute their programs, causing harm to their goodwill with U.S. audiences and Authorized U.S. Providers. *See* Tsang Decl. ¶ 33-35, 37; Lu Decl. ¶¶ 31-33. Defendants' pirate retransmission service not only streams CCTV and TVB programming in the U.S. without a license, but does so several hours before that programming is available in the U.S. through authorized channels. *See* Tsang Decl. ¶ 35; Lu Decl. ¶ 33. Defendants' unlawful activities also deprive Plaintiffs of their right not to disseminate many of their programs in the U.S. *See* Tsang Decl. ¶ 36; Lu Decl. ¶ 34. Defendants' conduct usurps and irreparably harms Plaintiffs' exclusive right to control the distribution, performance, and licensing of their copyrighted works. *See  WTV*, 824 F. Supp. 2d at 1012-13 (unauthorized video streaming service irreparably harmed film studios by allowing streaming of works during periods when plaintiffs had granted licensees exclusive rights to offer the works).

Fourth, Defendants' conduct threatens to interfere with Plaintiffs' ability to develop a lawful market for Internet distribution of their programming. In *BarryDriller*, the court found irreparable harm when the defendants' streaming service "compete[d] with Plaintiffs' ability to develop their own internet distribution channels." 915 F. Supp. 2d at 1147. In *WTV*, the court found that an unauthorized streaming service "threatens to confuse consumers about video on demand products, and to create incorrect but lasting impressions with consumers about what constitutes lawful [Internet-based] video on demand exploitation of Plaintiff's Copyrighted Works, including confusion or doubt regarding whether payment is required for access to Copyrighted Works." 824 F. Supp. 2d 1013. The same harms exist here. Tsang Decl. ¶ 38; Lu Decl. ¶ 35; Kuelling Decl. ¶ 28.

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
DWT 25460407v15 0094038-000021

DAVIS WRIGHT TREMAINE LLP
865 S. FIGUEROA ST, SUITE 2400
LOS ANGELES, CALIFORNIA 90017-2566
(213) 633-6800
Fax: (213) 633-6899

**Fifth**, Defendants' infringing conduct impairs Plaintiffs' brand, reputation, and goodwill with consumers by associating their programming with poor quality viewing experiences on the TVpad device. *See WTV*, 824 F. Supp. 2d at 1014. Here, Plaintiffs' investigators observed numerous problems with the TVpad viewing experience, such as video failing to stream or terminating prematurely, low video quality, pixilation, and sound issues. Braak Decl. ¶ 59. *See also id*. Ex. 51 (posts by TVpad users detailing a wide variety of technical difficulties); Weil Decl. ¶¶ 57-60, Ex. 33-37 (posts on CNT's Facebook page and fan forum apologizing to customers for technical difficulties).

**Finally**, "[a]bsent an injunction directing Defendants to prevent infringement of Plaintiffs' works, it is highly likely that Defendants' existing users and new users [will] continue to use Defendants' system to infringe Plaintiffs' copyrights." *Columbia Pictures Indus., Inc. v. Fung*, 2:06-cv-05578-SVW (JCx), Modified Order Granting Plaintiff's Motion for Permanent Injunction, slip op. at 7 (C.D. Cal. Aug. 5, 2013) (Dkt. 551) (attached hereto as Exhibit A). Courts also find irreparable harm where a defendant is unlikely to be able to pay a damages award because of the massive scale of infringement. *Grokster*, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) (irreparable harm where defendant "induce[d] far more infringement than it could ever possibly redress with damages"). Given the massive infringement for which Defendants are secondarily liable here, and the nature of Defendants' business activities, it is unlikely that Defendants will be able to satisfy a damages award.

## D.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR AN INJUNCTION

Both the balance of hardships and the public interest also favor a preliminary injunction. While Plaintiffs face immediate and irreparable harm to their legitimate business interests, Defendants "'cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities.'" *BarryDriller*, 915

F. Supp. 2d at 1147 (quoting *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)); *WTV*, 824 F. Supp. 2d at 1014-1015.

Furthermore, "it is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies and resources which are invested in the protected work." *WTV*, 824 F. Supp. 2d at 1015 (citation omitted); *BarryDriller*, 915 F. Supp. 2d at 1148. Any public interest the public may have "in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works." *Grokster*, 518 F. Supp. 2d at 1222.

