UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINA CENTRAL TELEVISION, a China company; CHINA INTERNATIONAL COMMUNICATIONS CO., LTD., a China company; TVB HOLDINGS (USA), INC., a California corporation; and DISH NETWORK L.L.C., a Colorado corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> CREATE NEW TECHNOLOGY (HK) LIMITED, a Hong Kong company; HUA YANG INTERNATIONAL TECHNOLOGY LIMITED, a Hong Kong company; SHENZHEN GREATVISION NETWORK TECHNOLOGY CO. LTD., a China company; CLUB TVPAD, INC., a California corporation; BENNETT WONG, an individual, ASHA MEDIA GROUP INC. d/b/a TVPAD.COM, a Florida corporation; AMIT BHALLA, an individual; NEWTVPAD LTD. COMPANY d/b/a NEWTVPAD.COM a/k/a TVPAD USA, a Texas corporation; LIANGZHONG ZHOU, an individual; HONGHUI CHEN d/b/a E-DIGITAL, an individual; JOHN DOE 1 d/b/a BETV; JOHN DOE 2 d/b/a YUE HAI; JOHN DOE 3 d/b/a 516; JOHN DOE 4 d/b/a HITV; JOHN DOE 5 d/b/a GANG YUE; JOHN DOE 6 d/b/a SPORT ONLINE; JOHN DOE 7 d/b/a GANG TAI WU XIA; and JOHN DOES 8-10, <br><br> Defendants. | CASE NO. CV 15-01869 MMM (MRWx) <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING ENTRY OF PRELIMINARY INJUNCTION |

On March 13, 2015, plaintiffs China Central Television ("CCTV"), China International Communications Co., Ltd. ("CICC"), TVB Holdings (USA), Inc. ("TVB USA"), and DISH Network L.L.C. ("DISH") (collectively, "plaintiffs") filed this copyright infringement action against Create New Technology HK Limited ("CNT"), Hua Yang International Technology Limited ("Hua Yang"), Shenzhen GreatVision Network Technology Co., Ltd. ("GreatVision"), Club TVpad, Inc. ("Club TVpad"), Bennett Wong, Asha Media Group ("AMG"), Amit Bhalla, newTVpad Ltd. Company ("newTVpad"), Liangzhong Zhou, Honghui Chen, and various fictitious defendants.[1]   Three days later, plaintiffs filed a motion for preliminary injunction against CNT, Club TVpad, and AMG (collectively, "defendants").[2]   None of these defendants has opposed the motion.[3]

## I.  FINDINGS OF FACT

### A.      The Parties

1.      CCTV and Television Broadcasts Limited ("TVB") are television broadcasters in mainland China and Hong Kong, respectively.   Through affiliates, CCTV and TVB license

---

[1] Complaint, Docket No. 1 (Mar. 13, 2015).

[2] Notice of Motion and Motion for Preliminary Injunction ("Motion"), Docket No. 23 (Mar. 16, 2015).

[3] CNT was served with the summons and complaint on March 18, 2015.  AMG was served on March 19, and Club TVpad was served on March 20.  (See Proof of Service on Create New Technology, Docket No. 38 (March 24, 2015); Proof of Service on Asha Media Group, Docket No. 42 (Mar. 27, 2015); Proof of Service on Club TVpad, Docket No. 44 (Mar. 27, 2015).)  Plaintiffs served a copy of their motion for preliminary injunction on CNT, Club TVpad, and AMG on March 18, 2015.  (See Proof of Service Re: Motion for Preliminary Injunction, Docket No. 33 (Mar. 18, 2015).)  CNT has not appeared and has had its default entered.  (See Minutes (In Chambers) Order Granting Plaintiffs' Requests for Entry of the Default, Docket No. 87 (May 28, 2015); Default by Clerk Entered As To Hua Yang and Create New Technology, Docket No. 88 (May 28, 2015).)  AMG and Club TVpad have each answered the complaint.  (See Answer to Complaint by Asha Media Group, Docket No. 58 (Apr. 23, 2015); Answer to Complaint by Club TVpad, Inc., Docket No. 72 (May 11, 2015).)

copyrighted television programming for retransmission in the U.S. via authorized satellite, cable, and other television service providers ("Authorized U.S. Providers").[4]

2.     CICC is a CCTV affiliate that licenses Authorized U.S. Providers to broadcast CCTV's "Great Wall" package of channels to paying U.S. subscribers.  Although CICC licenses certain satellite and cable retransmission rights, CCTV retains and owns the exclusive right to transmit CCTV programming in the United States over the internet.[5]

3.     TVB USA is a wholly owned indirect subsidiary of TVB and distributes and licenses TVB programming in the United States.  TVB owns and maintains the exclusive right to transmit TVB programming in the United States via Internet Protocol Television ("IPTV") and Over-the-Top ("OTT") in video-on-demand format.[6]

4.     "IPTV" is the electronic delivery of video programming via internet protocol over a service provider's infrastructure – such as AT&T's "U-verse."  "OTT" is the delivery of video programming using an internet connection that is not owned, managed, or operated by the party delivering the programming – i.e., Netflix.[7]

5.     DISH is a television service provider that delivers television services to subscribers through satellite and internet platforms.  DISH is a licensee of both CCTV and TVB; pursuant to the licensing agreements, DISH owns the exclusive right to transmit certain CCTV and TVB programming in the United States via satellite, and certain TVB programming via OTT, except in video-on-demand format.[8]

---

[4] Compendium of Evidence In Support of Motion for Preliminary Injunction – Volume I ("Comp. Vol. I"), Docket No. 23-1 (Mar. 16, 2015), Declaration of Samuel P. Tsang ("Tsang Decl."), ¶¶ 3-4, 11; Comp. Vol. I, Declaration of Chunguang Lu ("Lu Decl."), ¶¶ 3-5, 9.

[5] Lu Decl., ¶¶ 5, 10-11.

[6] Tsang Decl., ¶¶ 3-4, 9, 11.

[7] *Id.*, ¶ 9.

[8] Comp. Vol. I, Declaration of Christopher Kuelling ("Kuelling Decl."), ¶¶ 5-6, 9; Lu Decl., ¶¶ 12-13; Tsang Decl., ¶ 12.

