UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINA CENTRAL TELEVISION, a China company; CHINA INTERNATIONAL COMMUNICATIONS CO., LTD., a China company; TVB HOLDINGS (USA), INC., a California corporation; and DISH NETWORK L.L.C., a Colorado corporation, Plaintiffs, <br><br>     Plaintiffs, <br><br>    vs. <br><br> CREATE NEW TECHNOLOGY (HK) LIMITED, a Hong Kong company; HUA YANG INTERNATIONAL TECHNOLOGY LIMITED, a Hong Kong company; SHENZHEN GREATVISION NETWORK TECHNOLOGY CO. LTD., a China company; CLUB TVpad, INC., a California corporation; BENNETT WONG, an individual, ASHA MEDIA GROUP INC. d/b/a TVpad.COM, a Florida corporation; AMIT BHALLA, an individual; NEWTVpad LTD. COMPANY d/b/a NEWTVpad.COM a/k/a TVpad USA, a Texas corporation; LIANGZHONG ZHOU, an individual; HONGHUI CHEN d/b/a E-DIGITAL, an individual; JOHN DOE 1 d/b/a BETV; JOHN DOE 2 d/b/a YUE HAI; JOHN DOE 3 d/b/a 516; JOHN DOE 4 d/b/a HITV; JOHN DOE 5 d/b/a GANG YUE; JOHN DOE 6 d/b/a SPORT ONLINE; JOHN DOE 7 d/b/a GANG TAI WU XIA; and JOHN DOES 8-10, <br>     Defendants. | CASE NO. CV 15-01869 MMM (AJWx) <br><br> [AMENDED] ORDER GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT |

# I. BACKGROUND

## A.     Procedural Background

On March 13, 2015, plaintiffs China Central Television ("CCTV"), China International Communications Co., Ltd. ("CICC"), TVB Holdings (USA), Inc. ("TVB USA"), and DISH Network L.L.C. ("DISH") (collectively "plaintiffs") filed this action against Create New Technology HK Limited ("CNT"), Hua Yang International Technology Limited ("HYIT"), Shenzhen GreatVision Network Technology Co., Ltd. ("GreatVision"), (collectively "the CNT defendants"), and various fictitious defendants (plaintiffs denominate the CNT defendants and fictitious defendants collectively as the "Retransmission defendants").[1]  Plaintiffs also name as defendants Club TVpad, Inc. ("Club TVpad"), Bennett Wong, Asha Media Group ("AMG"), Amit Bhalla, newTVpad Ltd. Company ("newTVpad"), Liangzhong Zhou, Honghui Chen.[2]  Plaintiffs filed a notice of voluntary dismissal as to GreatVision on November 9, 2015.[3]  Plaintiffs have now filed a motion seeking the entry of default judgment against the two remaining CNT defendants, CNT and HYIT (collectively "defendants").[4]

Plaintiffs served the summons and complaint on HYIT and CNT respectively on March 17 and 18, 2015.[5]  HYIT has not appeared or responded to the complaint.[6]  CNT initially appeared through

---

[1]Complaint, Docket No. 1 (Mar. 13, 2015).

[2]*Id.*

[3]Notice of Voluntary Dismissal Without Prejudice of Defendant Shenzhen Greatvision Network Technology Co. Ltd. ("GreatVision Dismissal"), Docket No. 141 (Nov. 9, 2015).

[4]Motion for Default Judgment ("Motion"), Docket No. 123 (Sept. 14, 2015).  See also Reply in Support of Motion for Default Judgment against Defendants Create New Technology (HK) Limited; Hua Yang International Technology Limited, Docket No. 139 (Oct. 26. 2015).

[5]Compendium of Evidence in Support of Plaintiffs' Motion for Default Judgment ("Compendium"), Volume I, Docket No. 125-1 (Sept. 14, 2015), ¶ 2; Request for Entry of Default against Defendant Hua Yang International Technology Limited, Docket No. 64 (Apr. 27, 2015), Declaration of Carla A. McCauley ("McCauley DJ Decl."),¶¶ 6-7.

[6]McCauley DJ Decl., ¶ 3.

counsel, but its attorney subsequently requested and was granted leave to withdraw.[7]  CNT has not responded to the complaint.[8]

Plaintiffs requested that HYIT's default be entered on April 27, 2015;[9] they sought the entry of CNT's default on May 1, 2015.[10]  The court entered defaults against both defendants on May 28, 2015.[11]  On June 11, 2015, the court entered a preliminary injunction against CNT.[12]  Because it did not comply with the terms of the injunction, plaintiffs filed a motion for contempt on August 26, 2015.[13]  The court entered a contempt order against CNT on November 4, 2015.[14]  In the interim, on September 14, 2015, plaintiffs filed this motion for entry of default judgment.[15]  Defendants have not opposed the motion.

### B.    Factual Background

CCTV and Television Broadcasts Limited ("TVB") are television broadcasters in mainland China and Hong Kong, respectively.[16]  Through affiliates, CCTV and TVB license copyrighted

---

[7]*Id.*; Motion of Harry A. Zinn and Lester F. Aponte to Withdraw as Attorneys ("Withdrawal Motion"), Docket No. 56 (Apr. 17, 2015); Minutes (In Chambers) Order Granting Defense Counsel's Motion to Withdraw ("Withdrawal Order"), Docket No. 102 (June 25, 2015).

[8]McCauley DJ Decl., ¶ 3.

[9]Request for Entry of Default Against Defendant Hua Yang International Technology Limited, Docket No. 64 (Apr. 27, 2015).

[10]Request for Entry of Default against Defendant Create New Technology HK Limited, Docket No. 67 (May 1, 2015).

[11]Minutes (In Chambers) Order Granting Plaintiffs' Requests for Entry of the Defaults of Defendants Hua Yang International Technology Ltd. and Create New Technolgoy HK Ltd. ("Default"), Docket No. 87 (May 28, 2015).

[12]Preliminary Injunction, Docket No. 98 (June 11, 2015).

[13]Plaintiffs' Motion for Contempt, Docket No. 109 (Aug. 26, 2015).

[14]Findings of Fact and Conclusions of Law in Support of Contempt Order, Docket No. 140 (Nov. 4, 2015).

[15]Motion.

[16]Complaint, ¶¶ 1-3, 5.

television programming for retransmission in the United States via authorized satellite, cable, and other television service providers ("Authorized U.S. Providers").[17]

CICC is a CCTV affiliate that licenses Authorized U.S. Providers to broadcast CCTV's "Great Wall" package of channels to paying U.S. subscribers. Although CICC licenses certain satellite and cable retransmission rights, CCTV retains and owns the exclusive right to transmit CCTV programming in the United States over the internet.[18] TVB USA is a wholly owned indirect subsidiary of TVB and distributes and licenses TVB programming in the United States. TVB owns and maintains the right to transmit TVB programming in the United States. DISH is a television service provider that delivers television services to subscribers through satellite and internet platforms. DISH is a licensee of both CCTV and TVB; pursuant to licensing agreements, DISH owns the exclusive right to transmit certain CCTV and TVB programming in the United States via satellite, and certain TVB programming via OTT.[19]

CNT is a Hong Kong company that manufactures the "TVpad" device – a set-top box that delivers streaming television programming from Asia to customers in the United States over the internet without requiring customers to pay subscription fees to an authorized provider.[20] HYIT is a Hong Kong company that has its principal place of business in Hong Kong.[21] HYIT has total registered capital of only HKD 10,000 (approximately $1,300 USD) and is owned by individuals named Chen Xia and

---

[17]Compendium of Evidence in Support of Motion for Preliminary Injunction ("Injunction Compendium"), Volume I, Docket No. 23-1 (Mar. 16, 2015), Declaration of Samuel P. Tsang ("Tsang PI Decl."), ¶¶ 3-4, 11; Compendium, Volume I, Declaration of Chunguang Lu ("Lu Decl."), ¶¶ 3-5, 9.

[18]Lu Decl., ¶¶ 5, 10-11.

[19]Compendium, Volume I, Declaration of Christopher Kuelling ("Kuelling DJ Decl."), ¶¶ 5-7; Lu Decl., ¶¶ 12-13; Tsang Decl., ¶ 26. "OTT" is the delivery of video programming using an internet connection that is not owned, managed, or operated by the party delivering the programming – i.e., Netflix. (Kuelling DJ Decl., ¶ 4, n.1.)

[20]Complaint, ¶¶ 3-4; Injunction Compendium, Volume I, Declaration of Christopher Weil ("Weil PI Decl."), ¶¶ 9, 16.

[21]Complaint, ¶ 20.

Zhang Min.[22]   Min was the sole shareholder of CNT prior to July 2013.[23]   Plaintiffs allege on information and belief that the CNT defendants share a common operational office at North Gate, Building R2-A, Virtual University Park, High-Tech Industrial Park, Keyuan Road W., Nanshan District, Shenzhen.[24]   They assert that the CNT defendants are commonly owned, operated, and controlled for the purpose of distributing and profiting from the TVpad Retransmission Service in the United States and around the world.[25]

CNT and HYIT offer TVpads for sale to consumers throughout the United States – including within the Central District of California – via their joint website, www.iTVpad.com, and U.S. distributors.[26]   Until approximately September 2014, HYIT, on behalf of the CNT defendants, operated the TVpad website, as well as another website at tvpad.hk, both of which sold TVpad devices to consumers in the Central District of California.[27]   In approximately September 2014, the CNT defendants merged CNT's previous website (www.creatent.net) with the TVpad website.[28] CNT's latest model of the TVpad, the TVpad4, sells at retail for $299.00.[29]

Club TVpad is a California corporation based in Hayward, California.  Club TVpad operates an interactive website on which it offers TVpads for sale to California consumers.  Corporate records

---

[22]*Id.*, ¶ 76.

[23]*Id.*

[24]*Id.*, ¶ 79.

[25]*Id.*, ¶ 81.

[26]*Id.*, ¶ 74.

[27]*Id.*, ¶ 75.

[28]*Id.*

[29]Compendium, Volume I, Declaration of Christopher Weil ("Weil DJ Decl."), ¶¶19-21; Compendium, Volume IV, Exh. 56, Docket No. 125-3 (Sept. 14, 2015); Compendium, Volume V, Exh. 57-58, Docket No. 125-4 (Sept. 14, 2015).

identify Wong as Club TVpad's officer and agent for service of process.[30]  AMG is similarly a California corporation that operates an interactive website on which it offers TVpads for sale to California consumers.  Corporate records identify Amit Bhalla as AMG's president.[31]

Before a TVpad user can access television programming, he or she must download applications from the "TVpad Store."  The store is a primary feature of every TVpad device.  Thus, before TVpad users in the United States can access unauthorized CCTV and TVB programming, they must download free apps from the TVpad Store for their devices.[32]

Plaintiffs' investigators have identified 15 TVpad apps available in the TVpad Store that permit TVpad users in the United States to access unauthorized CCTV and TVB programming ("Infringing TVpad Apps").  These Infringing TVpad Apps provide CCTV and TVB programming in four modes: "live" streaming, "time-shifted" streaming, and two forms of video-on-demand streaming.[33]

Plaintiffs allege that the fictitious defendants develop and distribute the Infringing TVpad Apps.[34]  They plead, on information and belief, that the fictitious defendants either do not exist or are controlled by the CNT defendants, including both CNT and HYIT.[35]  The CNT defendants purportedly are deeply involved in, and are directly or indirectly responsible for (a) capturing CCTV's and TVB's broadcasts in Asia and infringing retransmission of that programming over the Internet to TVpad users in the United States; and (b) developing, maintaining, and disseminating the Infringing TVpad Apps.[36]

---

[30]Injunction Compendium, Volume I, Declaration of Shuk Kuen "Lily" Lau ("Lau Decl."), ¶¶ 4-5, 9.  See also Injunction Compendium, Volume V, Exhs. 57- 71, Docket No. 23-5 (March 16, 2015); *id.*, Volume VI, Exhs. 72-78, Docket No. 23-6 (March 16, 2015).