## IV.   CONCLUSION

For the reasons set forth above and in the accompanying declarations and exhibits, Plaintiffs respectfully request that this Court grant a preliminary injunction as set forth in the accompanying [Proposed] Order Granting Preliminary Injunction.

DATED:  March 16, 2015          DAVIS WRIGHT TREMAINE LLP
                                CARLA A. MCCAULEY
                                ROBERT D. BALIN (*pro hac vice* pending)
                                LACY H. KOONCE, III (*pro hac vice* pending)
                                SAMUEL BAYARD (*pro hac vice* pending)
                                GEORGE WUKOSON (*pro hac vice* pending)


                                By:_____/s Carla A. McCauley
                                        Carla A. McCauley
                                Attorneys for Plaintiffs

                                CHINA CENTRAL TELEVISION; CHINA
                                INTERNATIONAL COMMUNICATIONS CO.,
                                LTD.; TVB HOLDINGS (USA), INC.; AND
                                DISH NETWORK L.L.C.

# APPENDIX

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11   COLUMBIA PICTURES                    Case No. 2:06-cv-05578-SVW (JCx)
     INDUSTRIES, INC., *et al.*
12
                                          **MODIFIED ORDER GRANTING**
13
                                          **PLAINTIFFS' MOTION FOR**
           Plaintiffs,
14                                        **PERMANENT INJUNCTION**

15         v.

16   GARY FUNG, *et al.*

17

18         Defendants.

19

20   ///

21   ///

22   ///

23

24

25

26

27

28
                                              **MODIFIED ORDER GRANTING**
                                                      **PLAINTIFFS'**
                                          **MOTION FOR PERMANENT INJUNCTION**

## I.    BACKGROUND

On December 21, 2009, the Court granted Plaintiffs' Motion for Summary Judgment on Liability (the "Order," docket no. 391), finding that Defendants Gary Fung and Isohunt Web Technologies, Inc. (collectively, "Defendants") induced infringement of Plaintiffs' copyrights in violation of United States copyright law. See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 545 U.S. 913, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005).  The Court found that "evidence of Defendants' intent to induce infringement is overwhelming and beyond reasonable dispute," Order at 25, and therefore that "Defendants' inducement liability is overwhelmingly clear," id. at 15.

On the issue of a permanent injunction, the Court has considered the briefs filed by the parties, the arguments presented at the March 22, 2010 hearing on this matter, and the proposed language and arguments presented by the parties in response to the Court's proposed order.  The Court has also considered the instructions of the Ninth Circuit regarding the permanent injunction in its opinion dated March 21, 2013.  Columbia Pictures Indus. v. Fung, 710 F.3d 1020, 1047-1049 (9th Cir. 2013).  Based on the foregoing and all matters of record in this action, pursuant to Federal Rule of Civil Procedure 65 and 17 U.S.C. § 502, the Court enters a Permanent Injunction in favor of Plaintiffs and against Defendants in accordance with the terms contained herein.

## II.    DISCUSSION

The Court concludes that a permanent injunction should issue to restrain further infringement of Plaintiffs' copyrights.  Plaintiffs have satisfied their burden under eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s]

MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION

and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. at 391.

### A. Irreparable Harm

Plaintiffs have demonstrated that they have suffered irreparable harm, and would suffer further irreparable harm from Defendants' continued infringement, in three independent ways. First, given the staggering volume of infringement of Plaintiffs' copyrights, it is extremely unlikely that Defendants will be able fully to compensate Plaintiffs monetarily for the infringements Defendants have induced in the past, or the infringements they could induce in the future. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007) ("Grokster V"). Second, given the way in which Defendants' system works, when Defendants' end-users download one of Plaintiffs' works, the end-users automatically and simultaneously further distribute the work to innumerable others as a required part of the download process; additionally, at the conclusion of the download, Defendants' end-users obtain an unprotected digital copy of Plaintiffs' work that those end-users can further distribute indefinitely at will.[1] Thus, when Defendants induce infringement, "Plaintiffs' copyrighted works can be unstoppably and near-instantaneously infringed throughout the computer-literate world with the

---

[1] Defendants argue that the Supreme Court's holding in Grokster was limited solely to "devices" that induce infringement. Defendants further argue that they are immune from an injunction against their "activities." (Opp. at 6-7, 19.) Defendants' argument lacks merit. Nothing in Grokster requires that there be a "device"; the central inquiry is based on the defendants' "purposeful, culpable expression and conduct." Grokster, 545 U.S. at 937. The Supreme Court's holding in Grokster was not limited solely to "devices." The Supreme Court used terms such as "device," "product," and "tool" interchangeably. Id. at 940 n.13.