6.     CNT is a Hong Kong company that manufactures the "TVpad" device – a set-top box that delivers streaming television programming from Asia to customers in the United States over the internet without requiring customers to pay subscription fees to an authorized provider.[9]

7.     CNT offers TVpads for sale to consumers throughout the United States – including within the Central District – through its website, www.itvpad.com, and through U.S. distributors.  CNT's latest model of the TVpad, the TVpad4, is sold at retail for $299.00.[10]

8.     Club TVpad is a California corporation based in Hayward, California.  Club TVpad operates an interactive website on which it offers TVpads for sale to California consumers.  Corporate records identify Wong as Club TVpad's officer and agent for service of process.[11]

9.     AMG is a California corporation that operates an interactive website on which it offers TVpads for sale to California consumers.  Corporate records identify Amit Bhalla as president of AMG.[12]

**B.     Uncontested Facts Regarding Defendants' Infringement**

**1.     CNT and the TVpad Infringing Apps**

10.     Before a TVpad user can access television programming, he or she must download applications from the "TVpad Store" – the store is a primary feature of every TVpad device.  Thus, before TVpad users in the United States can access unauthorized CCTV and TVB programming, they must download free apps from the TVpad Store for their devices.[13]

---

[9] Comp. Vol. I, Declaration of Christopher Weil ("Weil Decl."), ¶¶ 9, 16.

[10] *Id.*, ¶¶ 10-13, 64-71; see also *id.*, Exh. 4.

[11] Comp. Vol. I, Declaration of Shuk Kuen "Lily" Lau ("Lau Decl."), ¶¶ 4-5, 9.  See also *id.*, Exhs. 57-78, 62.

[12] *Id.*, ¶¶ 21-24.  See also *id.*, Exh. 74.

[13] Weil Decl., ¶ 26; Comp. Vol. I, Declaration of Nicholas Braak ("Braak Decl."), ¶¶ 8, 14-16.

11.    Plaintiffs' investigators have identified 15 TVpad apps available in the TVpad Store that permit TVpad users in the United States to access unauthorized CCTV and TVB programming ("Infringing TVpad Apps").  The Infringing TVpad Apps are identified in the chart attached hereto as Exhibit A.  These Infringing TVpad Apps provide CCTV and TVB programming in four modes: "live" streaming, "time-shifted" streaming, and two forms of video-on-demand streaming.[14]

12.    In late 2014, plaintiffs' investigator observed and recorded 30 CCTV television episodes and 23 TVB television episodes streamed through Infringing TVpad Apps on the TVpad device.  A TVB USA executive observed and recorded portions of an additional 406 TVB episodes streamed through Infringing TVpad Apps in video-on-demand mode.  Each episode recorded by plaintiffs' investigator and the TVB USA executive ("Registered Programs") are registered with the United States Copyright Office.  Plaintiffs have not granted anyone a license to stream the Registered Programs over the internet into the United States through the Infringing TVpad Apps.[15]

13.    Before accessing the TVpad Store, users must accept CNT's mandatory terms of service.  These terms state, *inter alia*, that CNT reserves the right to "filter, modify, refuse or delete any or all software applications in the TVpad Store," and to "suspend, remove, or disable access to any Products, content, or other materials accessible through the TVpad Store."[16]

14.    CNT solicits new applications for the TVpad Store, announces the release of new applications, and sells different "editions" of its TVpad4 device with unique application collections.  CNT has stated that it "has strictly controlled and managed the way to upload apps on TVpad Store[.]"[17]

---

[14] Braak Decl., ¶¶ 16-17, 52; Tsang Decl., ¶ 22.

[15] Braak Decl., ¶¶ 74-76; Tsang Decl., ¶¶ 23, 25-27; *id.*, Exh. 92; Lu Decl., ¶¶ 23-25; *id.*, Exh. 94; Kuelling Decl., ¶ 14.

[16] Braak Decl., ¶¶ 29-30; *id.*, Exh. 47 at ¶¶ 3.8 and 3.10.

[17] Weil Decl., ¶¶ 18, 25, 36; *id.*, Exhs. 7, 9-12, 18; Comp. Vol. I, Declaration of George P. Wukoson ("Wukoson Decl."), ¶ 2; *id.*, Exh. 104 at 4.

15.     Plaintiffs' investigator performed forensic analysis of the TVpad device and determined that Infringing TVpad Apps in "live" mode stream CCTV and TVB programming through a peer-to-peer network, in which each TVpad user streams video content to large numbers of other users worldwide.  Stated differently, each TVpad user not only receives live CCTV and TVB broadcasts, but also simultaneously retransmits those broadcasts to other TVpad users throughout the United States and around the world.  CNT is aware of the peer-to-peer streaming feature of the TVpad and has publicly praised the feature.[18]

16.     According to plaintiffs' investigator, peer-to-peer streaming can only function if an individual initially captures CCTV and TVB broadcast signals in Asia.  After the signal is captured, the individual converts the signal into digital data and then streams the data to TVpad users through the peer-to-peer network.[19]

17.     Plaintiffs' investigator has also determined that Infringing TVpad Apps in "video-on-demand" mode stream CCTV and TVB programs to TVpad users directly from servers in the United States, including servers in Los Angeles.[20]

18.     Data packets received from these servers indicate that recorded video files reside on the servers.  Thus, individuals or entities that pirate CCTV and TVB programs from Asia make copies of the programs and stream those copies from servers located in the United States.[21]

19.     Forensic analysis has demonstrated that Infringing TVpad Apps in time-shift mode stream CCTV and TVB programming both through the peer-to-peer network and directly from servers in China.[22]

---

[18] Braak Decl., ¶¶ 10(a), 53-56; *id*, Exh. 45; Weil Decl., ¶ 19; *id.*, Exh. 9 at 1.

[19] Braak Decl., ¶¶ 17, 56.  Plaintiffs refer to individuals responsible for capturing broadcast signals and converting them into data streamed through peer-to-peer networks as "App Infringers."

[20] *Id.*, ¶¶ 10(b), (d), 60-62; *id*., Exh. 45

[21] *Id.*, ¶ 62; *id.*, Exh. 45.

[22] Braak Decl., ¶¶ 10(c), 63.