[31]Lau Decl., ¶¶ 21-24.  See also Injunction Compendium, Volume VI, Exh. 74.

[32]Injunction Compendium, Volume I, Declaration of Nicholas Braak ("Braak PI Decl."), ¶¶ 8, 14-16; Weil PI Decl., ¶ 26; Kuelling DJ Decl. ¶¶ 9-10.

[33]Compendium, Volume I, Declaration of Nicholas Braak ("Braak DJ Decl."), ¶ 4; *id.*, Declaration of Samuel P. Tsang ("Tsang DJ Decl."), ¶ 5-6.

[34]Complaint, ¶¶ 29-36.

[35]*Id.*, ¶ 8.

[36]*Id.*

In late 2014, plaintiffs' investigator observed and recorded 30 CCTV television episodes and 23 TVB television episodes streamed through Infringing TVpad Apps on a TVpad device.  A TVB USA executive observed and recorded portions of an additional 406 TVB episodes streamed through Infringing TVpad Apps in video-on-demand mode.  Each episode recorded by plaintiffs' investigator and the TVB USA executive ("Registered Programs") are registered with the United States Copyright Office.  Plaintiffs have not granted anyone a license to stream the Registered Programs over the internet into the United States through the Infringing TVpad Apps.[37]

Before accessing the TVpad Store, users must accept CNT's mandatory terms of service.  These terms state, *inter alia*, that CNT reserves the right to "filter, modify, refuse or delete any or all software applications in the TVpad Store," and to "suspend, remove, or disable access to any Products, content, or other materials accessible through the TVpad Store."[38]  CNT solicits new applications for the TVpad Store, announces the release of new applications, and sells different "editions" of its TVpad4 device with unique application collections.  CNT has stated that it "has strictly controlled and managed the way to upload apps on TVpad Store[.]"[39]

Plaintiffs' investigator performed forensic analysis of the TVpad device and determined that Infringing TVpad Apps in "live" mode stream CCTV and TVB programming through a peer-to-peer network, in which each TVpad user streams video content to large numbers of other users worldwide.  Stated differently, each TVpad user not only receives live CCTV and TVB broadcasts, but also simultaneously retransmits those broadcasts to other TVpad users throughout the United States and around the world.  CNT is aware of the peer-to-peer streaming feature of the TVpad and has publicly

---

[37]Braak PI Decl., ¶¶ 74-76; Tsang PI Decl., ¶¶ 23, 25-27; Injunction Compendium, Volume VI, Exh. 92; Lu Decl., ¶¶ 23-25; *id.*, Volume VI, Exh. 94; *id.*, Declaration of Christopher Kuelling ("Kuelling PI Decl."), ¶ 14.

[38]Braak PI Decl., ¶¶ 29-30; Injunction Compendium, Volume IV, Exh. 47, Docket No. 23-4 (March 16, 2015), ¶¶ 3.8, 3.10.

[39]Weil PI Decl., ¶¶ 18, 25, 36; Injunction Compendium, Volume II, Exhs. 7, 9-12, 18, Docket No. 23-2 (March 16, 2015); Injunction Compendium, Volume I, Declaration of George P. Wukoson ("Wukoson PI Decl."), ¶ 2; *id.*, Volume VII, Exh. 104, Docket No. 23-7 (March 16, 2015) at 4.

advertised the feature.[40]

Plaintiffs' investigator reports that peer-to-peer streaming can only function if an individual initially captures CCTV and TVB broadcast signals in Asia.  After the signal is captured, the individual converts the signal into digital data and then streams the data to TVpad users through the peer-to-peer network.[41]  The investigator has also determined that Infringing TVpad Apps in "video-on-demand" mode stream CCTV and TVB programs to TVpad users directly from servers in the United States, including servers in Los Angeles.[42]  Data packets received from the servers indicate that recorded video files reside on the servers.  Thus, individuals or entities that pirate CCTV and TVB programs from Asia make copies of the programs and stream those copies from servers located in the United States.[43] Forensic analysis has demonstrated that Infringing TVpad Apps in time-shift mode stream CCTV and TVB programming both through the peer-to-peer network and directly from servers in China.[44]

CNT promotes its television service, the Infringing TVpad Apps, and the availability of CCTV and TVB programming on the TVpad devices.  In some cases, it has falsely represented that the content it delivers has been authorized by CCTV and TVB.  CNT solicits new distributors by stating that it provides "[e]xclusive & authorized live content from mainland China/HK/Taiwan"; this statement is displayed next to CCTV's and TVB's logos.  CNT has also advertised on its website that the TVpad delivers "massive content from China, Taiwan, and HK."[45]

---

[40]Braak PI Decl., ¶¶ 10(a), 53-56; Injunction Compendium, Volume IV, Exh. 45; Weil PI Decl., ¶ 19; Injunction Compendium, Volume II, Exh. 9 at 1.

[41]Braak PI Decl., ¶¶ 17, 56.  Plaintiffs denominate individuals responsible for capturing broadcast signals and converting them into data streamed through peer-to-peer networks as "App Infringers."

[42]*Id.*, ¶¶ 10(b), (d), 60-62; Injunction Compendium, Volume IV, Exh. 45.

[43]Braak PI Decl., ¶ 62; Injunction Compendium, Volume IV, Exh. 45.

[44]Braak PI Decl., ¶¶ 10(c), 63.

[45]Weil PI Decl., ¶¶ 28-50; Injunction Compendium, Volume II, Exhs. 8, 13, 16, 18, 21-23, 26, 29, 33; Redacted Version of Exhibits Filed in Support of Plaintiffs' Motion for Default Judgment as to Defendants Create New Technology (HK) Limited and Hua Yang International Technology Ltd. ("Default Judgment Redacted Exhibits"), Docket No. 147 (Nov. 25, 2015), Exhs. 14, 15, 17,

CNT places banner advertisements for Infringing TVpad Apps that stream CCTV and TVB programs on the user interface of the TVpad device.  It also utilizes categories such as "Live TV," "VOD," and "TV Dramas" in the TVpad Store to make it easy for users to locate and download Infringing TVpad Apps.[46]

CNT's blog actively promotes the Infringing TVpad Apps.  For example, on January 8, 2014, CNT stated that the Gang Yue Wang Luo Dian Shi app provides live channels in high definition, and noted that it is "definitely the favorite of those who love to watch TVB."  CNT's blog post included a screenshot of a TVB program.[47]

CNT's Facebook page regularly promotes the availability of CCTV and TVB television programs through the Infringing TVpad Apps.  One post by the TVpad administrator on CNT's Facebook page encourages users to watch a CCTV documentary and places the CNT logo directly next to programming information for CCTV channels.[48]  CNT's Facebook page includes a promotional video that features icons of the Infringing TVpad Apps and a CCTV broadcast.[49]

CNT also actively collaborates with third-party App Infringers to develop and improve infringing content by providing customer support and technical assistance to help TVpad users access and share infringing streams of CCTV and TVB programming, and by conveying messages between TVpad users and App Infringers.  For example, a CNT blog post instructs users how to install the infringing BETV app from the TVpad Store, providing step-by-step screenshots.[50]

Administrators on CNT's Facebook page instruct users how to download and use Infringing

19, 20, 24, 25, 27, 28.

[46]Braak PI Decl., ¶¶ 31-36, 38-41, 46-50; Injunction Compendium, Volume IV, Exhs. 46, 48.

[47]Weil PI Decl., ¶ 36; Injunction Compendium, Volume III, Exh. 18, Docket No. 23-3 (Mar. 16, 2015).

[48]Weil PI Decl., ¶¶ 39-42; Default Judgment Redacted Exhibits, Exh. 20 at 3-6; *id.*, Exh. 21.

[49]Weil PI Decl., ¶¶ 42, 50; Injunction Compendium, Volume III, Exh. 21; *id.*, Exh. 29 at 1-53, 61-71.

[50]Weil PI Decl., ¶¶ 37, 54-56; Injunction Compendium, Volume III, Exh. 30; *id.*, Volume IV, Exh. 32; Default Judgment Redacted Exhibits, Exhs. 19, 31.

TVpad Apps to access CCTV and TVB programming.  On June 12, 2014, in response to the question – "Anyone knows which app or channel on TVpad is showing the World Cup???" – a CNT administrator advised the user to try BETV and Sport Online, two Infringing TVpad Apps that stream CCTV channels.[51]  When a user asked on CNT's Facebook page, "[w]hich TVpad . . . can see tvb day and night and 12 hour back and tvb drama," an administrator wrote "Could download three party applications from TVpad store for this case[.]"[52]  Administrators provide similar assistance to help TVpad users locate CCTV and TVB programming on CNT's official fan forum at TVpadfans.com.[53] Administrators on CNT's Facebook page and fan forum also provide technical assistance and updates to customers regarding server problems impacting their ability to stream infringing television content.[54] As recently as January 9, 2015, CNT responded to user complaints about problems downloading the new Gang Yue Wang Luo Dian Shi app – an Infringing TVpad App.  They apologized for any inconvenience, and asked customers to send a private message to CNT so that CNT and the "app provider" could address the problem.[55]

CNT has also made statements that suggest it collaborates with third party app developers to develop and improve infringing content.  By way of example, on August 18, 2013, CNT published a post on its Facebook page soliciting suggestions as to how it could  "better serve [its] overseas customers and allow overseas TVpad users to enjoy better Chinese TV services."  In response, one user suggested adding a TVB football channel; the administrator said he would "communicate with third-party application developers" regarding the suggestion.[56]  In response to another user's suggestion that

[51]Weil PI Decl., ¶¶ 43-45; Injunction Compendium, Volume III, Exhs. 22-23; Default Judgment Redacted Exhibits, Exh. 24.

[52]Weil PI Decl., ¶ 45; Default Judgment Redacted Exhibits, Exh. 24.

[53]Weil PI Decl., ¶ 50; Injunction Compendium, Volume III, Exh. 29 at 81-87.

[54]Weil PI Decl., ¶¶ 37, 39; Default Judgment Redacted Exhibits, Exhs. 34, 36; Braak PI Decl., ¶ 59; Injunction Compendium, Volume V, Exh. 51.

[55]Weil PI Decl., ¶ 60; Injunction Compendium, Volume IV, Exh. 37.

[56]Weil PI Decl., ¶ 54.

CNT "improve all streaming sound bit rates and enable stereo," the administrator reported that "the application providers are working on this issue."[57]

In addition to responding to user suggestions and questions, CNT also communicates information regarding the Infringing TVpad Apps to users.  In October 2013, for example, a CNT administrator posted a notification on CNT's official Facebook page advising TVpad users that maintenance required on the infringing 516 app might cause service disruptions.[58]

Despite its internet-based streaming business model, CNT has not (a) posted a policy instructing users how to report infringing activity, (b) appointed an agent to receive notifications of claimed infringement under the Digital Millennium Copyright Act, 17 U.S.C. § 512 (c)(2), or (c) adopted any notice-and-takedown procedures in the TVpad Store.[59]

CNT employs a business model that requires TVpad users to pay an up-front, one-time fee for unlimited access to unauthorized, infringing programming.  Consumers who wish to access the content from an Authorized U.S. Provider must pay regular subscription fees to receive programming.[60]

Both CCTV and TVB allege that they have registered or applied for trademarks and service marks.[61]  They have shown that they own numerous U.S. copyright registrations for television programming.[62]  Plaintiffs have also shown that the Infringing TVpad Apps on the TVpad have streamed 2,006 of the copyrighted programs and streamed entire programming schedules all day, every day for

---

[57] *Id.*, ¶¶ 54-55; Injunction Compendium, Volume IV, Exh. 30; Default Judgment Redacted Exhibits, Exh. 31.