In addition, the clear import of the Supreme Court's opinion was that a defendant may be secondarily liable for his conduct and activities, separate and apart from any products, devices, or tools he distributes.

**MODIFIED ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

files obtained by [Defendants'] end-users. Plaintiffs' power to control their rights has been so compromised by the means through which [Defendants] encouraged endusers to infringe (digital files plus the internet) that the inducement amounts to irreparable harm." Id. at 1218-19. Third, it is axiomatic that the availability of free infringing copies of Plaintiffs' works through Defendants' websites irreparably undermines the growing legitimate market for consumers to purchase access to the same works. E.g., Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 928-29, 125 S. Ct. 2764, 162 L. Ed. 2d 781 (2005) ("digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works"); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1017 (9th Cir. 2001) (citing "Napster's deleterious effect on the present and future digital download market").

## B. Inadequate Remedy at Law

For many of the same reasons,[2] Plaintiffs have demonstrated that they do not have an adequate remedy at law for the harm that has been or could be caused by Defendants' infringement. "'Damages are no remedy at all if they cannot be collected.'" Grokster V, 518 F. Supp. 2d at 1219 (quoting Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 716 (1990)). Likewise, "[a] legal remedy is inadequate if it would require a multiplicity of suits." Id. at 1220 (quoting Laycock, 103 Harv. L. Rev. at 714) (alteration in original).

Here, as in Grokster V, "[t]he irreparable harm analysis centers on two basic themes: (1) [Defendant] has and will continue to induce far more infringement than

---

[2] The "irreparable harm" and "inadequate remedies at law" inquiries are essentially identical. Grokster V, 518 F. Supp. 2d at 1219

**MODIFIED ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

it could ever possibly redress with damages; and (2) Plaintiffs' copyrights (especially those of popular works) have and will be rendered particularly vulnerable to continuing infringement on an enormous scale due to [Defendant's] inducement." Grokster V, 518 F. Supp. 2d at 1217. Both of these elements are present in this case as well.

In the Summary Judgment Order, the Court concluded that the evidence "strongly suggests that some 2.5 million United States citizens visited Defendants' websites each month" and that "at one point, Defendants' websites were accessed over 50 million times from the United States in a single month." Order at 41. The Court also concluded that Plaintiffs' statistical evidence showed that over 90% of the downloads using Defendants' websites were associated with copyright-infringing materials. Accord A& M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001) (relying on statistical evidence to show extent of infringement); Grokster V, 518 F. Supp. 2d at 1217-19 (same). Defendants have introduced no evidence to rebut these showings.

In addition, given the multiplicity of infringements of Plaintiffs' works caused by a single user downloading a single dot-torrent file from Defendants' sites, see Order at 6-7, it would be untenable for Plaintiffs to track and proceed against each infringing end-user. Additionally, Plaintiffs would not be able to recover damages from Defendants for the inevitable derivative infringements that would occur outside Defendants' websites when copyrighted content acquired as a result of Defendants' inducement is further distributed by Defendants' users. These further infringements are a continuing threat, making remedies at law insufficient to compensate for Plaintiffs' injuries. The only realistic method for remedying such future harm from Defendants' inducement is by way of a permanent injunction. Grokster V, 518 F. Supp. 2d at 1220.

**MODIFIED ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

## C.     Balance of Hardships

The balance of hardships between Defendants and Plaintiffs also warrants the issuance of a permanent injunction.  As described, absent an injunction, Plaintiffs would suffer a severe hardship as a result of Defendants' inducement of infringement.  The injunction being ordered by the Court would not pose a corresponding hardship on Defendants.  The Court has already found that Defendants' websites are used overwhelmingly for copyright infringement, with upwards of 95% of all dot-torrent files downloaded from Defendants' websites corresponding to works that are infringing or at least highly likely to be infringing. Summary Judgment Order at 10-11.  Obviously, the harm to Defendants from no longer being able to exploit and profit from that infringement is not a hardship the Court need consider.  See Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 829 (9th Cir. 1997) (defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities") (citation and internal quotation marks omitted).  Beyond that, the Court's injunction is limited to Plaintiffs' copyrights and will not substantially interfere with any claimed non-infringing aspects of Defendants' system.