20.     CNT promotes its television service, the Infringing TVpad Apps, and the availability of CCTV and TVB programming on the TVpad devices.  In some cases, it has falsely represented that the content it delivers has been authorized by CCTV and TVB.  CNT solicits new distributors by stating that it provides "[e]xclusive & authorized live content from mainland China/HK/Taiwan"; this statements is displayed next CCTV and TVB logos.  CNT has also advertised on its website that the TVpad delivers "massive content from China, Taiwan, and HK."[23]

21.     CNT places banner advertisements for Infringing TVpad Apps that stream CCTV and TVB programs on the user interface of the TVpad device.  It also utilizes categories such as "Live TV," "VOD," and "TV Dramas" in the TVpad Store to make it easy for users to locate and download Infringing TVpad Apps.[24]

22.     CNT's blog actively promotes Infringing TVpad Apps.  For example, on January 8, 2014, CNT stated that the Gang Yue Wang Luo Dian Shi app provides live channels in high definition, and noted that it is "definitely the favorite of those who love to watch TVB."  CNT's blog post included a screenshot of a TVB program.[25]

23.     CNT's Facebook page regularly promotes the availability of CCTV and TVB television programs through the Infringing TVpad Apps.  One post by the TVpad administrator on CNT's Facebook page encourages users to watch a CCTV documentary and places the CNT logo directly next to programming information for CCTV channels.[26]

24.     CNT's Facebook page includes a promotional video that features icons of Infringing TVpad Apps and a CCTV broadcast.[27]

---

[23] Weil Decl., ¶¶ 28-50; *id.*, Exhs. 8, 13-29, 33.

[24] Braak Decl., ¶¶ 31-36, 38-41, 46-50; *id.*, Exhs. 46, 48.

[25] Weil Decl., ¶ 36; *id.*, Exh. 18.

[26] *Id.*, ¶¶ 39-42; *id.*, Exh. 20 at 3-6; *id.*, Exh. 21.

[27] *Id.*, ¶¶ 42, 50; *id.*, Exh. 21; *id.*, Exh. 29 at 1-53, 61-71.

25.     CNT also actively collaborates with purported third-party App Infringers to develop and improve infringing content by providing customer support and technical assistance to help TVpad users access and share infringing streams of CCTV and TVB programming, and by conveying messages between TVpad users and App Infringers.  For example, a CNT blog post instructs users how to install the infringing BETV app from the TVpad Store, providing step-by-step screenshots.[28]

26.     Administrators on CNT's Facebook page instruct users how to download and use Infringing TVpad Apps to access CCTV and TVB programming.  On June 12, 2014, in response to the question – "Anyone knows which app or channel on tvpad is showing the World Cup???" – a CNT administrator advised the user to try BETV and Sport Online, two Infringing TVpad Apps that stream CCTV channels.[29]

27.     When a user asked on CNT's Facebook page, "[w]hich tvpad is can see [sic] tvb day and night and 12 hour back and tvb drama," an administrator wrote "Could download three party applications from TVpad store for this case[.]"[30]

28.     Administrators provide similar assistance to help TVpad users locate CCTV and TVB programming on CNT's official fan forum at tvpadfans.com.[31]

29.     Administrators on CNT's Facebook page and fan forum also provide technical assistance and updates to customers regarding server problems impacting their ability to stream infringing television content.[32]

30.     As recently as January 9, 2015, CNT responded to user complaints about problems downloading the new Gang Yue Wang Luo Dian Shi app – an Infringing TVpad App,

---

[28] *Id.*, ¶¶ 37, 54-56; *id.*, Exhs. 19, 30-32

[29] *Id.*, ¶¶ 43-45; *id.*, Exhs. 22-24.

[30] *Id.*, ¶ 45; *id.*, Exh. 24.

[31] *Id.*, ¶ 50; *id.*, Exh. 29 at 81-87.

[32] *Id.*, ¶¶ 37, 39; *id.*, Exhs. 34, 36; Braak Decl., ¶ 59; *id.*, Exh. 51.

They apologized for any inconvenience, and asked customers to send a private message to CNT so that CNT and the "app provider" could address the problem.[33]

31.     CNT's statements demonstrate that it collaborates with third party app developers to develop and improve infringing content.  By way of example, on August 18, 2013, CNT published a post on its Facebook page soliciting suggestions as to how it could help CNT "better serve [its] overseas customers and allow overseas TVpad users to enjoy better Chinese TV services."  In response, one user suggested adding a TVB football channel; the administrator said he would "communicate with third-party application developers" regarding the suggestion.[34]

32.     In response to another user's suggestion that CNT "improve all streaming sound bit rates and enable stereo," the administrator reported that "the application providers are working on this issue."[35]

33.     In addition to responding to user suggestions and questions, CNT also communicates information regarding the Infringing TVpad Apps to users.  In October 2013, for example, a CNT administrator posted a notification on CNT's official Facebook page advising TVpad users that maintenance required on the infringing 516 app might cause service disruptions.[36]

34.     Despite its internet-based streaming business model, CNT has not (a) posted a policy instructing users how to report infringing activity, (b) appointed an agent to receive notifications of claimed infringement under the Digital Millennium Copyright Act, 17 U.S.C. § 512 (c)(2), or (c) adopted any notice-and-takedown procedures in the TVpad Store.[37]

---

[33] Weil Decl., ¶ 60; *id.*, Exh. 37.

[34] *Id.*

[35] *Id.*, ¶¶ 54-55; *id.*, Exhs. 30-31.

[36] *Id.*, ¶ 56; *id.*, Exh. 32.

[37] Braak Decl., ¶ 51.