[58] Weil PI Decl., ¶ 56; Injunction Compendium, Volume IV, Exh. 32.

[59] Braak PI Decl., ¶ 51.

[60] Weil PI Decl., ¶¶ 4, 28, 35, 38, 62; Injunction Compendium, Volume II, Exhs. 6, 13; *id.*, Volume IV, Exh. 38; Lau Decl., ¶¶ 26, 30, 34; *id.*, Volume VI, Exh. 80; Tsang Decl., ¶ 14; Lu Decl., ¶ 15; Kuelling Decl., ¶¶ 7-8, 11; Default Judgment Redacted Exhibits, Exh. 17.

[61] Complaint, ¶ 52, 64.

[62] See *id.*, Exh. A-Exh. D (table listing numerous registered works and their accompanying copyright registrations).

at least four years.[63]

Plaintiffs' trademarks are streamed through defendants' TVpads along with plaintiffs' programming.[64]  Not only do defendants stream plaintiffs' copyrighted programming and trademarks, but they use plaintiffs' trademarks in advertising and promotional materials such as posts to their Facebook page and blog.[65]  They display plaintiffs' trademarks and assert that they have "exclusive & authorized live content[ ]" to solicit investors.[66]

## II. DISCUSSION

### A.    Standard Governing Motions for Entry of Default Judgment

A court may enter judgment against parties whose default has been taken pursuant to Rule 55(b).  See *PepsiCo, Inc. v. California Security Cans*, 238 F.Supp.2d 1172, 1174 (C.D. Cal. 2002); *Kloepping v. Fireman's Fund*, No. 94-2684 TEH, 1996 WL 75314, *2 (N.D. Cal. Feb. 13, 1996).  Granting or denying a motion for default judgment is a matter within the court's discretion.  *Elektra Entm't Group, Inc. v. Bryant*, No. CV 03-6381 GAF (JTLx), 2004 WL 783123, *1 (C.D. Cal. Feb. 13, 2004); see also *Sony Music Entm't, Inc. v. Elias*, No. CV 03-6387 DT (RCx), 2004 WL 141959, *3 (C.D. Cal. Jan. 20, 2004).  Once a party's default has been entered, the factual allegations in the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party.  See FED.R.CIV.PROC. 8(b)(6); see also, e.g., *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977) (stating the general rule that "upon default[,] the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true").  The court, however, must still "consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not

---

[63]Braak DJ Decl., ¶¶ 12-14; Tsang DJ Decl. ¶¶ 5-15.

[64]Weil PI Decl., ¶¶ 14-40, 41; Default Judgment Redacted Exhibits, Exh. 20.

[65]*Id.*; Complaint, ¶¶ 6–8, 47–49, 50–53, 138-39.

[66]Weil PI Decl., ¶¶ 28-50; Injunction Compendium, Volume II, Exhs. 8, 13, 16; *id.*, Volume III, Exhs. 18, 21-23, 26, 29; *id.*, Volume IV, Exh. 33; Default Judgment Redacted Exhibits, Exhs. 14, 15, 17, 19, 20, 24, 25, 27, 28.

admit mere conclusions of law."  10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2688, at 63 (1998) (footnote omitted); see also *Cripps v. Life Ins. Co. of North America*, 980 F.2d 1261, 1267 (9th Cir. 1992) ("[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default"); *Doe v. Qi*, 349 F.Supp.2d 1258, 1272 (N.D. Cal. 2004) ("[Although] the factual allegations of [the] complaint together with other competent evidence submitted by the moving party are normally taken as true . . . this Court must still review the facts to insure that the Plaintiffs have properly stated claims for relief").

If the court determines that the allegations in the complaint are sufficient to establish liability, it must then determine the "amount and character" of the relief that should be awarded.  10A Wright, Miller, & Kane, *supra*, § 2688, at 63; see also *Elecktra Entm't Group Inc. v. Crawford*, 226 F.R.D. 388, 394 (C.D. Cal. 2005) (stating that the district court has "wide latitude" and discretion in determining the amount of damages to award upon default judgment, quoting *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993)).

## B.     Procedural Requirements

Before a court can enter default judgment against a defendant, the plaintiff must satisfy the procedural requirements for default judgments set forth in Rules 54(c) and 55 of the Federal Rules of Civil Procedure, as well as in Local Rule 55-1.  Rule 54(c) states that "judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." FED.R.CIV.PROC. 54(c).  Rule 55(a) provides that the clerk must enter default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  FED.R.CIV.PROC. 55(a).  Rule 55(b)(2) requires service of any motion for default judgment on the defaulting party if the party has appeared in the action. FED.R.CIV.PROC. 55(b)(2) ("If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 3 days before the hearing"); see also, e.g., *In re Roxford Foods, Inc.*, 12 F.3d 875, 879 (9th Cir. 1993) (stating that Rule 55(b)(2) notice "is only required where the party has made an appearance").

Additionally, Local Rule 55-1 requires that a party moving for default judgment submit a

declaration (1) indicating when and against which party default has been entered; (2) identifying the pleading as to which default has been entered; (3) indicating whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented by a general guardian, committee, conservator or other representative; (4) stating that the Servicemembers Civil Relief Act, 50 App. U.S.C. § 521 does not apply; and (5) affirming that notice has been served on the defaulting party if required by Rule 55(b)(2). CA CD L.R. 55-1, 55-2; *PepsiCo, Inc.*, 238 F.Supp.2d at 1174.

Plaintiffs have satisfied these procedural requirements.  In their motion, plaintiffs seek statutory damages of $300,900,000 and actual damages of $25,460,691.[67]  These are the types of damages sought in the complaint.[68]  As a result, plaintiffs have complied with Rule 54(c).  Second, plaintiffs filed proofs of service on September 15, 2015, indicating that both CTV and HYIT had been served in compliance with Rule 55(b)(2).  Plaintiffs represent that CNT has failed to file a responsive pleading and that it has not appeared through new counsel since the withdrawal of its attorneys of record.  HYIT has not appeared at all.[69]  Both parties' defaults were entered on May 28, 2015.  Thus, Rule 55(a) has been satisfied.

In addition to satisfying Rules 54(c) and 55(a) of the Federal Rules of Civil Procedure, plaintiffs have complied with the procedural requirements set out in Local Rule 55-1.  Plaintiffs attached to their motion the declaration of Carla A. McCauley, which states that plaintiffs served the summons and complaint on HYIT and CNT on March 17 and 18, 2015 respectively;[70] that when defendants failed to respond or defend, the court ordered the entry of their defaults as to the complaint;[71] that defendants are not infants or incompetent persons, and are not otherwise exempt under the Servicemembers Civil Relief

---

[67]Motion at 2.

[68]See Complaint at 73.

[69]Proof of Service by Hand Delivery of Motion for Default Judgment on Defendant Create New Technology (HK) Limited, Docket No. 126 (Sept. 15, 2015); Proof of Service by Hand Delivery of Motion for Default Judgment on Defendant Hua Yang International Technology Limited, Docket No. 127 (Sept. 15, 2015).

[70]McCauley DJ Decl., ¶¶ 3-4.

[71]*Id.*, ¶ 4.

Act;[72] and that plaintiffs will personally serve copies of the motion for default judgment on the defendants.[73]   For these reasons, the court concludes that plaintiffs have satisfied the procedural prerequisites of Rules 54(c) and 55 of the Federal Rules of Civil Procedure, as well as Local Rule 55-1. The court therefore turns to the merits of the motion.

### C.      The *Eitel* Factors

Granting or denying a motion for default judgment is a matter within the court's discretion. *Bryant*, 2004 WL 783123 at *1; see also *Elias*, 2004 WL 141959 at *3.   The Ninth Circuit has directed that courts consider the following factors in deciding whether to enter default judgment: (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning the material facts; (6) whether defendant's default was the product of excusable neglect; and (7) the strong policy favoring decisions on the merits.  See *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986); see also *Bryant*, 2004 WL 783123 at *1-2.

### 1.      Possibility of Prejudice to Plaintiffs

The first *Eitel* factor considers whether plaintiffs will suffer prejudice if a default judgment is not entered. *PepsiCo, Inc.*, 238 F.Supp.2d at 1177; see also *Eitel*, 782 F.2d at 1471-72.  Because HYIT has not responded to plaintiffs' complaint or otherwise appeared, and because CNT has not responded to the complaint or participated in this litigation since its counsel withdrew in June 2015, plaintiffs would be left without recourse against HYIT and CNT if default judgment were not entered in their favor.   Given the ongoing nature and large scale of the infringement alleged, plaintiffs would be prejudiced if denied a remedy against HYIT and CNT.  See *PepsiCo, Inc.*, 238 F.Supp.2d at 1177 (stating that plaintiffs would have no other recourse if a default judgment were not entered).  As a result, the first *Eitel* factor weighs in favor of the entry of default judgment.

---

[72]*Id.*, ¶ 5.

[73]*Id.*, ¶ 6.

### 2.      Substantive Merits and Sufficiency of the Claims

The second and third *Eitel* factors assess the substantive merit of the movant's claims and the sufficiency of the pleadings.  These factors "require that a [movant] 'state a claim on which [he] may recover.'"  *PepsiCo, Inc.*, 238 F.Supp.2d at 1175 (quoting *Kloepping*, 1996 WL 75314 at *2); see also *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978) (stating that the issue is whether the allegations in the pleading state a claim upon which plaintiff can recover); *Discovery Commc'ns, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1288 (C.D. Cal. 2001) ("The Ninth Circuit has suggested that the [ ] two *Eitel* factor[s] involving the substantive merits of Plaintiff's claims and the sufficiency of the complaint [ ] 'require that plaintiff's allegations state a claim on which they may recover,'" quoting *Danning*, 572 F.2d at 1388).

### a.      Direct Copyright Infringement Claim

To prevail on a copyright infringement claim, plaintiffs must show: (1) ownership of a valid copyright; and (2) infringement of the copyright by defendants.  See *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1143 (9th Cir. 2003) (citing *North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992)); *Metcalf v. Bochco*, 294 F.3d 1069, 1072 (9th Cir. 2002).

### (1)      Ownership of a Copyrighted Work

The first element plaintiffs must show to prevail on their copyright infringement claim is ownership of a valid copyright.  As the Ninth Circuit has observed, copyright "registration is considered *prima facie* evidence of the validity of the copyright."  *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002); see also 17 U.S.C. § 410(c)*; Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 n. 2 (9th Cir. 2012) (stating that registration serves as *prima facie* evidence of the validity of the copyright and plaintiff's ownership); *Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997).  Plaintiffs attached copies of their respective copyright registration certificates for their collective 2,006 registered works.[74]  Having failed to appear, defendants have not disputed the validity of any of the copyrights.  Consequently, the court

---

[74][Proposed] Order Granting Plaintiffs' Motion for Default Judgment and Permanent Injunction Against Defendants Create New Technology (HK) Limited and Hua Yang International Limited Technology ("Proposed Default Judgment Order"), Exh. A, Docket No. 123-1 (Sept. 14, 2015).

1   concludes that plaintiffs have shown that they own valid copyrights in the 2,006 registered works.

2   ### (2)     Infringement

3       Section 106 of the Copyright Act "provides that the owner of [a] copyright . . . has the exclusive

4   rights to do and to authorize others to display, perform, reproduce, or distribute copies of the work and

5   to prepare derivative works." *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1152 (9th

6   Cir. 2010) (internal quotation marks omitted).  "Because direct evidence of copying is not available in

7   most cases, [a] plaintiff may establish copying by showing that defendant had access to plaintiff's work

8   and that the two works are 'substantially similar' in idea and in expression of the idea." *Smith v.