The Court is further persuaded that Defendants would likely continue to induce infringement in the absence of a permanent injunction.  As this Court observed in Grokster:

> [A] successful inducer will sometimes have no need to repeat the infringing message ad infinitum.  This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate.  At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn.  Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even

**MODIFIED ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

though he/she no longer chooses to actively promote that message.

Grokster V, 518 F. Supp. 2d at 1233-34.

The Court finds those observations fully applicable to this case. For years, Defendants operated their websites as popular destinations for copyright infringement and etched their niche in the market for infringement. Defendants were enormously successful in building a user-base of infringers that, by Defendants' own account, number in the millions. See Order at 42. As stated, the evidence of Defendants' illegal objective was "overwhelming" and the resulting amount of infringement of Plaintiffs' copyrights has been staggering. Defendants' websites "remain[] inexorably linked to [Defendants'] historical efforts to promote infringement." Grokster V, 518 F. Supp. 2d at 1235. Absent an injunction directing Defendants to prevent infringement of Plaintiffs' works, it is highly likely that Defendants' existing users and new users would continue to use Defendants' system to infringe Plaintiffs' copyrights.

Moreover, the Court's conclusion that Defendants are likely to continue to induce copyright infringement is warranted by (1) the great extent to which Defendants have actively encouraged copyright infringement in the past; (2) the fact that Defendants' very business model, at its core, depends upon copyright infringement, and Defendants would financially benefit from further infringement; and (3) the fact that, even since the Court's Order finding Defendants liable for inducing copyright infringement, Defendants have not taken meaningful steps to mitigate the infringement of Plaintiffs' works. Defendants' proposed "primal" or "lite" website contains all of the same indexing and searching functions as the original websites, only with a different interface for the users to operate. (See Servodidio Reply Decl., Ex. G, at 15-21.) In fact, Defendants have not even ceased all of the active conduct of encouraging and promoting infringement which the Court specifically identified in its Summary Judgment Order. A number of features

7

**MODIFIED ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

mentioned in this Court's Summary Judgment Order remain active: a "top 20" TV shows and movies feature; a "top searches" feature (which invariably includes all, or almost all, copyrighted works); and access to Plaintiffs' works that are specifically identified as the subject of this action. (Pls. Reply at 10.) Defendant Fung has affirmatively stated that he will not take steps to prevent infringement on his websites unless he is ordered to do so by this Court. (Fung interview, quoted in Defs. Opp. at 3.) In short, Defendants' past and present statements and conduct establish that Defendants "fully intend[] to continue [their] distribution of the" tools that are central to their inducement of copyright infringement. See Grokster V, 518 F. Supp. 2d at 1229-30.

As this Court explained at length in Grokster V, a defendant who is liable for inducing infringement may be enjoined from **distributing** his products in the future, **even if** he no longer promotes an inducing message. Although the quote is lengthy, it is worth setting forth in full:

> The Court is mindful of the following critical passage from the Supreme Court's opinion in this case:
>> It is not only that encouraging a particular consumer to infringe a copyright can give rise to secondary liability for the infringement that results. Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use.
>
> Grokster, 545 U.S. at 940 n. 13, 125 S.Ct. 2764.
>
> In effect, the "culpable act," which induces third parties to infringement, certainly manifests itself once two components are present-- distribution and promotion/ encouragement. See Amazon.com, 487 F.3d at 727 n. 11; Visa, 494 F.3d at 800-01. It is important to recognize that the Supreme Court did not impose any strict timing relationship between specific acts promoting infringements, distribution, and the direct infringements themselves. For a party to be liable for inducement, distribution may begin prior to any promotion of infringement, distribution and promotion can occur at the same time, and most critically, **distribution can follow past**

8

**promotion**. This highlighted portion of the above sentence is crucial. As a matter of common sense, a successful inducer will sometimes have no need to repeat the infringing message ad infinitum. This is especially likely to be the case where the product in question is overwhelmingly used for infringing purposes, and requires little or no specialized training to operate. At a certain point, the inducer can simply continue to distribute the product without any additional active encouragement, recognizing that the marketplace will respond in turn.