35.    CNT employs a business model that requires TVpad users to pay an up-front, one-time fee for unlimited access to unauthorized, infringing programming.  Consumers who wish to access the content must pay regular subscription fees to receive programming from an Authorized U.S. Provider.[38]

### 2.    Club TVpad

36.    Club TVpad operates an interactive website on which it sells TVpads.  On its website and Facebook page, Club TVpad also markets the Infringing TVpad Apps, the infringing capabilities of the TVpad, and the availability of CCTV and TVB programming.[39]

37.    For example, in November 2012, Club TVpad posted the following on its Facebook page: "Are you a Direct TV subscriber? Then you might be aware that they are removing TVB from their line up at the end of the month. . . .  This is the best time to get a TVpad to replace Direct TV."[40]

38.    Club TVpad also operates an online forum through which it regularly promotes Infringing TVpad Apps; it also assists customers who wish to download Infringing TVpad Apps and access unauthorized CCTV and TVB content and programming.[41]

39.    On October 26, 2014, plaintiffs' investigator contacted Club TVpad and spoke with Bennett Wong about purchasing a TVpad device.  Wong told the investigator that TVB's TVBS and Jade channels were available through the TVpad device and that the one-time purchase price of the TVpad was the only cost to access television programming.[42]

---

[38] Weil Decl., ¶¶ 4, 28, 35, 38, 62; *id.*, Exhs. 6, 13, 17, 38; Lau Decl., ¶¶ 26, 30, 34; *id.*, Exh. 80; Tsang Decl., ¶ 14; Lu Decl., ¶ 15; Kuelling Decl., ¶¶ 7-8, 11.

[39] Lau Decl., ¶¶ 10-11; *id.*, Exhs. 63-67.

[40] *Id.*, ¶ 10(d); *id.*, Exh. 66.

[41] *Id.*, ¶¶ 12-15; *id.*, Exhs. 68-71.

[42] *Id.*, ¶ 17.

40.     Plaintiffs' investigator purchased a TVpad device from Club TVpad's website. After receiving the TVpad device, the investigator determined that Club TVpad had pre-installed several Infringing TVpad Apps that stream CCTV and TVB programming.[43]

### 3.     AMG

41.     AMG, like Club TVpad, operates an interactive website that offers TVpads for sale to consumers in California.   Promotional blog posts on the website advertise the availability of free CCTV and TVB programming through the Infringing TVpad Apps.   For example, a December 2014 blog post promoting the new TVpad4 model stated: "Not wanting to pay for streaming television?   TVpad4 still streams live news, sports, and television programming from stations like SoLive, CCTV, and many, many more."[44]

42.     Similarly, a June 2014 blog post stated: "There are over 100 different Asian channels and apps to choose from, but lovers of television shows will certainly want to install the HITV app [an Infringing TVpad App that streams TVB programs].   Viewers can watch hundreds of live shows from Hong Kong, including all of their favorite dramas."[45]

43.     On May 30, 2014, plaintiffs' investigator called AMG and spoke to an individual identifying himself as Amit.   Amit confirmed that CCTV channels were available on the TVpad device.    In response to a question about CCTV channels, AMG sent the investigator a spreadsheet listing CCTV and TVB channels and the Infringing TVpad Apps that could access those channels.[46]

44.     Plaintiffs' investigator purchased two TVpad devices from AMG's website. Both devices came with USB flash drives that contained several Infringing TVpad Apps.[47]

---

[43] *Id.*, ¶ 18; Braak Decl., ¶¶ 65-67.

[44] Lau Decl., ¶ 28; *id.*, Exhs. 82-87.

[45] *Id.*, ¶ 28(d); *id.*, Exh. 86.

[46] *Id.*, ¶¶ 30, 32; *id.*, Exh. 89.

[47] *Id.*, ¶¶ 31, 35; Braak Decl., ¶¶ 68-73.

45.     Prior to filing suit, DISH sent cease-and-desist letters to CNT, Club TVpad, and AMG, demanding that each stop infringing and/or inducing infringement of plaintiffs' copyrights.  The letters identified the Infringing TVpad Apps on the TVpad3 and listed specific CCTV and TVB channels and programs streamed without authorization on the Infringing TVpad Apps.[48]

46.     Despite notice, CNT, Club TVpad, and AMG have continued to market, advertise, and promote the Infringing TVpad Apps and the availability of unauthorized CCTV and TVB television programming via the TVpad device.[49]

47.     Defendants' conduct has materially reduced the number of individuals who subscribe to authorized platforms for CCTV and TVB programming in the United States.  It has also reduced the number of individuals willing to pay for access to such programming.  This has led to reductions in plaintiffs' revenues that are difficult to quantify.[50]

48.     Defendants' ongoing infringement impairs the ability of CCTV, CICC and TVB (USA) to negotiate favorable license agreements with Authorized U.S. Providers and others.[51]

49.     Defendants' ongoing infringement has also damaged plaintiffs' goodwill. Plaintiffs' investigators have observed numerous problems with the TVpad viewing experience, e.g., video failing to stream or terminating prematurely, low video quality, pixilation, and sound issues.[52]

50.     Defendants' infringing conduct adversely affects plaintiffs' strategic choices about where, when, and how to distribute their programs, harming their goodwill with U.S.

---

[48] Kuelling Decl., ¶¶ 15-25; *id.*, Exhs. 95-103.

[49] *Id.*, ¶¶ 22, 25; Declaration of Carla A. McCauley in Support of Plaintiffs' Motion for Preliminary Injunction ("McCauley Decl."), Docket No. 85 (May 22, 2015), ¶¶ 4-7; *id.*, Exhs. B-E.

[50] Tsang Decl., ¶¶ 29-32; Lu Decl., ¶¶ 27-28; Kuelling Decl., ¶¶ 26-32.

[51] Tsang Decl., ¶ 39; Lu Decl., ¶ 29.

[52] Tsang Decl., ¶ 40; Lu Decl., ¶ 30; Kuelling Decl., ¶ 33; Braak Decl., ¶ 59; *id.*, Exh. 51; Weil Decl., ¶¶ 57-60; *id.*, Exhs. 33-37.

audiences and Authorized U.S. Providers.  Defendants' retransmission service not only streams CCTV and TVB programming in the United States without a license, but does so several hours before the programming is available through authorized channels.[53]

51.     Defendants' unlawful activities deprive plaintiffs of their right not to disseminate many of their programs in the United States.[54]

52.     Defendants' unlawful activities also pose a risk of confusion – defendants' unauthorized streaming of plaintiffs' programming has confused consumers about video on demand products and created an mistaken perception about what constitutes lawful video on demand programming.[55]

## II.  CONCLUSIONS OF LAW

1.     The court has authority to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).

2.     To determine whether to issue a preliminary injunction, the court must balance four factors: (1) whether plaintiff is likely to succeed on the merits; (2) whether plaintiff will suffer irreparable harm in the absence of preliminary relief; (3) whether the equities favor plaintiff; and (4) whether issuance of a preliminary injunction is in the public interest.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009); see also *Winter v. Natural Defense Counsel, Inc.*, 555 U.S. 7, 20 (2008); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F.Supp.2d 1138, 1141 (C.D. Cal. 2012) ( stating that to "obtain preliminary injunctive relief, a plaintiff must establish: "(1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest" (citation omitted)).