9   Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996); see also *Funky Films, Inc. v. Time Warner Entm't Co.,

10   L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) ("[P]roof of infringement involves fact-based showings that

11   the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar,'"

12   citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000)); *Kouf v. Walt Disney

13   Pictures & Television*, 16 F.3d 1042, 1044 n. 2 (9th Cir. 1994) ("To establish copyright infringement,

14   Kouf, as plaintiff, must show that he owns a valid copyright in his screenplay, and that the defendant

15   Disney copied protected elements of it.  To prove copying, Kouf must show that Disney had access to

16   his screenplay and that parts of Disney's films are substantially similar to protected elements of the

17   screenplay").

18       The substantial similarity analysis is irrelevant, however, where a plaintiff shows direct copying

19   because substantial similarity "is not an element of a claim of copyright infringement.  Rather, it is a

20   doctrine that helps courts adjudicate whether copying of the 'constituent elements of the work that are

21   original' actually occurred when an allegedly infringing work appropriates elements of an original

22   without reproducing it *in toto*." *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668 F.3d 1148, 1154

23   (9th Cir. 2012) (citing *Funky Films*, 462 F.3d at 1076); see also *Funky Films*, 462 F.3d at 1076 (noting

24   that a showing of substantial similarity is only necessary to prove infringement "[a]bsent evidence of

25   direct copying"); *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir. 1989) ("A finding [is made] that a

26   defendant copied a plaintiff's work, without application of a substantial similarity analysis[,] when the

27   defendant has engaged in virtual duplication of a plaintiff's entire work").

28       The court need not engage in a substantial similarity analysis in this case because plaintiffs

allege that defendants directly copied the copyrighted television programs by capturing entire CCTV television channels and rebroadcasting them to users in the United States and around the world via TVpad devices.[75]  Plaintiffs allege not that defendants rebroadcasted programs that were substantially similar to the copyrighted works, but rather that they used the copyrighted programs themselves. Because defendants have admitted these allegations by failing to answer or otherwise respond, the court accepts as true that defendants directly copied the works; this satisfies the second element of plaintiffs' copyright claim.  Plaintiffs have therefore stated a plausible claim for direct copyright infringement.

### b.    Secondary Copyright Infringement

Plaintiffs' second claim for relief alleges a claim for vicarious or contributory copyright infringement.  "Although the Copyright Act does not expressly impose liability on anyone other than direct infringers, courts have long recognized that in certain circumstances, vicarious or contributory liability will be imposed." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996).  In *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004), the Ninth Circuit described the different variants of copyright infringement, and the requirements needed to establish each.  *Id.* at 1076.  It stated:

"As a threshold question, a plaintiff who claims copyright infringement must show: (1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act.  We recognize three doctrines of copyright liability: direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement. . . .  One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another may be liable as a contributory copyright infringer.  We have interpreted the knowledge requirement for contributory copyright infringement to include both those with actual knowledge and those who have reason to know of direct infringement." *Id.* at at 1076.

"Within the general rule that '[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement,' the Court has defined two categories of contributory liability: 'Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement

---

[75]Complaint, ¶¶ 3, 77.

18

through specific acts (as the Court's opinion develops) or on distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses.'" *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, 942 (2005)).  A computer system operator can be held contributorily liable for copyright infringement under the first category "if it 'has actual knowledge that specific infringing material is available using its system,' and can 'take simple measures to prevent further damage' to copyrighted works, yet continues to provide access to infringing works." *Id.* at 1172 (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001); *Religious Tech. Center v. Netcom On-Line Commc'n Servs., Inc.*, 907 F.Supp. 1361, 1375 (N.D. Cal. 1995)).

"A defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit from another's infringing activity and has the right and ability to supervise the infringing activity." *Ellison*, 357 F.3d at 1076 (citations and quotation marks omitted); see also *Fonovisa*, 76 F.3d at 262 ("[E]ven in the absence of an employer-employee relationship one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities," quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

Plaintiffs allege that defendants manufacture, distribute, maintain and market the TVpad Service, TVpad device, TVpad Store, and infringing TVpad apps with the object of promoting their use to infringe plaintiffs' copyrighted television programs.[76]  They also assert that defendants control the TVpad store, manufacture and distribute the TVpad, aggressively advertise TVpad's use as a peer-to-peer network, and assist customers seeking to view and access infringing TVpad applications that deliver plaintiffs' content.[77]  The complaint pleads that not only are defendants unwilling to take steps within their control to stop the infringement, but that their entire business model is based on generating

---

[76]Complaint, ¶¶ 248-49.

[77]*Id.*, ¶¶ 111-37; 148.

profit from widespread infringement of plaintiffs' programming.[78]  Because plaintiffs have alleged facts indicating that defendants intentionally and materially contribute to TVpad users' infringement, they have stated a claim for contributory infringement.  Plaintiffs have also alleged sufficient facts to support a finding that defendants enjoy a direct financial benefit from customers' infringing use of the TVpad and that they have the right and ability to supervise the infringing activity; plaintiffs have therefore stated a claim for vicarious copyright infringement as well.

### c.    False Designation of Origin under 15 U.S.C. § 1125(a)

Plaintiffs also allege a claim for false designation of origin under 15 U.S.C. § 1125(a).[79]  Section 43(a) of the Lanham Act provides in pertinent part:

"Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a)(1).

---

[78]*Id.*, ¶¶ 111, 120-21, 123-24, 135-37.

[79]Plaintiffs term this cause of action "Trademark Infringement and Unfair Competition," but cite 15 U.S.C. § 1125(a).  (*Id.* at 70.)  Given the content of the allegations that comprise the cause of action, the court construes the claim as a false designation of origin claim.  It notes, however, that it would reach the same result under 15 U.S.C. § 1114.  See *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 n. 6 (9th Cir. 1999) (noting that § 1125(a)(1) "embodie[s]" "[t]he same standard" as § 1114(1)).

1   "To establish a claim for either trademark infringement or false designation of origin, . . . a

2   plaintiff must prove that the defendant (1) used in commerce (2) any word, false designation of origin,

3   false or misleading description, or representation of fact, which (3) is likely to cause confusion or

4   mistake, or to deceive, as to sponsorship, affiliation, or the origin of the goods or services in question."

5   *Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F.Supp.3d 1156, 1170 (N.D. Cal. 2015) (citing *Freecycle*

6   *Network, Inc. v. Oey*, 505 F.3d 898, 902-04 (9th Cir. 2007); *Int'l Order of Job's Daughters v. Lindeburg*

7   *& Co.*, 633 F.2d 912, 917 (9th Cir. 1980)).

8   ### (1)    Validity of the Trademarks

9   Registration of a mark is "prima facie evidence of the validity of the registered mark[,] . . .

10  of the registrant's ownership of the mark, and . . . [of the] exclusive right to use the registered mark

11  in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C.

12  § 1115(a); *Brookfield Commc'ns*, 174 F.3d at 1047 (plaintiff's "registration of the mark on the

13  Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the

14  validity of the registered mark and of [plaintiff's] exclusive right to use the mark on the goods and

15  services specified in the registration"). "[I]t is axiomatic in trademark law[, however,] that the

16  standard test of ownership is priority of use. . . . [T]he party claiming ownership must have been

17  the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l,*

18  *Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996).

19  The complaint alleges that TVB owns registrations for the word mark JADE (U.S. Serial No.

20  76406416), the JADE logo (U.S. Serial No. 76445114 and U.S. Application Serial No. 86171201), the

21  word mark TVB (U.S. Application Serial No. 86171162); and the Chinese language word mark for THE

22  JADE CHANNEL (U.S. Serial No. 76407746) (collectively, the "TVB Marks").[80]  Accepting these

23  allegations as true, they constitute prima facie evidence of the validity of TVB's registered marks.

24

25  The complaint also alleges that CCTV brands its television broadcasting services and television

26  programming under the CCTV family of trademarks (the "CCTV Marks"), including the word marks

27

28      [80]Complaint, ¶ 64.

"CCTV" and "CCTV America," as well as the stylized CCTV logo.[81]  CCTV has applied to register its CCTV America design mark with the USPTO.[82]  It does not plead, however, that any of the CCTV Marks have been registered.  CCTV must therefore demonstrate that it has a protectable interest in the CCTV Marks and that it has used the CCTV Marks in commerce.

The court need not determine the precise strength of the CCTV Marks because exact copying of the type in which defendants have allegedly engaged is evidence of secondary meaning.  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) ("Proof of exact copying, without any opposing proof, can be sufficient to establish a secondary meaning. . . . 'There is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence,'" quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 557 (9th Cir.1960) ).  Thus, even if the CCTV Marks are weak, CCTV has demonstrated that it has a protectable interest in the marks.

CCTV has also sufficiently alleged prior use of the CCTV Marks in commerce.  "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."  *Sengoku Works*, 96 F.3d at 1219.  See also *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009) ("It is a cardinal principle of federal trademark law that the party who uses the mark first gets priority"), cert. denied, 130 S.Ct. 1739 (2010); *Kreation Juicery, Inc. v. Shekarchi*, No. CV 14-658 DMG (ASx), 2014 WL 7564679, *3 (C.D. Cal. Sept. 17, 2014) ("Plaintiff's standing to sue under the Act is based on ownership of the unregistered mark through prior use").  Plaintiffs allege that "[l]ong before" defendants began using their marks, "CCTV and CICC adopted and began using the CCTV Marks in commerce in the United States in connection with their television broadcasting services, programming, and related entertainment services."[83]

Because they have failed to appear, defendants have not challenged the validity of the marks.

---

[81] *Id.*, ¶ 48.

[82] *Id.*, ¶ 51.

[83] *Id.*, ¶ 51.

The court therefore finds that plaintiffs have adequately alleged that they own their respective marks and established the first element of their federal trademark infringement and false designation of origin claims.

### (2)     Likelihood of Confusion

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG*, 142 F.3d 1127, 1129 (9th Cir. 1998) (footnote omitted).   The Ninth Circuit has identified eight factors that should be considered in making this assessment: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods at issue, and the degree of care customers are likely to exercise in purchasing those goods; (7) evidence of defendants' intention in selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will expand their product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979), abrogated in part on other grounds as recognized in *Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792, 810 n. 19 (9th Cir. 2003); see also, e.g., *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (reciting the *Sleekcraft* factors).

Although assessing likelihood of confusion under this eight-factor test is generally a factual determination, "in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination . . . because counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Shalabi*, 352 F.Supp.2d 1067, 1073 (C.D. Cal. 2004); see also *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284, 287 (S.D.N.Y. 2003) ("[C]ounterfeits by their very nature, cause confusion").   A counterfeit mark for purposes of the Lanham Act is "a non-genuine mark identical to the registered, genuine mark of another, where [ ] the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 946 (9th Cir. 2011) (citing *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005)); *Gucci Am., Inc. v. Pieta*, No. CV 04-9626 ABC (MCx), 2006 WL 4725706, *3 (C.D. Cal. Jan. 23, 2006) ("A trademark is counterfeited if the

defendant, without authorization from the trademark owner, uses an original mark or a copy of a mark in connection with the sale of goods," citing *H-D Michigan, Inc. v. Biker's Dream, Inc.*, No. CV 97-864 SVW (CWx), 1998 WL 697898, *1 (C.D. Cal. July 28, 1998)).