Thus, once the market has internalized the inducer's promotion of infringement, the resulting infringements should be attributable to that defendant even though he/she no longer chooses to actively promote that message. There is no difference between these infringements and those that are consummated while the defendant is still engaging in the active promotion of infringement.

Critically, Justice Souter recognized the importance of this relationship between past promotion and future distribution during the Supreme Court's oral argument in this case:

> But I don't ... understand how you can separate the past from the present in that fashion. One, I suppose, could say, "Well, I'm going to make inducing remarks Monday through Thursday, and I'm going to stop, Thursday night." The sales of the product on Friday are still going to be sales which are the result of the inducing remarks Monday through Wednesday. And you're asking, in effect--you're asking us--to ignore Monday through Thursday.

Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd., No. 04-480, Mar. 29, 2005 ("Oral Argument Transcript"), at 30. Thus, distribution of a product capable of substantial noninfringing uses, even after the promotion/ encouragement of infringement ceases, can by itself constitute inducement. StreamCast's future distribution is undoubtedly connected to past promotional efforts. In its September 27, 2006 Order, this Court recounted in detail, among other undisputed facts, StreamCast's efforts to promote its software to the Napster market as a mechanism for infringing Plaintiffs' copyrighted works. Grokster, 454 F.Supp.2d at 985-86. These promotional efforts proved to be wildly successful, especially because StreamCast marketed itself to Napster users at a particularly important juncture--while Napster was in imminent legal jeopardy. End-user infringement exponentially increased, evidencing that StreamCast's express and implied messages of promotion were received, absorbed, and responded to by the market. Or as more recently stated by the Ninth Circuit:

> The software systems in ... Grokster were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted music and reducing legitimate sales of such music to that extent. Most ... users understood this and primarily used those systems to purloin copyrighted music. Further, the ... operators explicitly

MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION

targeted then-current users of the Napster program by sending them ads for its OpenNap program.

<u>Visa Int'l Serv. Ass'n</u>, 494 F.3d at 801. StreamCast's revenues skyrocketed as a result. Furthermore, StreamCast could not reasonably claim ignorance of the infringements perpetrated by Morpheus endusers. <u>Grokster</u>, 454 F.Supp.2d at 992.

StreamCast has etched its niche in the market for infringement. Under the facts of this case, and the doctrinal point raised by Justice Souter, neither the simple passage of time nor the entry of judgment in this case can remedy StreamCast's past promotion as the "next Napster." The fact that a permanent injunction is imposed also does not leave Morpheus magically reborn as a product safe for unfiltered distribution under Sony.

As stated by Justice Scalia to StreamCast's counsel at oral argument, "the point is that those past acts [of encouragement] are what have developed your client's current clientele." Oral Argument Transcript at 29.

. . .

StreamCast is not being "punished" for its past actions; rather, StreamCast's past activity is relevant to what future actions constitute inducement going forward.

An unfiltered Morpheus, which StreamCast intends to distribute if provided the opportunity, necessarily capitalizes on and remains inexorably linked to its historical efforts to promote infringement. The bell simply cannot be unrung. Accordingly, Morpheus's connection to the past promotion of infringement means that StreamCast's continued distribution of Morpheus alone constitutes inducement. This Court is empowered to regulate Morpheus under 17 U.S.C. § 502(a) in order to prevent this distribution from causing future harm to Plaintiffs' rights.

<u>Grokster V</u>, 518 F. Supp. 2d at 1233-35.

### D.     Public Interest

Finally, the Court agrees that the public interest will be served with a permanent injunction, since it will protect Plaintiffs' copyrights against increased and unrestrained infringement. <u>Id.</u> at 1222. Although Defendants argue that the BitTorrent "ecosystem" would be harmed by the present injunction, Defendants have not introduced any evidence to show the harmful "wider implications" of this injunction, nor have they shown that further discovery is warranted because the relevant evidence is exclusively within Plaintiffs' possession. (See Opp. at 15-17.) In addition, this injunction is aimed solely at *Defendants'* unlawful use of BitTorrent

MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION

1 and similar technology, not at *third parties'* lawful use of BitTorrent and similar
2 technology. The public interest will not be harmed by the injunction.