---

[53] Tsang Decl., ¶¶ 33-35, 37; Lu Decl., ¶¶ 31-33.

[54] Tsang Decl., ¶ 36; Lu Decl., ¶ 34.

[55] Tsang Decl., ¶ 38; Lu Decl., ¶ 35; Kuelling Decl., ¶ 28.

3.      The Ninth Circuit employs a "sliding scale" under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (holding that the sliding scale approach survives *Winter* so long as there is a showing of likely irreparable harm).

**A.      Likelihood of Success on the Merits**

**1.      Secondary Liability for Copyright Infringement**

**a.      Direct Liability**

4.      For all theories of secondary liability, a plaintiff "must establish that there has been a direct infringement by third parties."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007).  This requires a showing of: "(1) ownership of the infringed material, and (2) violation of at least one exclusive right granted to copyright holders under 17 U.S.C. § 106 by the infringer."  *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1013 (9th Cir. 2001) (citing 17 U.S.C. § 501(a); *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987); *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n. 3 (9th Cir. 1989)).

5.      Plaintiffs are likely to succeed in showing its "ownership of the infringed material," *A&M Records, Inc.*, 239 F.3d at 1013, because it holds copyright registrations for the Registered Programs; this gives rise to a presumption of ownership and validity.  17 U.S.C. § 410(c) (noting that a certificate of registration is "*prima facie* evidence of the validity of the copyright and the facts stated in the certificate").  Defendants, who did not oppose the motion, have made no attempt to rebut the presumption that flows from a valid copyright registration.  Plaintiffs are also likely to succeed in showing that they own the exclusive rights to transmit the Registered Programs and other CCTV and TVB programming in the U.S. over the internet in various formats, and therefore have standing to sue for infringement of those rights.  17 U.S.C. § 501(b).

6.      Next, plaintiffs are likely to succeed in showing that the unauthorized streaming of their programs over the internet, as evidenced by the observations and recordings of

plaintiffs' investigator and a TVB USA executive, infringes an "exclusive right granted to copyright holders under 17 U.S.C. § 106." *A&M Records, Inc.*, 239 F.3d at 1013.

7.      The Copyright Act grants plaintiffs the exclusive right to "perform the copyrighted work publicly."  17 U.S.C. § 106(4).  A party publicly performs a copyrighted work when it "transmit[s] or otherwise communicate[s] a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101.

8.      In *ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014), the Supreme Court held that Aereo publicly performed plaintiffs' television programs by streaming those programs over the internet to "large numbers of paying subscribers who lack[ed] any prior relationship to the works." *Id.* at 2510.  The Court reasoned that Aereo performed the works "publicly" because it streamed programs to "a large number of people who [were] unrelated and unknown to each other," and who did not "receive [the] performances in their capacities as owners or possessors of the underlying works."  *Id.* at 2509-10; see also *Warner Bros. Entertainment v. WTV Systems, Inc.*, 824 F.Supp.2d 1003, 1009-11 (C.D. Cal. 2011) (entering a preliminary injunction against a service that streamed motion pictures without authorization over the internet to customers); *DISH Network L.L.C. v. TV Net Solutions, LLC*, 12-cv-1629, 2014 U.S. Dist. LEXIS 165120, *13-14 (M.D. Fla. Nov. 25, 2014) (holding that the retransmission of Arabic television channels over the internet and into the United States infringed DISH's public-performance rights).

9.      The App Infringers stream live and time-shifted CCTV and TVB channels through a peer-to-peer network and/or through servers in the United States to large numbers of TVpad users who have no right to access the content.  Thus, plaintiffs are likely to succeed in showing that the App Infringers publicly perform plaintiffs' television programming in the United States without authorization under *Aereo*.

10.     Because TVpad users operate as peers in a peer-to-peer network through which each user retransmits live and time-shifted CCTV and TVB programs to large numbers of other

TVpad users, plaintiffs are likely to succeed in showing that the TVpad users publicly perform plaintiffs' television programming in the United States without authorization.  "[T]he concep[t] of public performance . . . cover[s] not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public." *Aereo*, 134 S.Ct. at 2506 (quoting H.R. Rep. No. 94-1976, at 63 (1976)).  TVpad user retransmissions are "to the public" because TVpad users who receive them are "a large number of people who are unrelated and unknown to each other," and TVpad users are not "owners or possessors of the underlying works." *Id.* at 2510.

11.   Plaintiffs are thus likely to prevail in showing direct copyright infringement by third party users – a necessary predicate to their claims for contributory copyright infringement.

### 2.   Contributory Copyright Infringement

12.   To prove contributory copyright infringement, plaintiffs must show that defendants: (1) had knowledge of the infringing activity; and (2) induced, caused, or materially contributed to direct infringement by others.  *Perfect10, Inc.*, 508 F.3d at 1170 ("In order for Perfect 10 to show it will likely succeed in its contributory liability claim against Google, it must establish that Google's activities meet the definition of contributory liability enunciated in *Grokster*.  Within the general rule that '[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement," the Court has defined two categories of contributory liability[, including]: 'Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops). . . ," citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)); *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F.Supp.2d 1098, 1106 (N.D. Cal. 2008) ("Contributory copyright infringement requires (1) knowledge of another's infringement and (2) either (a) material contribution to the infringement or (b) inducement of the infringement" (citation omitted)).

13.   Defendants had actual knowledge of the infringing activity because plaintiffs sent them cease and desist letters.  *A&M Records, Inc.*, 239 F.3d at 1022 n.6 (defendant had actual notice of the infringement because the RIAA informed it of the infringing files); *see also*

*Louis Vuitton*, 591 F.Supp.2d at 1106 ("Actual knowledge exists where it can be shown by a defendant's conduct or statements that it actually knew of specific instances of direct infringement. . . . '[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement," citing *A&M Records, Inc.*, 239 F.3d at 1021 (in turn citing *Religious Technology Center v. Netcom On-Line Comm. Serv. Inc.*, 907 F.Supp. 1361, 1374 (N.D. Cal. 1995)).