Plaintiffs allege that defendants have used marks identical to their genuine marks – not confusingly similar marks – to advertise the TVpad Service, falsely representing to consumers that plaintiffs have authorized the streaming of their television programming on the TVpad.[84]  Plaintiffs also allege that defendants' unauthorized advertising and use of their marks is likely to cause confusion and deceive the public.[85]  Plaintiffs' allegations suffice to establish that defendants are using counterfeit marks; as a result, it is unnecessary to perform a step-by-step examination of the likelihood of confusion.

Accepting plaintiffs' allegations as true, an ordinary consumer encountering the counterfeit marks in the marketplace would likely be confused by defendants' use of plaintiffs' marks, and believe either that there was an association between plaintiffs and defendants or that plaintiffs had authorized defendants to stream their television content on the TVpad.  Thus, plaintiffs' allegations satisfy the final element of federal trademark infringement and false designation of origin claims.  Consequently, the court concludes that plaintiffs have stated a viable claim under 15 U.S.C. § 1125(a).

### d.  Common Law Trademark Infringement & Violation of Business & Professions Code § 17200

Finally, plaintiffs allege claims for common law trademark infringement and violation of California Business and Professions Code § 17200.  "[F]ederal and state laws regarding trademarks and related claims of unfair competition are substantially congruent."  *Int'l Order of Job's Daughters*, 633 F.2d at 916; see *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (holding that "[a]ll of Mattel's infringement claims [(including, *inter alia*, false designation of origin and common law unfair competition)] [we]re subject to the same test"); *Ingrid & Isabel, LLC v. Baby Be Mine, LLC*, 70 F.Supp.3d 1105, 1119 (N.D. Cal. 2014) ("The Ninth Circuit 'has consistently held that state common law claims of unfair competition . . . are substantially congruent to claims made under the Lanham

---

[84]*Id.*, ¶¶ 138-41.

[85]*Id.*

Act,'" citing *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)).  This is because "the courts have uniformly held that common law and statutory trademark infringement are merely specific aspects of unfair competition."  See *New W. Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979).          "Under the Lanham Act, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks."  *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F.Supp.2d 1013, 1031 (C.D. Cal. 2011) (citing *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir. 1968)), aff'd, 738 F.3d 1085 (9th Cir. 2013).  The same is true under California law.  See *Acad. of Motion Picture Arts & Scis. v. Benson*, 15 Cal.2d 685, 692 (1940) (common law unfair competition protects "a similarity which would be likely to deceive or mislead an ordinary unsuspecting customer"); see also *Solid 21, Inc v. Hublot of Am.*, No. CV 11-00468 DMG (JCx), 2015 WL 3756490 *7 (C.D. Cal. June 12, 2015) (addressing Lanham Act and state trademark and unfair competition claims in tandem); *Century 21 Real Estate, LLC v. Ramron Enterp.*, No. 1:14-cv-00788-AWI-JLT, 2015 WL 521350 *7 (E.D. Cal. Feb. 9, 2015) ("claims for trademark infringement and unfair competition under California law are 'subject to the same legal standards' as Lanham Act claims," quoting *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012)).  For this reason, the state and federal trademark and unfair competition claims rise or fall together; because they have stated viable Lanham Act claims, plaintiffs have also stated viable common law trademark infringement and § 17200 claims as well.

### e.      Conclusion Regarding Second and Third *Eitel* Factors

Because each of plaintiffs' causes of action is adequately pled, the second and third *Eitel* factors weigh in favor of granting plaintiffs' motion for default judgment.

### 3.      Sum of Money at Stake in the Action

The fourth *Eitel* factor balances "the amount of money at stake in relation to the seriousness of the [defaulting party's] conduct."  *PepsiCo, Inc.*, 238 F.Supp.2d at 1176; see also *Eitel*, 782 F.2d at 1471-72. This determination requires a comparison of the recovery sought and the nature of defendant's conduct to determine whether the remedy is appropriate.  See *Walters v. Statewide Concrete Barrier, Inc.*, No. C-04-2559 JSW (MEJ), 2006 WL 2527776, *4 (N.D. Cal. Aug. 30, 2006) ("If the sum of money at issue is reasonably proportionate to the harm caused by the defendant's actions, then default judgment is warranted").  "In general, the fact that a large sum of money is at stake is a factor

disfavoring default judgment.  However, if the requested amounts have evidentiary support, are specifically tailored to the misconduct of the defendant, and are otherwise proportionate to the defendant's offenses, default should not be refused merely because the amount sought is substantial." *BR North 223, LLC v. Glieberman*, No. 1:10-cv-02153 LJO-BAM, 2012 WL 639500, *5-6 (E.D. Cal. Feb. 27, 2012) (citing *Board of Tr. of the Sheet Metal Workers Health Care Plan v. Superhall Mechanical, Inc.*, No. 10-cv-2212-EMC, 2011 WL 2600898, *2 (N.D. Cal. June 30, 2011); *Facebook, Inc. v. Fisher*, No. 09-cv-05842-JF-PSG, 2011 WL 250395, *2-3 (N.D. Cal. Jan. 26, 2011); *Stellmacher v. Guerrero*, No. 10-cv-1357-JAM-KJM, 2010 WL 2889771, *1-2 (E.D. Cal. July 21, 2010); *Facebook, Inc. v. Wallace*, No. 09-cv-798, JF-RS, 2009 WL 3617789, *2-3 (N.D. Cal. Oct. 29, 2009)).

Plaintiffs seek an award of $300,900,000 in statutory damages for copyright infringement and $25,460,691 in actual damages for trademark infringement.  As discussed *infra*, plaintiffs have proffered evidence supporting an award of damages of $55,460,691 and have demonstrated that this amount is proportionate to the harm caused by defendants' conduct.  Accordingly, this factor weighs in favor of the plaintiffs.

### 4.   Possibility of Dispute

The fifth *Eitel* factor considers the possibility that material facts may be in dispute.  *PepsiCo, Inc.*, 238 F.Supp.2d at 1177; see also *Eitel*, 782 F.2d at 1471-72.  As both defendants have failed to respond to the complaint, the court accepts plaintiffs' allegations as true.  See *PepsiCo, Inc.*, 238 F.Supp.2d at 1177 ("Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages," citing *TeleCideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)).  As a result, there appears to be little possibility of dispute concerning the material facts of this case.  Accordingly, the fifth *Eitel* factor weighs in favor of entering default judgment against defendants.

### 5.   Possibility of Excusable Neglect

The sixth *Eitel* factor considers whether defendants' defaults may have been the product of excusable neglect.  See *PepsiCo, Inc.*, 238 F.Supp.2d at 1177; see also *Eitel*, 782 F.2d at 1471-72.  Here, the possibility of excusable neglect is remote.  Plaintiffs served the summons and complaint on HYIT

and CNT on March 17 and 18, 2015, respectively.[86]  When defendants failed to respond or defend, the court ordered the entry of their defaults.[87]  Since service was effected, defendants neither responded to the complaint nor attempted to have their defaults set aside.  CNT initially requested additional time to respond to the complaint, but later instructed its counsel to cease work and withdraw as counsel of record.[88]  CNT further failed to comply with the court's preliminary injunction order, which resulted in entry of an order of contempt.[89]  This chronology compels the conclusion that defendants' defaults were not the product of excusable neglect.  Cf. *PepsiCo, Inc.*, 238 F.Supp.2d at 1177 (finding no excusable neglect where plaintiffs made numerous attempts to contact defendant to settle the matter).  Consequently, this factor favors entry of default judgment.

### 6.    Policy in Favor of Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible."  *Eitel*, 782 F.2d at 1472.  The fact that Rule 55(b) has been enacted, however, indicates that "this preference, standing alone, is not dispositive."  *PepsiCo, Inc.*, 238 F.Supp.2d at 1177 (quoting *Kloepping*, 1996 WL 75315 at *3).  Rule 55(a) allows a court to decide a case before the merits are heard if defendants fail to appear and defend.  See *PepsiCo, Inc.*, 238 F.Supp.2d at 1177 ("Defendant's failure to answer plaintiffs' complaint makes a decision on the merits impractical, if not impossible").  Since defendants failed to respond to plaintiffs' claims, the seventh *Eitel* factor does not preclude the entry of default judgment against them.

### 7.    Conclusion Regarding the *Eitel* Factors

For the reasons stated, the *Eitel* factors, on balance, support the entry of default judgment against CNT and HYIT.

---

[86]McCauley DJ Decl., ¶¶ 3-4.

[87]Minutes (In Chambers) Order Granting Plaintiff's Application for Entry of Default Against Defendants, Docket No. 87 (May 28, 2015).

[88]McCauley DJ Decl., ¶ 3; Withdrawal Motion at 3; Withdrawal Order at 3.

[89]Findings of Fact and Conclusions of Law in Support of Plaintiffs' Motion to Hold Defendant Create New Technology in Contempt, Docket No. 140 (Nov. 4, 2015).

**D.     The Character and Amount of Plaintiffs' Recovery**

Rule 54(c) "allows only the amount prayed for in the [pleadings] to be awarded to the plaintiff in a default [judgment]." *Bryant*, 2004 WL 783123 at *5; see also *Fong v. United States*, 300 F.2d 400, 413 (9th Cir. 1962) (stating that a default judgment may not be different in kind from or exceed in amount that prayed for in the complaint); *PepsiCo, Inc.*, 238 F.Supp.2d at 1175 (stating that a default judgment "shall not be different in kind from or exceed in amount that prayed for in the [complaint]," citing FED.R.CIV.PROC. 54(c) (alteration original)).   Under Rule 8(a)(3), a plaintiff's demand for relief must be specific, and it "must 'prove up' the amount of damages."  *Philip Morris USA Inc. v. Banh*, No. CV 03-4043 GAF (PJWx), 2005 WL 5758392, *6 (C.D. Cal. Jan. 14, 2005); *Bryant*, 2004 WL 783123 at *5 ("Plaintiffs must 'prove up' the amount of damages that they are claiming").   Defaulting defendants are not deemed to have admitted the facts concerning damages alleged in the complaint. See *PepsiCo, Inc.*, 238 F.Supp.2d at 1177 ("Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages," citing *TeleVideo Sys., Inc.*, 826 F.2d at 917-18).

The forms of relief that plaintiffs seek in their motion those included in the prayer for relief in their complaint.[90]  Specifically, plaintiffs seek injunctive relief to restrain copyright and trademark infringement, statutory damages for copyright infringement, and actual damages for trademark infringement.[91]  Plaintiffs sought all of these forms of relief in the complaint.   Their motion thus complies with Rule 54(c).  The only remaining question, therefore, is whether plaintiffs have proved an entitlement to such relief.

**1.     Monetary Damages**

**a.     Damages for Copyright Infringement**

Plaintiffs seek statutory damages for defendants' infringement of their copyrighted works.[92] "The damages provision of the Copyright Act states: '[A]n infringer of copyright is liable for either –

---

[90]Motion at 2-3.

[91]*Id.*

[92]*Id.*

1   (1) the copyright owner's actual damages and any additional profits of the infringer . . . ; or (2) statutory

2   damages." *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1010 (9th Cir. 1994) (citing 17

3   U.S.C. § 504). A copyright owner "may elect which measure of damages to recover." *Id.* "Statutory

4   damages are particularly appropriate in a case . . . in which defendant has failed to mount any defense

5   or to participate in discovery, thereby increasing the difficulty of ascertaining plaintiffs' actual

6   damages." *Jackson v. Sturkie*, 255 F.Supp.2d 1096, 1101 (N.D. Cal. 2003).