3 **E. Summary**

4 The Court thus finds that the four part <u>eBay</u> test favors the imposition of a
5 permanent injunction to restrain Defendants' infringement. In its discretion, the
6 Court deems it appropriate for a permanent injunction to issue.

7 In issuing the injunction, the Court is cognizant that "[t]he fact that absolutely
8 perfect compliance is unattainable does not of itself preclude an injunction."
9 <u>Withrow v. Concannon</u>, 942 F.2d 1385, 1388 (9th Cir. 1991). "If a violating party
10 has taken 'all reasonable steps' to comply with the court order, technical or
11 inadvert[e]nt violations of the order will not support a finding of civil contempt."
12 <u>Gen. Signal Corp. v. Donallco, Inc.</u>, 787 F.2d 1376, 1379 (9th Cir. 1986) (citation
13 omitted). Ultimately, Defendants have the option — and the burden — of deciding
14 how they will comply with the following injunction. <u>Triad Systems Corp. v.</u>
15 <u>Southeastern Exp. Co.</u>, 64 F.3d 1330, 1337 (9th Cir. 1995) ("Putting this burden on
16 Southeastern is appropriate because Southeastern is the infringer."), *overruled on*
17 *other grounds by* <u>Gonzales v. Texaco Inc.</u>, 344 Fed. Appx. 304, 306 (9th Cir. 2009).

18 **III. INJUNCTION**

19 It is therefore ORDERED, ADJUDGED, and DECREED that:

20 1. For the purposes of this Permanent Injunction, the following definitions shall
21 apply:

22 (a) "Defendants" shall mean Gary Fung and Isohunt Web Technologies,
23 Inc., whether acting jointly or individually.

24 (b) "Isohunt System" shall mean the websites www.isohunt.com,
25 www.podtropolis.com, www.torrentbox.com, and www.ed2k-it.com, and
26 shall further include any servers, trackers, software, and electronic data that
27 make up or support such websites.

28

**MODIFIED ORDER GRANTING**
**PLAINTIFFS' MOTION FOR PERMANENT**
**INJUNCTION**

11

(c) "Comparable System" shall mean any website, system or software that provides users access to Plaintiffs' Copyrighted Works, using BitTorrent or any peer-to-peer or other file-sharing or content delivery technology.

(d) "Copyrighted Works" shall mean each of those works, or portions thereof, whether now in existence or later created, in which any Plaintiff (or parent, subsidiary or affiliate of any Plaintiff), at the time of Defendants' conduct in question, owns or controls a valid and subsisting exclusive right under the United States Copyright Act, 17 U.S.C. §§ 101 et seq., and which Plaintiffs have identified to Defendants by the title of the work.

(e) "Dot-torrent or similar files" shall mean dot-torrent files, magnet links, hash links, or other functionally similar files, links or identifiers.

(f) "Infringement-Related Terms" shall mean:

    (i) terms that refer to the titles or commonly understood names of Plaintiffs' Copyrighted Works (for example, the full title or common name of a television series);

    (ii) the following terms: "warez," "Axxo," "Jaybob," "DVD Rips," "Cam," "Telesync," "Telecine," "Screener," "PPV," or "R5";

    (iii) Plaintiffs may request that this Court modify (ii) above to include additional terms upon competent proof that such terms should be included in Paragraph 1(f)(ii).

2. Subject to the terms of Paragraph 5 below, Defendants shall be permanently enjoined from knowingly engaging in any of the following activities in connection with the Isohunt System or any Comparable System:

(a) hosting, indexing, linking to, or otherwise providing access to any Dot-torrent or similar files that correspond, point or lead to any of the Copyrighted Works;

(b)     assisting with end-user reproductions or transmissions of any of the Copyrighted Works through a tracker server, or any other server or software that assists users in locating, identifying or obtaining files from other users offering any of the Copyrighted Works for transmission; or

(c)     hosting or providing access to any of the Copyrighted Works. Defendants shall be in knowing violation of this paragraph if they fail to act in response to the list of titles as set forth in Paragraph 5.1.