14.     The second element can be satisfied by showing either "inducement" and "material contribution." *Perfect 10 v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007). Inducement is shown when a defendant has undertaken purposeful acts aimed at assisting and encouraging others to infringe. *Grokster, Ltd.*, 545 U.S. at 936-37.  Thus, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Id*.

15.     "[A] defendant may be liable for 'activity undertaken abroad that knowingly induces infringement within the United States.'" *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW (JCx), 2009 WL 6355911, *8 (C.D. Cal. Dec. 21, 2009), aff'd, 710 F.3d 1020 (9th Cir. 2013).

16.     In the Ninth Circuit, proof of inducement has four elements: (1) distribution of a device, product, or service; (2) acts of infringement; (3) an object of promoting use of the device, product, or service to infringe a copyright; and (4) causation.  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013).

17.     The first element is satisfied by showing the distribution of either a device or a service that is "used in accomplishing the infringement." *Id.* at 1033.  Plaintiffs are likely to succeed in showing this element because CNT, Club TVpad, and AMG distribute the TVpad device, which enables users to view and transmit infringing streams of plaintiffs' programming, and operate the TVpad Store, a service through which users can download the Infringing TVpad Apps.

18.     Plaintiffs are also likely to show the second element, i.e., acts of infringement, based on forensic analysis that establishes both the App Infringers and the TVpad users directly infringe plaintiffs' public-performance rights.  *Munhwa Broadcasting Co v. Create New Technology (HK) Inc.*, Case No. CV 14-4213 RGK (RZx), Order, *4-5 (C.D. Cal. May 12, 2015) (Docket No. 217).  See also *Aereo*, 134 S.Ct. at 2509-10; *WTV Systems*, 824 F.Supp.2d at 1009-11.

19.     A defendant's intent to foster or promote infringement can be established by a "clear expression" of such intent and "affirmative steps taken to foster infringement." *Grokster, Ltd.*, 545 U.S. at 936-37.   "The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations."  *Id.* at 938.

20.     Other evidence of intent to foster or promote infringement can include providing customer support and technical assistance to customers engaged in infringing uses; failing to "develop filtering tools or other mechanisms to diminish the infringing activity using their software[;]" or relying on infringing activity for the success of the defendant's business model. *Id.* at 938-40; see also *Fung*, 710 F.3d at 1027-28, 1036-37 (holding that a website that encouraged users to upload torrent files with copyrighted content, offered links to copyrighted films and urged users to download them, responded to requests for help in locating and playing copyrighted materials, and failed to develop filters substantiated infringement through inducement); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F.Supp.2d 966, 987-88 (C.D. Cal. 2006) (noting that defendant's interface had a "Top 40" song category that "made it easier for users to share copyrighted content").

21.     Plaintiffs are likely to prove the third element by showing that defendant CNT intends to foster, promote and profit from App Infringers' and TVpad users' direct infringement of plaintiffs' copyrighted works, since it advertises the Infringing TVpad Apps, and provides customer support and technical assistance to users attempting to locate, install and use the Infringing TVpad Apps to share Plaintiffs' copyrighted programming.  The evidence also demonstrates that CNT collaborates with App Infringers to develop and improve the Apps

and their content.  It has not developed filtering tools, and the success of its business model depends on customers paying a one-time fee for unlimited access to infringing programming.

22.    Plaintiffs are likely to prove that defendants Club TVpad and AMG likewise intend to foster, promote and profit from direct infringement because they advertise and promote the Infringing TVpad Apps and the availability of copyrighted programming on those apps; provide customer support and technical assistance to users; inform customers of the availability of CCTV and TVB content on the Apps; and have taken affirmative steps to facilitate user infringement by, *inter* alia, pre-loading Infringing TVapps on the devices.

23.    Plaintiffs are likely to show the fourth element necessary to prove inducement because once intent to promote infringement is found, "the only causation requirement is that the product or service at issue [have been] used to infringe the plaintiff's copyrights." *Fung*, 710 F.3d at 1037.  In *Fung*, the Ninth Circuit rejected Fung's argument that "the acts of infringement must be caused by the manifestations of the distributor's improper object – that is, by the inducing messages themselves." *Fung*, 710 F.3d at 1037; see also *Grokster*, 454 F.Supp.2d at 985-86 (rejecting an argument that plaintiffs had to prove the inducing statements "caused specific acts of infringement").  Plaintiffs will likely be able to meet this standard because the TVpad device and TVpad Store are being used to infringe plaintiffs' copyrighted works, and defendants are the but-for cause of that infringement, i.e., their distribution and promotion of the Infringing TVpad Apps is the mechanism that makes that infringement by a large number of users possible.

24.    Plaintiffs are also likely to succeed on their alternate theory of contributory infringement through material contribution against defendant CNT.  In the Ninth Circuit, "material contribution" can be established by proof that "a computer system operator has actual knowledge that specific infringing material is available using its system and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Perfect10, Inc.*, 508 F.3d at 1172.

25.    A defendant has actual notice of infringement when it receives a cease and desist letter.  *A&M Recordings, Inc.*, 239 F.3d at 1022 n. 6 (defendant had actual notice of

infringement because the RIAA informed it of the infringing files).  A defendant materially contributes to infringement when it fails to take steps to protect the copyrighted works.  See *Perfect10, Inc.*, 508 F.3d at 1172 ("assist[ing] a worldwide audience of users to access infringing materials" constitutes material contribution); *Gershwin Publ'g v. Columbia Artists Mgmt.*, 443 F.2d 1159, 1163 (2d Cir. 1971) (creating an audience for an infringing performance supports a finding of contributory liability).  A defendant also materially contributes to infringement by providing software that makes it an infringing peer in a peer-to-peer network. *See A&M Recordings, Inc.*, 239 F.3d at 1022 (peer-to-peer software provides "the site and facilities" for direct infringers and constitutes contributory infringement).  Plaintiffs are likely to success in establishing that CNT has materially contributed to infringement under all of these tests.

26.     For these reasons, the court concludes that plaintiffs are likely to succeed on the merits of their contributory infringement claims against defendants.