7        The court has wide discretion in "setting the amount of statutory damages under the Copyright

8   Act." *Nintendo of Am.*, 40 F.3d at 1010. The court's consideration of the appropriate award of statutory

9   damages under the Copyright Act is guided by factors that include, *inter alia*, "the expenses saved and

10   profits reaped by the infringer, the deterrent effect of the award on defendant and on third parties, and

11   the infringer's state of mind in committing the infringement." *Playboy Enters., Inc. v. Webbworld, Inc.*,

12   968 F.Supp. 1171, 1176 (N.D. Tex. 1997); see also *Controversy Music v. Shiferaw*, No. C03-5254 MJJ,

13   2003 WL 22048519, *2 (N.D. Cal. July 7, 2003) ("Factors the Court can consider in determining the

14   amount of a damages award are: the expense saved by the defendant in avoiding a licensing agreement;

15   profits reaped by defendant in connection with the infringement; revenues lost to the plaintiff; and the

16   willfulness of the infringement," citing *Cross Keys Pub. Co., Inc. v. Wee, Inc.*, 921 F.Supp. 479, 481

17   (W.D. Mich. 1995)); *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 914 (D. Conn. 1980) ("Among

18   the factors to be considered in arriving at a determination of [statutory] damages are the expenses saved

19   and profits reaped by the defendants in connection with the infringements, the revenues lost by the

20   plaintiffs as a result of the defendants' conduct, and the infringers' state of mind, whether willful,

21   knowing, or merely innocent"). Cf. *Odnil Music Ltd. v. Katharsis LLC*, No. CIV S-05-0545 WBSJFM,

22   2006 WL 2545869, *7 (E.D. Cal. July 21, 2006) ("[I]nfringers should not be free to 'sneer' in the face

23   of the Copyright Act; courts must put defendants on notice that it costs less to obey the Copyright Act

24   than to violate it," citing *Int'l Korwin Corp. v. Kowalczyk*, 665 F.Supp. 652, 659 (N.D. Ill. 1987), aff'd,

25   855 F.2d 375 (7th Cir. 1988)).

26        A court is more likely to award significant statutory damages, especially maximum damages,

27   if the plaintiff substantiates or delineates the basis for the relief sought. See *Coach, Inc. v. Am. Fashion*

28   *Gift*, No. CV 12-07647-MWF (RZx), 2013 WL 950938, *2 (C.D. Cal. Mar. 12, 2013) (awarding

plaintiffs $10,000, instead of a requested $100,000, in statutory damages based on "the paucity of supporting evidence" where "it [was] not clear whether Defendants sold one or one million infringing purses"); *Coach Inc. v. Envy*, No. 1:11-cv-1029 LJO GSA, 2012 WL 78238, *4 (E.D. Cal. Jan. 10, 2012) (denying plaintiffs' motion for default judgment without prejudice in part because of the breadth of the allegations in the complaint and a lack of evidence "regarding what products in particular were obtained, the value of the items, the presence of other products in the store, or how the introduction of these products into the market specifically [a]ffected Coach's profit.  Plaintiffs' statements that they do not have information as to how many goods were sold, or the amount of revenues lost by Plaintiffs because Defendants failed to appear in this action, is not sufficient to support a $100,000 damage request"). Compare *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 501-02 (C.D. Cal. 2003) (awarding $2,000,000 in statutory damages where a defendant willfully imported 8,000,000 counterfeit cigarettes having a street value of millions of dollars).

This is because there must be a "plausible relationship" between the damages sought by plaintiff and the defendant's infringing conduct.  Compare *Beachbody, LLC v. Johannes*, No. CV 11-1148 PSG (RZx), 2011 WL 3565226, *3 (C.D. Cal. Aug. 12, 2011) (finding that plaintiff's request for $2,150,000 in statutory damages was unreasonable and did not have a "plausible relationship" to the defendant's profits from infringement where there were no figures confirming defendant's profits and the complaint failed to allege that defendant actually sold any counterfeit goods) with *Sweet People Apparel, Inc. v. Zipper Clothing*, No. CV 12-02759-ODW (CWx), 2012 WL 1952842, *4-5 (C.D. Cal. May 31, 2012) (awarding plaintiff $150,000 in statutory damages per infringed trademark where plaintiffs alleged that their jeans retailed for approximately $100 and their sales of jeans totaled tens of millions of dollars, and the statutory damages award bore a "'plausible relationship to [d]efendants' infringing activities and the profits [d]efendants may have realized from those activities").  Such a plausible relationship between statutory damages and plaintiffs' actual damages can be demonstrated by adducing evidence of (1) the estimated revenues lost by the plaintiff; and (2) the expenses saved and profits garnered by the defendant.  See *Sennheiser Elec. Corp. v. Eichler*, No. CV 12-10809 MMM (PLAx), 2013 WL 3811775, *8-9 (C.D. Cal. July 19, 2013).

Plaintiffs seek the maximum award of statutory damages under the Copyright Act –  $150,000

per willfully infringed work.  Because there are 2,006 copyright programs, this totals $300,900,000.[93] Plaintiffs have adequately established defendants' willfulness, adducing evidence that defendants have infringed thousands of plaintiffs' works over a period of years and continue to do so despite entry of a preliminary injunction.[94]

Plaintiffs assert that the amount of statutory damages they seek bears a plausible relationship to their actual financial damage and the profits defendants have reaped from their infringement.  Plaintiffs have traced shipments of 194,073 TVpad devices to the United States.[95]  They allege that 8,191 TVpads were sold directly to consumers at a price of $249.00, and 185,882 were sold to distributors at a wholesale price of $126.00, resulting in a total of $25,460,691 in sales.[96]  Plaintiffs argue that because defendants did not participate in the litigation, and thwarted their ability to obtain discovery regarding the costs defendants incurred in producing the TVpads, only defendants' profits should be considered.  See *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F.Supp.2d 1072, 1084 (C.D. Cal. 2012) ("With respect to Defendants' profits, Plaintiff is required to prove only sales; had Defendants mounted a defense, they would have carried the burden of showing deductions.  In her declaration, Walker stated that Defendants Adams and IFG received at least $25,000 in revenue from at least four customers.  Given the fact that Defendants have frustrated Plaintiff's ability to determine with any precision the amount of their sales and considering the circumstances of Defendants' operation, the Court concludes that Plaintiff has established $25,000 as an appropriate measure of Defendants' profits").

---

[93]*Id.* at 2.  Section 504 of the Copyright Act permits a copyright owner to recover statutory damages of not less than $750 and not more than $30,000 for the infringement of any one work; in cases of willful infringement, the maximum amount of statutory damages increases to not more than $150,000 per work.  (17 U.S.C. §§ 504(c)(1), (2).)

[94]Tsang DJ Decl., ¶¶ 7-15; Compendium, Volume II, Exh. 43, Docket No. 125-1 (Sept. 14, 2015); Lu Decl., ¶ 25; Braak DJ Decl., ¶¶ 12-14.

[95]Motion at 20; see also Compendium, Volume I, Exh. 11 ("Shipments and Lost Fees"); McCauley DJ Decl., ¶¶ 9-10.  Plaintiffs tracked shipments from CNT through DHL, UPS, and Hoogle. They also tracked additional shipments to YTC and MetroVista.  (*Id.*)

[96]Weil DJ Decl., ¶¶ 25, 29; McCauley DJ Decl., ¶¶ 13-14, 21, 24, 25, 36; Zhou Decl., ¶ 10; Shipments and Lost Fees.

Plaintiffs additionally allege that they have lost $279,465,120 in licensing and subscription fees that should have been paid by defendants.[97]  Specifically, they assert that had defendants attempted to secure the right to show all of the TVB and CCTV channels available through the Infringing Tvpad Apps by legitimate means, they would have had to pay CCTV and TVB a $30-per-user licensing fee.[98] Multiplied by the number of Tvpad users (194,273) and the number of months that defendants have been illegally retransmitting CCTV and TVB channels via the Tvpad device (48 months), this yields lost licensing revenue of $279,465,120.[99]  Plaintiffs contend this amount represents both costs that defendants avoided as a result of their illegal conduct as well as fees plaintiffs were not paid due to the illegal conduct.[100]

Hypothetical licensing damages can be used as an appropriate measure of damages, "provided the amount is not based on 'undue speculation.'"  *Polar Bear Prods. Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004) (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003)).  To calculate damages "based on a hypothetical-license theory, we look to 'the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [the infringer] of the plaintiff's work.'"  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014) (quoting *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 786 (9th Cir. 2006) (internal quotation marks omitted)).

Plaintiffs' calculation of hypothetical licensing damages is based on "undue speculation." Most importantly, plaintiffs assume for purposes of the calculation that all TVpad users purchased a TVpad at the beginning of the relevant period and continued to use it for 48 months.  Plaintiffs have adduced no evidence supporting this assumption, however; depending on the pattern of TVpad sales over the

---

[97]*Id.*  Plaintiffs reach this conclusion by assuming that only 25% of TVpad users would have subscribed to an authorized viewing service in lieu of streaming infringing content on their TVpads. (McCauley DJ Decl., ¶ 56.)

[98]McCauley DJ Decl., ¶ 54; Kuelling DJ Decl., ¶ 14.

[99]McCauley DJ Decl., ¶ 55; Compendium, Volume I, Exh 11.

[100]McCauley DJ Decl., ¶ 55.

four-year period, the amount of hypothetical licensing damages could be significantly lower.  Plaintiffs base the number of TVpad users on shipment records of TVpads to the United States via various carriers;[101] it is thus clear they have the ability to calculate more precisely the duration of users' TVpad usage.

Plaintiffs also contend they have lost as much as 50% in DISH subscription revenue since introduction of the TVpad in 2011.[102]  This damages measure duplicates at least a portion of the hypothetical licensing damages discussed above; for users who previously had a DISH subscription and abandoned it in favor of using a TVpad, it is not appropriate to award damages both for the loss of licensing revenue from defendants and the loss of licensing revenue from DISH.  Plaintiffs have not identified the amount of lost subscription fees from DISH customers that allegedly discontinued their subscriptions to use defendants' product.  Further, they have not provided a baseline, e.g., information regarding general DISH subscriber trends,[103] that would enable the court to determine what portion of the 50% reduction in subscription fees is due to defendants' actions and what portion can be attributed to changes in the general market for cable services.

In sum, the only basis for a "plausible relationship" between statutory damages and defendants' infringing conduct that is not impermissibly speculative is the gross income defendants received in connection with sales of the TVpad product.  See *Sennheiser Elec. Corp.*, 2013 WL 3811775 at *8-9 (evaluating whether there was a plausible relationship between statutory damages and plaintiffs' actual damages using evidence of plaintiffs' estimated lost revenues and profits earned by the defendant).  As discussed above, this amounts to $25,460,691 – significantly less than the $300,900,000 plaintiffs seek in statutory damages.  Plaintiffs have therefore failed to demonstrate a plausible relationship between their claim for statutory damages and defendants' infringing conduct.  The court therefore reduces

---

[101]Compendium, Volume I, Exh. 11.

[102]Motion at 22; Kuelling DJ Decl., ¶ 16; Tsang DJ Decl., ¶ 18.

[103]Although plaintiffs assert that revenue from the "Great Wall" package is down 50%, they provide no information that would allow the court to control for possible other factors, e.g., a general decline in DISH cable subscribers.

plaintiffs' award for copyright infringement from the requested $300,900,000 to $30,000,000.[104]

### b. Trademark Damages

Plaintiffs next seek disgorgement of defendants' revenue of $25,460,691 under the Lanham Act.[105]   When a violation of the Lanham Act has been proved, "the plaintiff [is] entitled . . . to recover defendant's profits" "as an alternative to actual damages . . . to the extent they are attributable to the infringement [alleged]."   15 U.S.C. § 1117; *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985).   "In establishing the infringer's profits, the plaintiff is required to prove only the defendant's sales." *Frank Music Corp.*, 772 F.2d at 514; *Wecosign,* 845 F.Supp.2d at 1084 ("With respect to Defendants' profits, Plaintiff is required to prove only sales; had Defendants mounted a defense, they would have carried the burden of showing deductions," citing 15 U.S.C. § 1117(a)).   If the plaintiff provides proof of revenue, "the burden then shifts to the defendant to prove the elements of costs to be deducted from sales in arriving at profit." *Id*.  "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff." *Id*. (citing *Shapiro, Bernstein & Co. v. Remington Records, Inc.*, 265 F.2d 263 (2d Cir. 1959)).