3.     Defendants shall immediately and permanently be enjoined from knowingly engaging in any activities having the object or effect of fostering infringement of Plaintiffs' Copyrighted Works, including without limitation, by engaging in any of the following activities:

(a)     advertising or promoting access to or the availability of Plaintiffs' Copyrighted Works;

(b)     encouraging or soliciting users to reproduce or distribute Plaintiffs' Copyrighted Works;

(c)     encouraging or soliciting users to upload, post or index any Dot-torrent or similar files that correspond, point or lead to any of the Copyrighted Works;

(d)     encouraging or soliciting users to link to copies of Plaintiffs' Copyrighted Works;

(e)     providing technical assistance or support services to users engaged in infringement of, or seeking to infringe, Plaintiffs' Copyrighted Works;

(f)     creating, maintaining, highlighting or otherwise providing access to lists of "top" downloads of, or search terms for, Dot-torrent or similar files that include, refer to or signal the availability of Plaintiffs' Copyrighted Works;

(g)     including Infringement-Related Terms in metadata for any webpages;

MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION

(h)    creating, maintaining or providing access to browsable website categories of Dot-torrent or similar files using or based on Infringement-Related Terms;

(i)    organizing, harvesting or categorizing Dot-torrent or similar files using or based on Infringement-Related Terms;

(j)    engaging in any of the following activities with regard to the "Sites" defined below:

   (i)    using the names of any of the Sites in meta tags on any web pages;

   (ii)   bidding on, purchasing or using the names of any of the Sites as keywords in any advertising campaigns;

   (iii)  placing advertisements on any of the Sites; and

   (iv)   advertising by referring to any of the Sites by name.

For purpose of this provision, "Sites" shall mean: The Pirate Bay, Torrentspy, Aimster, Kazaa, Grokster, Morpheus, Newzbin, BT Junkie,Torrentreactor.net, kat.ph, torrents.net, SurftheChannel.com, Kino.to, Movie2k.to, and/or Dl4all.com.

   (v)    Plaintiffs may request that this Court modify the injunction to include additional websites upon competent proof that such websites should be added to Paragraph 3(j).

(k)    transferring or redirecting users of the Isohunt System to any other service that, directly or indirectly, provides access to unauthorized copies of Plaintiffs' Copyrighted Works;

(l)    indexing or providing access to Dot-torrent or similar files harvested or collected from the following sites or services: The Pirate Bay, Torrentspy, BT Junkie, Torrentreactor.net, kat.ph or torrents.net;

(i)    Plaintiffs may request that this Court modify the injunction to include additional source websites upon competent proof that such websites should be added to Paragraph 3(l).

(m)    soliciting revenue from third party advertisers or advertising brokers based on (or by referring to or highlighting) the availability of Plaintiff's Copyrighted Works.

4.    The terms of Paragraphs 2 and 3 of this Permanent Injunction shall not apply to any Copyrighted Work for which Defendants have obtained express written authorization or license for the use being made of such Copyrighted Work from each Plaintiff that owns or controls the rights to such Copyrighted Work, provided such authorization or license is in force and valid at the time of Defendants' use of the Copyrighted Work.

5.    Defendants shall not be in violation of this Permanent Injunction as to Copyrighted Works that Plaintiffs, or representatives of Plaintiffs, have not (a) identified to Defendants by title of the work, and (b) represented to Defendants that, based on a reasonable review and good faith belief, a Plaintiff (or a parent, subsidiary or affiliate of a Plaintiff) owns or controls a valid and subsisting exclusive right under the United States Copyright Act, 17 U.S.C. §§ 101 et seq. in the work (a "list of titles").

(a)    Plaintiffs shall be permitted to supplement and update their list of titles without restriction, including without limitation with works soon-to-be but not yet released to the public.

(b)    Plaintiffs shall provide Defendants with the list of titles in electronic form.

(c)    Defendants shall promptly provide Plaintiffs with a valid email address to use for the lists of titles, and Defendants shall immediately notify Plaintiffs in writing of any change in such email address.  A list of titles shall be

MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION

1   deemed delivered when sent to the most current email provided by
2   Defendants.

3   (d)   With regard to the initial list of titles provided by Plaintiffs pursuant to
4   this Permanent Injunction, Defendants shall be required to comply with the
5   terms of Paragraph 2 above no later than 14 calendar days from the date
6   Plaintiffs deliver the initial list of titles.

7   (e)   For all subsequent lists of titles, Defendants shall be required to comply
8   with the terms of Paragraph 2 above no later than 24 hours from the time
9   Plaintiffs deliver the list of titles.