### 3.     Vicarious Liability for Copyright Infringement

27.     To show likelihood of success on their vicarious infringement claim against CNT, plaintiffs must show that CNT "profit[s] from direct infringement while declining to exercise a right to stop or limit it." *Grokster, Ltd.*, 545 U.S. at 930 (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)).  Plaintiffs are likely to succeed on their vicarious infringement claim, because they will likely be able to establish that CNT (1) has the right and ability to control the infringing conduct, and (2) derives a direct financial benefit from it.  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996).

28.     A defendant "exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect10, Inc.*, 508 F.3d at 1173.  "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *A&M Records, Inc.*, 239 F.3d at 1023; see also *Fonovisa*, 76 F.3d at 261-63 (holding that a contractual right to terminate or exclude swap meet vendors constituted control over pirated goods).  Plaintiffs have adduced evidence that CNT has practical, operational control over the

1    apps in its store, and the servers necessary to stream content.  They have also adduced evidence

2    that it has the right to exclude Infringing Apps from its device and service.

3         29.    "Financial benefit exists where the availability of infringing material 'acts as a

4    "draw" for customers.'"  *A&M Records, Inc.*, 239 F.3d at 1023.  In *Fonavisa*, the swap meet

5    operator reaped "substantial financial benefits from admission fees, concession stand sales and

6    parking fees, all of which flow[ed] directly from customers who want[ed] to buy the counterfeit

7    recordings at bargain basement prices."  *Fonavisa*, 76 F.3d at 263.  In *A&M Records, Inc.*,

8    Napster's revenue was dependent on "increases in [its] user-base" that were stimulated by "the

9    quality and quantity of available [infringing] music."  *A&M Records, Inc.*, 239 F.3d at 1023.

10   Plaintiffs are likely to succeed on their vicarious infringement claim because they have shown

11   that CNT has financially benefited by offering free and unauthorized programming on the

12   TVpad device.

13        **B.    Irreparable Harm**

14        30.    A plaintiff moving for a preliminary injunction must demonstrate not only that

15   harm is irreparable, but also imminent.  *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844

16   F.2d 668, 674 (9th Cir. 1988); see also *A&M Records, Inc.*, 239 F.3d at 1013.

17        31.    Following issuance of the Supreme Court's decision in *eBay Inc. v.*

18   *MercExchange, L.L.C.*, 574 U.S. 388, 391 (2006), a court may no longer presume irreparable

19   injury from the bare fact of liability in a copyright case.  Nonetheless, the injury caused by the

20   presence of infringing products in the market – such as lost profits and customers, as well as

21   damage to goodwill and business reputation – will often constitute irreparable injury.  See, e.g.,

22   *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 CV 6403 (SLT) (SMG), 2008 WL

23   2884761, *5 (E.D.N.Y. July 23, 2008) (concluding that plaintiff had shown irreparable injury

24   where it had "established that defendant committed copyright and trademark infringement, and

25   . . . there [was] no reason to conclude that defendant ha[d] or [would] cease its infringing acts

26   because it continued infringing plaintiff's copyrights and trademarks despite being notified of

27   its infringement").  See also *Stuhlbarg International Sales Co., Inc. v. John D. Brush and Co,*

28   *Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers

or goodwill certainly supports a finding of the possibility of irreparable harm").  Such harms are difficult to quantify and compensate over time.  See *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).  Plaintiffs have amply demonstrated that they have suffered and will continue to suffer these types of harm.

32.   Unauthorized and uncompensated internet streaming that competes directly with the television programming of a copyright owner and its authorized licensees causes harm that is "neither easily calculable, nor easily compensable."  *BarryDriller*, 915 F.Supp.2d at 1147 (granting preliminary injunction); see also *WTV Systems*, 824 F.Supp.2d at 1012-13 (granting preliminary injunction); *Fox Television Stations, Inc. v. Filmon X LLC*, 966 F.Supp.2d 30, 49-51 (D.D.C. 2013) (granting preliminary injunction); *Twentieth Century Fox Film Corp. v. iCraveTV*, No. Civ.A. 00-121, Civ.A. 00-120, 2000 WL 255989, *8 (W.D. Pa. Feb. 8, 2000) (granting preliminary injunction).

33.   Defendants' conduct has caused irreparable harm because it has materially reduced the number of individuals who subscribe to authorized U.S. platforms for CCTV and TVB programming, causing lost market share.  See, e.g., *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1153 (Fed. Cir. 2011); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010); *WTV Systems*, 824 F.Supp.2d at 1013 ("[T]he loss of revenue to Plaintiffs and their licensees, which is already significant, will continue to increase, and constitutes irreparable injury to Plaintiffs").

34.   Defendants' conduct further harms plaintiffs because it impairs plaintiffs' ability to negotiate favorable licenses.  "[I]f Defendants can transmit Plaintiffs' content without paying a fee, Plaintiffs' existing or prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives."  *BarryDriller*, 915 F.Supp.2d at 1147; *WTV Systems*, 824 F.Supp.2d at 1012-13.  Stated differently, "[t]he availability of [p]laintiffs' content from sources other than [p]laintiffs also damages [p]laintiffs' goodwill with their licensees."  *BarryDriller*, 915 F.Supp.2d at 1147.

35.   Plaintiffs have also been irreparably harmed by defendants' conduct because defendants' unauthorized retransmission service not only streams CCTV and TVB

programming in the U.S. without a license, but does so several hours before that programming is available in the U.S. through authorized channels.  This prevents plaintiffs from exercising exclusive control over the retransmission of their programming and is likely to damage plaintiffs' goodwill with their licensees.  *See WTV Systems*, 824 F.Supp.2d at 1012-13.

36.     Defendants have also interfered with plaintiffs' ability to develop a lawful market for internet distribution.  *See BarryDriller*, 915 F.Supp.2d at 1147 (finding irreparable harm when defendants' streaming service "compete[d] with Plaintiffs' ability to develop their own internet distribution channels"); *WTV Systems*, 824 F.Supp.2d at 1013 (holding that an unauthorized streaming service "threaten[ed] to confuse consumers about video on demand products, and to create incorrect but lasting impressions with consumers about what constitutes lawful [internet-based] video on demand exploitation of Plaintiff's Copyrighted Works, including confusion or doubt regarding whether payment is required for access to Copyrighted Works").