In support of this aspect of their damages request, plaintiffs proffer evidence that defendants have made TVpad sales of $25,460,691 to distributors and consumers in the United States, based in part on defendants' use of plaintiffs' marks and their representations that TVpad users can watch TVB and CCTV shows on the TVpad device.[106] As plaintiffs have traced shipments of 194,073 TVpad devices to the United States, which were sold to customers and distrubutors at a price of $249.00 and $126.00, respectively.   This results in total sales of $25,460,691.[107]   Plaintiffs correctly assert that they

---

[104]This amounts to approximately $15,000 per infringing work, or ten times the statutory minimum for willful infringement.  See 17 U.S.C. § 504(c)(2).

[105]Motion at 2.

[106]*Id.* at 23; see also Shipments and Lost Fees; McCauley DJ Decl., ¶¶ 9-10.

[107]Weil DJ Decl., ¶¶ 25, 29; McCauley DJ Decl., ¶¶ 13-14, 21, 24, 25, 36; Zhou Decl., ¶ 10; Shipments and Lost Fees.

1  are "required to prove only sales," as had defendants "mounted a defense, they would have carried the

2  burden of showing deductions."  See *Wecosign*, 845 F.Supp.2d at 1084.

3      Plaintiffs adduce the same evidence in support of their request for Lanham Act damages that

4  they do in support of their assertion that the statutory damages they seek for copyright infringement

5  are plausibly related to their actual damages.  Awarding this amount as trademark damages does not

6  constitute an impermissible double recovery, as under Ninth Circuit law, "it is clear enough that,

7  when a defendant violates both the Copyright Act and the Lanham Act, an award of both types of

8  damages is appropriate."  *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir.

9  1994) (awarding statutory damages under the Copyright Act and disgorgement under the Lanham

10 Act, where defendant's sale of Nintendo cartridges constituted both copyright infringement and

11 trademark infringement).

12     For this reason, and having considered plaintiffs' evidence, the court finds it appropriate to

13 award plaintiffs $25,460,691 in damages for trademark infringement.

## 2.    Permanent Injunction

15     Finally, plaintiffs seek a permanent injunction under the Copyright and Lanham Acts

16 enjoining CNT and all those in active concert or participation with it, including HYIT, from

17 "(i) publicly performing, transmitting, distributing, and/or reproducing Plaintiffs' Copyrighted

18 Works; (ii) inducing, encouraging, causing, facilitating, and/or materially contributing to the

19 unauthorized public performance, transmission, distribution, and/or reproduction of Plaintiffs'

20 Copyrighted Works by others; (iii) infringing Plaintiffs' trademarks and service marks; or

21 (iv) engaging in unfair competition."[108]

22     It is well established that "[c]ourts [can] issue injunctions as part of default judgments." *Elias*,

23 2004 WL 141959 at *4; see *Priority Records, LLC v. Tabora*, No. C 07-1023 PJH, 2007 WL 2517312,

24 *2 (N.D. Cal. Aug. 31, 2007) (granting permanent injunctive relief in a copyright case as part of a

25 default judgment); *Bryant*, 2004 WL 783123 at *6 (granting a permanent injunction as part of a default

---

[108]Complaint at 73.  See also Proposed Default Judgment Order.

judgment in a copyright infringement case, and stating that "[p]laintiffs in this case need not show irreparable harm, as the default against [d]efendants satisfies the element of success on the merits"); see also 15 U.S.C. § 1116(a) (vesting the district court with the "power to grant injunctions, according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right" of a trademark owner).

Plaintiffs seeking a permanent injunction must satisfy a four-factor test before the court can grant relief.  See *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006) (explaining that the Supreme Court has "consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed"); see also *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137-38 (9th Cir. 2006) (applying "traditional equitable principles" under *eBay* in deciding whether entry of a permanent injunction in a trademark case was appropriate).  Specifically, plaintiffs seeking a permanent injunction must demonstrate (1) that they have suffered irreparable injury; (2) that there is no adequate remedy at law; (3) "that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted"; and (4) that it is in the public's interest to issue the injunction.  *eBay*, 547 U.S. at 391.

"[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts."  *eBay*, 547 U.S. at 394.  Any injunction entered "must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs rather than to enjoin all possible breaches of the law."  *Inconix, Inc. v. Tokuda* , 457 F.Supp.2d 969, 998 (N.D. Cal. 2006) (quoting *Price v. City of Stockton* , 390 F.3d 1105, 1117 (9th Cir. 2004)).

### a.   Whether Plaintiffs Have Suffered Irreparable Harm and Lack  an Adequate Remedy at Law

Irreparable harm is "that for which compensatory damages are unsuitable."  *MGM Studios, Inc. v. Grokster*, 518 F.Supp.2d 1197, 1210 (C.D. Cal. 2007) (quoting *Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992)).  "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement.  It is the remedy provided by federal and state trademark infringement statutes."  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180-81 (9th Cir. 1988).  Injunctive

relief is also routinely awarded in copyright infringement cases where a plaintiff has demonstrated that a defendant has infringed its copyrights and is likely to infringe again in the future. See *Sturkie*, 255 F.Supp.2d at 1103 (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993)). The likelihood of future infringement generally leads to a finding of irreparable harm, "given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to *use* [a protected work] against the [right-holder's] wishes." *eBay*, 547 U.S. at 395 (Roberts, C.J., concurring) (emphasis original).

Although post-*eBay*, a court may no longer presume irreparable injury from the bare fact of liability in a trademark or copyright infringement case, the injury caused by the presence of infringing products in the market – such as lost profits and customers, as well as damage to goodwill and business reputation – will often constitute irreparable injury. See, e.g., *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 CV 6403 (SLT)(SMG), 2008 WL 2884761, *5 (E.D.N.Y. July 23, 2008) (concluding that plaintiff had shown irreparable injury where it had "established that defendant committed copyright and trademark infringement, and . . . there [was] no reason to conclude that defendant ha[d] or [would] cease its infringing acts because it continued infringing plaintiff's copyrights and trademarks despite being notified of its infringement").

Plaintiffs have adequately shown that they would suffer irreparable harm absent an injunction. Defendants' use of plaintiffs' marks confuses and/or deceives the public and causes it to believe that defendants' programming is affiliated with plaintiffs, or is being streamed by them with plaintiffs' authorization. This misleads the public, and misappropriates plaintiffs' goodwill and reputation. Further, defendants continue to interfere with plaintiffs' exclusive rights as holders of the copyrights and trademarks. For these reasons, plaintiffs have shown that they will suffer irreparable harm in the absence of injunctive relief. See, e.g., *Sennheiser Elec. Corp.*, 2013 WL 3811775 at *10 ("Sennheiser has adequately alleged that Apex has used, and in all likelihood, will continue to use, counterfeit marks on its products; it has also established the likelihood of customer confusion and damage to reputation and goodwill. For these reasons, Sennheiser has established that it will suffer irreparable harm in the absence of injunctive relief"); *Warner Bros. Home Entm't Inc. v. Jimenez*, No. CV 12-9160 FMO (JEMx), 2013 WL 3397672, *7 (C.D. Cal. July 8, 2013) (concluding that a permanent injunction

1    was warranted and that plaintiff had made an adequate showing of irreparable harm, in part, because

2    "[d]efendant's failure to appear [ ] suggests that defendant's infringing activities will not cease

3    absent judicial intervention" (citation omitted)); *Wecosign,* 845 F.Supp.2d at 1084 ("If an injunction

4    were not granted, Plaintiff would suffer irreparable injury from the ongoing damages to its goodwill

5    and diversion of customers to counterfeit services"); *Atek 3000 Computer Inc.*, 2008 WL 2884761

6    at *5 ("[P]laintiff has demonstrated that it has no adequate remedy at law since 'there is no assurance

7    in the record against defendant's continued violation of plaintiff's copyrights' and trademarks,"

8    quoting *Warner Bros. Entm't, Inc. v. Carsagno*, No. 06 CV 2676 NG (RLM), 2007 WL 1655666,

9    *6 (E.D.N.Y. June 4, 2007)); *Sturkie*, 255 F.Supp.2d at 1103 (granting a permanent injunction as

10   part of a default judgment in a copyright infringement action in part because "[d]efendant's lack of

11   participation in this litigation has given the court no assurance that [d]efendant's infringing activity

12   will cease").   Accordingly, this factor weighs in favor of granting an injunction against further

13   infringement both of plaintiffs' copyrights and their trademarks.

14            **b.      Whether the Balance of Hardships Favors Entry of a Permanent**

15                      **Injunction**

16            "In each case, a court must balance the competing claims of injury and must consider the effect

17   on each party of the granting or withholding of the requested relief."   *Amoco Prod. Co. v. Village of*

18   *Gambell, Alaska*, 480 U.S. 531, 542 (1987).  Plaintiffs have shown that they will suffer irreparable harm

19   if an injunction does not issue.  The court moreover, can discern no injury or hardship defendants will

20   suffer if an injunction issues.  Defendants will be prevented only from unlawfully counterfeiting

21   plaintiffs' trademarks and infringing their copyrighted programs. See *Wecosign*, 845 F.Supp.2d at 1084

22   ("[T]he balance of hardships favors Plaintiff because without an injunction, Plaintiff will lose profits

23   and goodwill, while an injunction will only proscribe Defendants' infringing activities"); *Grokster*, 518

24   F.Supp.2d at 1221 ("Because StreamCast is likely to induce further infringements without an injunction,

25   the balance of hardships necessarily shifts further in Plaintiffs' favor").   Accordingly, the balance of

26   hardships favors entry of a permanent injunction.

27            **c.      Whether the Public Interest Favors Entry of a Permanent Injunction**

28            "In exercising their sound discretion, courts of equity should pay particular regard for the public

1   consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*,

2   456 U.S. 305, 312 (1982).  "The public interest is served in protecting the holders of valid copyrights

3   from infringing activities." *Taylor Corp. v. Four Seasons Greetings, LLC*, 315 F.3d 1039, 1042 (8th

4   Cir. 2003).  The same is true with respect to trademarks.  See *CytoSport, Inc. v. Vital Pharm., Inc.*,

5   617 F.Supp.2d 1051, 1081 (E.D. Cal. 2009) ("In the trademark context, courts often define the

6   public interest at stake as the right of the public not to be deceived or confused"), aff'd, 348 Fed.

7   Appx. 288 (9th Cir. Oct. 13, 2009) (Unpub. Disp.).  "Where defendant[s'] concurrent use of

8   plaintiff[s'] trademark without authorization is likely to cause confusion, the public interest is damaged

9   by the defendant[s'] use." *Id.*; see also *Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*,

10  559 F.3d 985, 993 n. 5 (9th Cir. 2009) ("The public has an interest in avoiding confusion between two

11  companies' products"); *Atek 3000 Computer Inc.*, 2008 WL 2884761 at *5-6 ("[T]he public interest lies

12  in the enforcement of the principles recognized by Congress in creating the [Copyright and Lanham]

13  Acts, especially the prevention of consumer confusion").  This factor, therefore, also favors entry of a

14  permanent injunction.