10  (f)   In the event a commercial vendor or other third party becomes able to
11  provide Defendants with a reliable list of Plaintiffs' Copyrighted Works,
12  Plaintiffs may apply to the Court for an order modifying this Permanent
13  Injunction to relieve them of the obligation of providing Defendants with lists
14  of titles, even if there is a cost to Defendants of securing the lists of titles from
15  the commercial vendor or third party.

16  6.   Prior to Defendants entering into any agreement or transaction whatsoever to
17  sell, lease, license, assign, convey, give away, distribute, loan, barter, hypothecate,
18  encumber, pledge or otherwise transfer, whether or not for consideration or
19  compensation, any part of the software, source code, data files, other technology,
20  domain names, trademarks, brands, or Dot-torrent or similar files used in connection
21  with the Isohunt System or any Comparable System (a "Transfer of Isohunt-Related
22  Assets"), Defendants shall require, as a condition of any such transaction, that the
23  transferee:

24  (a)   submit to the Court's jurisdiction and venue;
25  (b)   agree to be bound by the terms herein; and
26  (c)   apply to the Court for an order adding it as a party to this Permanent
27  Injunction.

28

MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION

Defendants shall not permit any Transfer of Isohunt-Related Assets to close until the Court has entered such an order. Defendants further shall not engage in a Transfer of Isohunt-Related Assets with or to any person whom Defendants know to be engaged in, or intending to be engaged in, conduct that would violate the terms of Paragraphs 2 or 3 above.

7.     This Permanent Injunction shall bind Gary Fung, individually, and Isohunt Web Technologies, Inc., and their officers, agents, servants, employees, attorneys, successors, and assigns, and all those in active concert or participation with any of them, who receive actual notice of this Permanent Injunction by personal service or otherwise. Defendants shall provide a copy of this Permanent Injunction to each of their respective officers, agents, servants, employees, attorneys, principals, shareholders, current and future administrators or moderators for the Isohunt System (or Comparable System) or any online forums associated with the Isohunt System (or Comparable System), and any domain name registries or registrars responsible for any domain names used in connection with the Isohunt System (or Comparable System).

8.     Nothing in this Permanent Injunction shall limit the right of Plaintiffs to seek to recover damages under 17 U.S.C. § 504, or costs, including attorneys' fees, under 17 U.S.C. § 505.

9.     For purposes of clarity, as the Court has personal jurisdiction over Defendants and has concluded that the conduct of Defendants induces infringement of Plaintiffs' Copyrighted Works in the United States under the copyright laws of the United States, this Permanent Injunction enjoins the conduct of Defendants wherever they may be found, including without limitation in Canada.

10.     The Court further clarifies that this injunction covers any acts of direct infringement, as defined in 17 U.S.C. § 106, that take place in the United States. To the extent that an act of reproducing, copying, distributing, performing, or

17

**MODIFIED ORDER GRANTING PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

displaying takes place in the United States, it may violate 17 U.S.C. § 106, subject to the generally applicable requirements and defenses of the Copyright Act. As explained in the Court's December 23, 2009 Order, "United States copyright law does not require that both parties be located in the United States. Rather, the acts of uploading and downloading are each independent grounds of copyright infringement liability." Summary Judgment Order at 19. Each download or upload of Plaintiffs' copyrighted material violates Plaintiffs' copyrights if even a single United States-based user is involved in the "swarm" process of distributing, transmitting, or receiving a portion of a computer file containing Plaintiffs' copyrighted content.

11.     Violation of this Permanent Injunction shall expose the Defendants, and all others properly bound by it, to all applicable penalties, including for contempt of Court.

12.     The Court shall maintain jurisdiction over this action for the purposes of enforcing this Permanent Injunction and for amending the injunction in response to future changes in the law or factual circumstances. See Grokster V, 518 F. Supp. 2d at 1239-40 (collecting cases).

13.     Gary Fung, individually, shall not be deemed to be in violation of this injunction solely as a result of his being a bona fide employee or independent contractor of a third party entity that may be engaged in acts that violate this injunction or whose services might be used by third parties to engage in infringement, provided that Mr. Fung does not personally direct or participate in conduct that violates this injunction.

        IT IS SO ORDERED.

DATED: August 5, 2013

_____
THE HON. STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE

18

**MODIFIED ORDER GRANTING
PLAINTIFFS' MOTION FOR PERMANENT
INJUNCTION**