37.     Finally, defendants' infringing conduct has caused irreparable harm because it impairs plaintiffs' brand, reputation, and goodwill by associating their programming with poor quality transmissions and viewing experiences on the TVpad device.  *See WTV Systems*, 824 F.Supp.2d at 1014.

38.     Absent preliminary injunctive relief, plaintiffs will continue to suffer these types of irreparable harm as a result of defendants' activities.

39.     Moreover, given the extensive nature of the infringement alleged, and for which defendants are likely secondarily liable, it is unclear that defendants would be able to satisfy any damages award entered.  This further supports the conclusion that injunctive relief is appropriate in this case.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1217 (C.D. Cal. 2007) (finding irreparable harm where defendant "induce[d] far more infringement than it could ever possibly redress with damages").

**C.     Public Interest**

40.     "Enjoining violation of federal statutes is in the public interest."  *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009).

41.     The injunction plaintiffs seek is in the public interest.  "[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and correspondingly, preventing the misappropriation of skills, creative energies, and resources which are invested in the protected work." *WTV Systems*, 824 F.Supp.2d at 1015 (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983)); *BarryDriller*, 915 F.Supp.2d at 1148.  Any public interest the public may have "in receiving copyrighted content for free is outweighed by the need to incentivize the creation of original works." *Grokster*, 518 F.Supp.2d at 1222.

**D.      Balance of Equities**

42.     Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987); *Cybermedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1073 (N.D. Cal. 1998).

43.     Here, the balance of equities weighs in plaintiffs' favor and supports entry of a preliminary injunction.  The only harm defendants will suffer if an injunction is entered is that they will be unable to continue to profit from infringing plaintiffs' copyrights.  Defendants "'cannot complain of the harm that will befall [them] when being forced to desist from [their] infringing activities.'"  *BarryDriller*, 915 F.Supp.2d at 1147 (quoting *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995)).  See also *WTV Systems*, 824 F.Supp.2d at 1014-15.

44.     It is appropriate to dispense with the filing of a bond in this case.  It is well established in the Ninth Circuit that "Rule 65(c) [ ]vests the district court 'with discretion as to the amount of security required, if any.'"  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahone-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).  In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Jorsenson*, 320 F.3d at 919.  Here, the court finds no realistic likelihood that a preliminary injunction will harm defendants and thus will not require plaintiffs to post an injunction bond.

Based on these findings of fact and conclusions of law, the court grants Plaintiffs' motion for preliminary injunction.

DATE: June 11, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

EXHIBIT A

**Exhibit ▮ – Infringing TVpad Apps**

| | **TVpad3** | **TVpad4** |
|---|---|---|
| **Infringing TVpad App and icon** | **Plaintiffs' Programming and Mode** | **Plaintiffs' Programming and Mode** |
| BETV PLUS  | | CCTV 1 (live & replay live), CCTV 2 (live), CCTV 3 (live & replay live), CCTV 4 (live & replay live), CCTV6 (live & replay live), CCTV 10 (live), CCTV 11 (live), CCTV12 (live), CCTV13 (live & replay live), CCTV14 (live & replay live) |
| BETV_HD  | CCTV 1 HD (live), CCTV 5 HD (live) | |
| BETV II  | CCTV 1 (live & replay live), CCTV 2 (live), CCTV 3 (live & replay live), CCTV 4 (live & replay live), CCTV 5 (live & replay live), CCTV 5+ (live), CCTV6 (live & replay live), CCTV 10 (live), CCTV 11 (live), CCTV12 (live), CCTV13 (live & replay live), CCTV14 (live & replay live), CCTV风云足球（CCTV fengyun soccer) (live) | |

| | TVpad3 | TVpad4 |
|---|---|---|
| **Infringing TVpad App and icon** | **Plaintiffs' Programming and Mode** | **Plaintiffs' Programming and Mode** |
| BETV  | CCTV 1, CCTV 2, CCTV 3, CCTV 4, CCTV 5+, CCTV6, CCTV 10, CCTV 11, CCTV12, CCTV13, CCTV14, CCTV风云足球（CCTV fengyun soccer) (all live) | |
| 粤海時移 (Yue Hai Shi Yi)  | JADE HD, JADE (both time-shifted by 12 hours) | JADE HD, JADE (both time-shifted by 12 hours) |
| 粤海寬頻 (Yue Hai Kuan Pin)  | JADE HD, JADE HD, J2, JADE, PEARL, iNews (all live) | |
| 粤海寬頻2 (Yue Hai Kuan Pin 2)  | JADE HD, JADE, J2 (Live and replay live) PEARL, iNews (live) | |

DWT 26394458v1 0094038-000021

| | **TVpad3** | **TVpad4** |
|---|---|---|
| **Infringing TVpad App and icon** | **Plaintiffs' Programming and Mode** | **Plaintiffs' Programming and Mode** |
| 港粤網絡電視 (Gang Yue Wang Luo Dian Shi)  | JADE HD, JADE, J2 (live and replay live); PEARL, iNews (live)<br><br>TVB programs on demand | JADE HD, JADE, J2, PEARL (live and replay live); iNews (live)<br><br>TVB programs on demand |
| 粤海直播 (Yue Hai Zhi Bo)  | iNews, J2, PEARL, JADE, JADE HD (live) | |
| 516TV  | TVBS (live) | |
| 516網路電視 (516 Online TV)  | CCTV4 (live)<br><br>TVBS (live) | CCTV4 (live)<br><br>TVBS (live)<br><br>TVBS News (live) |

3

| | TVpad3 | TVpad4 |
|---|---|---|
| **Infringing TVpad App and icon** | **Plaintiffs' Programming and Mode** | **Plaintiffs' Programming and Mode** |
| HITV  | JADE HD, J2, JADE, PEARL, iNews (live) | |
| 体育online (Sport Online)  | CCTV 1, CCTV 5, CCTV 5+, CCTV风云足球（CCTV fengyun soccer) (all live) | CCTV 5, CCTV 5+, CCTV风云足球 (CCTV fengyun soccer), CCTV 高尔夫. 网球 (CCTV Golf/ Tennis) (all live) |
| 港粤快看 (Gang Yue Kuai Kan)  | TVB programs on demand | |
| 港台武侠(Gang Tai Wu Xia)  | TVB programs on demand | TVB programs on demand |

4