15                       **d.      Scope of the Proposed Injunction**

16          As noted, "an injunction must be narrowly tailored . . . to remedy only the specific harms

17  shown by the plaintiffs rather than to enjoin all possible breaches of the law." *Inconix, Inc.*, 457

18  F.Supp.2d at 998 (quoting *Price*, 390 F.3d at 1117).  The injunction plaintiffs seek is narrowly

19  tailored to prevent defendants from continuing to infringe their copyrights and trademarks.  Based

20  on the showing they have made, plaintiffs have demonstrated that it would be appropriate to enter

21  an injunction: (1) permanently enjoining defendants from broadcasting, advertising, distributing,

22  offering for sale, or selling, whether directly or indirectly, plaintiffs' copyrighted works, including

23  works bearing plaintiffs' trademarks or trade names that are confusingly similar to the trademarks,

24  trade names, designs, or logos of plaintiffs; (2) permanently enjoining defendants from using

25  plaintiffs' marks or any copy, reproduction, or colorable imitation, or confusingly similar simulation

26  of plaintiffs' marks on or in connection with the promotion, advertising, distribution, manufacture

27  or sale of defendants' goods; and (3) ordering defendants to cancel, withdraw, and recall all

28  promotions and advertisements bearing plaintiffs' marks or confusingly similar simulation of the

marks, that have been published or placed by defendants.  An injunction of this type directly addresses the infringing conduct in which defendants have engaged.  The court therefore finds that it is narrowly tailored to redress the harm plaintiffs continue to suffer.

### e.       Conclusion Regarding Injunctive Relief

Because all relevant favors weigh in favor of issuing an injunction against future trademark and copyright infringement, and because the terms of the injunction plaintiffs propose are narrowly tailored, the court will enter the permanent injunction requested by plaintiffs and enjoin defendants from using plaintiffs' marks and copyrights in connection with the advertising, promotion, offering for sale, or selling of their products.

### 3.       Attorneys' Fees and Costs

Plaintiffs also seek an award of attorneys' fees pursuant to the fee schedule set forth in Local Rule 55-3.  They also seek costs under Rule 54.

### a.       Attorneys' Fees

The Lanham Act and the Copyright Act grant courts discretion to allow a prevailing plaintiff to recover its costs and reasonable attorneys' fees.  See 15 U.S.C. § 1117(a); 17 U.S.C. § 505.  The Lanham Act authorizes an award of attorneys' fees in "exceptional cases," such as this, where the defendant has engaged in willful infringement of a plaintiff's trademarks.  See *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003) ("A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully"); see also *Reno Air Racing Ass'n*, 452 F.3d at 1130 n. 4 (citing *Earthquake Sound Corp.*, 352 F.3d at 1216). Because the court has found that defendants willfully infringed, this is an "exceptional case" meriting an award of fees under the Lanham Act.

The Copyright Act also authorizes an award of reasonable attorneys' fees and costs to a prevailing party.  See *Twentieth Century Fox Film Corp. v. Streeter*, 438 F.Supp.2d 1065, 1073-74 (D. Ariz. 2006) ("Under 17 U.S.C. § 505, district courts have judicial discretion to grant attorneys' fees to the prevailing party in a copyright action," citing *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994)). Although there is no "exact formula for how courts should exercise their discretion to grant attorneys' fees" under the Copyright Act, *id.* at 1074, the Ninth Circuit has identified five non-exclusive factors

a court can consider in deciding whether a fee award under § 505 is appropriate: (1) the degree of success obtained; (2) the frivolousness of plaintiffs' claims or defendants' defenses; (3) plaintiffs' motivation in bringing the action; (4) whether plaintiffs were objectively unreasonable in bringing the action or defendants were objectively unreasonable in defending it; and (5) the need for deterrence. *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1432 (9th Cir. 1996) (citing *Jackson v. Axton*, 25 F.3d 884, 890 (9th Cir. 1994); see also *Penpower Tech. Ltd. v. S.P.C. Tech.*, 627 F.Supp.2d 1083, 1094 (N.D. Cal. 2008) ("'District courts should consider, among other things, the degree of success obtained; frivolousness; motivation; objective unreasonableness (both in the factual and legal arguments in the case); and the need in particular circumstances to advance consideration of compensation and deterrence,'" quoting *Historical Research v. Cabral*, 80 F.3d 377, 379 n. 1 (9th Cir. 1996)); *Sturkie*, 255 F.Supp.2d at 1104 ("In determining whether to award attorney fees, the district court should consider the degree of success obtained by the moving party, the frivolousness of any claims, the motivation for the claims, the objective reasonableness of the factual and legal arguments advanced in support of them, and the need for compensation and deterrence," citing *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 558 (9th Cir. 1996); *Maljack Prods., Inc. v. GoodTimes Home Video*, 81 F.3d 881, 889 (9th Cir. 1996)).

The court concludes that an award of attorneys' fees is appropriate under both the Lanham Act and the Copyright Act. Plaintiffs adequately stated a copyright infringement claim against defendants, and the court has found that they are entitled to have default judgment entered in their favor on that claim. Consequently, it cannot be said that plaintiffs' claim was frivolous, nor that the factual and legal arguments supporting the claim were objectively unreasonable. See *Sturkie*, 255 F.Supp.2d at 1104 ("Here, plaintiff's success is complete and unquestioned: a default judgment against defendant and an award of statutory damages. Plaintiff's claims clearly cannot be characterized as frivolous"). Moreover, plaintiffs' motivation in filing the claim was to vindicate the goals of the Copyright Act – i.e., to protect their copyrights from the substantial infringing activity of defendants. See, e.g., *Streeter*, 438 F.Supp.2d at 1074-75 ("The Ninth Circuit has emphasized that 'in considering motions for attorneys' fees under § 505 of the Copyright Act, the district court should 'seek to promote the Copyright Act's objectives.' In this case, Film Corp. presented a set of facts that establish copyright infringement. Film Corp.'s motivation is pursuing this litigation is to protect its copyrights which is one of the objectives of the

41

1  Copyright Act" (citation omitted)).  Finally, "[a]n award of attorneys' fees would promote the protection

2  of copyrights and further the goal of deterrence, by encouraging infringement actions for such

3  violations."  *Id.* at 1075; see also *Sturkie*, 255 F.Supp.2d at 1104-05 ("Moreover, an award of attorney

4  fees and costs in this action serves the goal of deterring similar misconduct, particularly defendant's

5  apparent practice of evading obligations under copyright law by simply failing to defend himself").

6       Plaintiffs seek attorneys' fees under 15 U.S.C. § 1117(a), 17 U.S.C. § 505, and Local Rule 55–3.

7  "Local Rule 55–3 states that, in the context of a default judgment, when an applicable statute provides

8  for the recovery of 'reasonable' attorneys' fees, the fees are to be calculated pursuant to the schedule set

9  forth in Rule 55–3."  CA CD L.R. 55–3.  The court grants plaintiffs'  request.  Given the court's award

10  of $55,460,691 in damages, and pursuant to Rule 55–3, the amount of attorneys' fees that would be

11  awarded pursuant to the schedule would be $1,112,813.82.[109]  Under the particular circumstances of this

12  case, where the statutes that authorize an award of fees vest the court with discretion to determine

13  whether to award fees, and if so, what amount is reasonable, the court concludes that the otherwise

14  mandatory language of Local Rule 55-3 conflicts with the statutes, and that "strict application of Local

15  Rule 55-3's 'reasonable attorneys' fees' schedule would stand contrary to the clear language of 505 [and

16  § 1117]."  *Nexon Am. Inc. v. Kumar*, No. 2:11–cv–06991–ODW (PJWx), 2012 WL 1116328, *8 (C.D.

17  Cal. Apr. 3, 2012) ("While Local Rule 55–3 appears to establish a mandatory calculation to be applied

18  in cases where the 'applicable statute provides for the recovery of reasonable attorneys' fees,' the Court

19  finds it significant that § 505 gives courts discretion whether to award costs to the prevailing party at

20  all. . . .  This grant of discretion contrasts with other statutory schemes that grant courts no discretion

21  in awarding attorney's fees and costs to prevailing parties. . . .  In light of § 505's grant of judicial

22  discretion, the Court finds that a strict application of Local Rule 55–3's 'reasonable attorneys' fees'

23  schedule would stand contrary to the clear language of § 505.  Accordingly, the Court hereby ORDERS

24  the parties to submit to the Court, within thirty days of the date of this Order, an affidavit documenting

25  in detail the fees and costs actually incurred in prosecuting this action.  The affidavit must include the

26

27       [109]Rule 55-3 provides that fees shall be calculated at $5,600 plus 2% of the judgment over
   $100,000.  CA CD L.R. 55-3.  This amounts to $5,600 + ($55,460,691 - $100,000) x 2% =
28  $1,112,813.82.

1   hourly rate charged by each attorney and staff member who performed services in this case").  The court

2   therefore directs plaintiffs to file a declaration stating the hourly rates of the attorneys who have worked

3   on this matter and the number of hours expended litigating matters related to the liability of CNT and

4   HYIT.  This declaration must be filed no later than **December 11, 2015**.

5                                               **b.      Costs**

6            As stated, the Lanham Act and the Copyright Act grant courts discretion to allow recovery of

7   prevailing plaintiffs' costs.  See 15 U.S.C. § 1117(a); 17 U.S.C. § 505; CA CD L.R. 54-2.  Under Rule

8   54, moreover, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs – other

9   than attorney's fees – should be allowed to the prevailing party."  FED.R.CIV.PROC. 54(d)(1).  This rule

10  "creates a presumption in favor of awarding costs to a prevailing party."  *Ass'n of Mexican–Am.*

11  *Educators v. State of Cal.*, 231 F.3d 572, 591 (9th Cir. 2000).

12           Plaintiffs seek costs under Local Rule 54-2, and state that they plan to submit an application to

13  tax costs following entry of judgment.  Under Local Rule 54-2, plaintiffs may file a bill of costs within

14  fourteen days after the entry of judgment.  See CA CD L.R. 54-2.

15                                      **4.      Post-Judgment Interest**

16           In addition, plaintiffs request post-judgment interest.  An award of post-judgment interest is

17  mandatory.  See *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013) ("Under 28 U.S.C. § 1961,

18  the award of post judgment interest on a district court judgment is mandatory").  Post-judgment interest

19  accrues at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by

20  the Board of Governors of the Federal Reserve System, for the calendar week preceding this judgment.

21  28 U.S.C. § 1961(a).  See also *Trs. of S. Cal. IBEW-NECA Pension Plan v. Alarm Tech Security Sys.,*

22  *Inc.*, No. CV 08-3432 PSG (PJWx), 2008 WL 4196627, *6 (C.D. Cal. Sept. 8, 2008) ("Plaintiffs are

23  entitled to interest 'at a rate equal to the weekly average 1-year constant maturity Treasury yield, as

24  published by the Board of Governors of the Federal Reserve System, for the calendar week

25  preceding,'" quoting *Bd. of Trs. of Laborers Health & Welfare Trust Fund For N. Cal. v. Shade*

26  *Constr. & Eng'g*, No. C 06-6830, 2007 WL 3071003, *11 (N.D. Cal. Oct. 19, 2007)).  The rate for

27  the week ending November 27, 2015 was 0.51%.  The court will therefore award post-judgment

28  interest at that rate from and after December 7, 2015.

### III.  CONCLUSION

For the reasons stated, the court grants plaintiffs' motion for default judgment.  The court will award $55,460,691 in copyright and trademark damages, and enter a permanent injunction precluding further copyright and trademark infringement by defendants.  The court directs plaintiffs to file a declaration stating the hourly rates of the attorneys who have worked on this matter and the number of hours expended litigating matters related to the liability of CNT and HYIT.  This declaration must be filed no later than **December 11, 2015**.

DATED: December 7, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE